## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| MILTON MILLS, M.D., RASHID GHOLSON, HUA-WEI CHERNG, NORMA HUMPHRIES, LYNETTE GARNER, DARRELL BRANSOME, PAUL MILLER, GLENDA COSTNER, SYBIL HAROLD, ELIZABETH RUSSELL, for themselves and on behalf of all other District of Columbia residents similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>GIANT OF MARYLAND, LLC, SAFEWAY INC., HORIZON ORGANIC, DEAN FOODS CO., NESTLE HOLDINGS, INC., FARMLAND DAIRIES, LLC, SHENANDOAH'S PRIDE, LLC, STONYFIELD FARM, INC., CLOVERLAND FARMS DAIRY, INC.,<br><br>Defendants. | Case No.: 05-CV-2211 (HHK)<br><br><br>**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS** |

## MEMORANDUM OF LAW IN SUPPORT OF MOTION TO DISMISS OF DEFENDANTS GIANT OF MARYLAND, LLC, SAFEWAY, INC., HORIZON ORGANIC HOLDING CORPORATION, DEAN FOODS COMPANY, NESTLE HOLDINGS, INC., FARMLAND DAIRIES, LLC, SHENANDOAH'S PRIDE, LLC AND STONYFIELD FARM, INC.

Steven J. Rosenbaum (D.C. Bar No. 331728)
Derron J. Blakely (D.C. Bar No. 483733)
Nadia I. Shihata (D.C. Bar No. 493448)
COVINGTON & BURLING
1201 Pennsylvania Ave., N.W.
Washington, D.C. 20004
(202) 662-6000

Attorneys for Defendants Giant Of Maryland, LLC, Safeway Inc., Horizon Organic Holding Corporation, Dean Foods Company, Nestle Holdings, Inc., Farmland Dairies, LLC, Shenandoah's Pride, LLC, and Stonyfield Farm, Inc.

**TABLE OF CONTENTS**

I.      BACKGROUND ................................................................................. 1

II.     PLAINTIFFS' CLAIMS ARE EXPRESSLY PREEMPTED BY THE FEDERAL
        FOOD, DRUG & COSMETICS ACT ................................................................. 5

        A.    Milk Is The Subject Of A Standard Of Identity ........................................ 5

        B.    A State May Not Impose Labeling Requirements In Addition To Those
              Set Forth In A Standard Of Identity ................................................... 5

        C.    Plaintiffs' Statements Do Not Constitute Warning Statements About Safety
              And Therefore Do Not Fall Under The FD&C Act's Exception To
              Preemption. ......................................................................... 11

III.    PLAINTIFFS' REQUESTED RELIEF IS PREEMPTED BECAUSE IT WOULD
        STAND AS AN OBSTACLE TO THE ACCOMPLISHMENT OF IMPORTANT
        FEDERAL OBJECTIVES. ........................................................................ 17

        A.    Congress Has Manifested A Clear Objective Of Promoting Milk
              Consumption, Which Plaintiffs' Proposed Labeling Is Openly Designed to
              Undercut. ........................................................................... 18

        B.    The Federal Government Has Determined That Lactose Labeling Is
              Inappropriate. ...................................................................... 21

        C.    Plaintiffs' Lawsuit Frustrates The Federal Government's Objectives
              Regarding Warning Statements For Food Products ........................................ 22

IV.     ASSUMING *ARGUENDO* THAT PLAINTIFFS' LAWSUIT IS NOT
        PREEMPTED, THE DOCTRINE OF PRIMARY JURISDICTION DICTATES
        THAT THE ISSUES RAISED IN THIS LAWSUIT BE REFERRED TO THE FDA.... 25

        A.    FDA Is The Preeminent Organization Responsible For Ensuring The
              Safety Of The Nation's Food Supply And Unquestionably Has The
              Authority, Experience, And Expertise Necessary To Address Plaintiffs'
              Claims. ............................................................................. 26

        B.    The Complaint Raises Issues Not Within The Conventional Expertise
              Of Judges And Requiring The Exercise Of Agency Discretion. .......................... 30

        C.    A Failure To Dismiss This Lawsuit Would Present A Substantial Risk Of
              Inconsistent Rulings ................................................................ 33

V.      DEFENDANTS HAVE NO DUTY TO WARN UNDER D.C. TORT LAW ................ 34

VI.     THE NAMED PLAINTIFFS HAVE NOT STATED A PROPER CLAIM FOR
        INJUNCTIVE RELIEF .......................................................................... 37

VII.    THE RELIEF PLAINTIFFS SEEK WOULD VIOLATE THE DISTRICT OF
        COLUMBIA SELF-GOVERNMENT AND GOVERNMENTAL
        REORGANIZATION ACT. ....................................................................... 38

CONCLUSION ........................................................................................ 41

# TABLE OF AUTHORITIES

## FEDERAL CASES

*APCC Servs., Inc. v. WorldCom, Inc.*,
  305 F. Supp. 2d 1 (D.D.C. 2001) .................................................................................25

*A.W. Chesterton Co. v. Chesterton*,
  128 F.3d 1 (1st Cir. 1997).............................................................................................37

*Alberta Gas Chem., Ltd. v. Celanese Corp.*,
  650 F.2d 9 (2d Cir. 1981) .............................................................................................32

*Allnet Communication Service, Inc. v. Nat'l Exchange Carrier Ass'n*,
  965 F.2d 1118 (D.C. Cir. 1992).........................................................................25, 26, 33

*Anheuser-Busch, Inc. v. Schmoke*,
  63 F.3d 1305 (4th Cir. 1995), *affirmed after remand by* 101 F.3d 325 (4th Cir.
  1996) ...............................................................................................................................2

*Arkansas Elec. Co-op Corp. v. Arkansas P.S.C.*,
  461 U.S. 375 (1983).....................................................................................................22

*Astoria Federal Sav. & Loan Ass'n v Solimino*,
  501 U.S. 104 (1991)....................................................................................................2, 3

*Banks v. Multi-Family Management, Inc.*,
  554 F.2d 127 (4th Cir. 1977) .......................................................................................38

*Banner v. United States*,
  2005 WL 2897351 (D.C. Cir. Nov. 4, 2005) ...............................................................39

*Barnett Bank of Marion County, N.A. v. Nelson*,
  517 U.S. 25 (1996).........................................................................................................7

*Bernhardt v. Pfizer, Inc.*,
  No. 00 CIV 4042, 2000 WL. 1738645 (S.D.N.Y. Nov. 22, 2000) ...................................32

*Bonito Boats, Inc. v. Thunder Craft Boats, Inc.*,
  489 U.S. 141 (1989)................................................................................................20, 21

*Bradley v. Weinberger*,
  483 F.2d 410 (1st Cir. 1973).........................................................................................32

*Cipollone v. Liggett Group, Inc.*,
  505 U.S. 504 (1992).................................................................................................7, 40

*City of New York v. FCC*,
    486 U.S. 57 (1988)...........................................................................................17

*Continental Airlines, Inc. v. United Air Lines, Inc.*,
    120 F. Supp. 2d 556 (E.D. Va. 2000) ...........................................................30

*Continental Seafoods, Inc. v. Schweiker*,
    674 F.2d 38 (D.C. Cir. 1982) ........................................................................16

*Cook Family Foods, Ltd. v. Voss*,
    781 F. Supp. 1458 (C.D. Cal. 1991) .............................................................10

*Cruz v. American Airlines, Inc.*,
    356 F.3d 320 (D.C. Cir. 2004) ......................................................................38

*Dial A Car, Inc. v. Transportation, Inc.*,
    82 F.3d 484 (D.C. Cir. 1996) ........................................................................25

*Does I through III v. District of Columbia*,
    216 F.R.D. 5 (D.D.C. 2003)...........................................................................38

*Fidelity Federal Sav. & Loan Ass'n v. De la Cuesta*,
    458 U.S. 141 (1982).......................................................................................17

*Geier v. Am. Honda Motor Co.*,
    529 U.S. 861 (2000).......................................................................................24

*Goya De Puerto Rico, Inc. v. Santiago*,
    59 F. Supp. 2d 274 (D. P.R. 1999).................................................................9

*Greater Washington Bd. Of Trade v. District Of Columbia*,
    948 F.2d 1317 (D.C. Cir. 1991), *aff'd*, 506 U.S. 125 (1992) ...................6, 7

*Grocery Manufacturers of America, Inc. v. Gerace*,
    755 F.2d 993 (2d Cir. 1985), *aff'd*, 474 U.S. 801 (1985)..............................10

*Ingersoll-Rand Co. v. McClendon*,
    498 U.S. 133 (1990).........................................................................................7

*Jones v. Rath Packing Co.*,
    430 U.S. 519 (1977)......................................................................................7, 8

*Kraft Foods North America, Inc. v. Rockland County Dep't of Weights and Measures*,
    No. 01 Civ. 6980 (WHP), 2003 WL 554796 (S.D.N.Y. Feb. 26, 2003)......7, 10

*Mack v. South Bay Beer Distribs., Inc.*,
  798 F.2d 1279 (9th Cir. 1986) ...................................................................2

*McCarthy v. Olin Corp.*,
  119 F.3d 148 (2d Cir. 1997)......................................................................34

*Nat'l Broiler Council v. Voss*,
  44 F.3d 740 (9th Cir. 1994) ...................................................................9, 10

*Nat'l Communications Ass'n v. Am. Tel. & Tel. Co.*,
  46 F.3d 220 (2d Cir. 1995)..........................................................................2

*Norfolk & Western Railway Co. v. Public Utilities Commission of Ohio*,
  926 F.2d 567 (6th Cir. 1991) ...................................................................24

*Northwestern Selecta, Inc. v. Munoz*,
  106 F. Supp. 2d 223 (D. P.R. 2000).......................................................9, 10

*Pelman v. McDonald's Corp.*,
  237 F. Supp. 2d 512 (S.D.N.Y. 2003).......................................................35

*Pepsi-Cola Bottling Co. of Pittsburg, Inc. v. Pepsico, Inc.*,
  175 F. Supp. 2d 1288 (D. Kan. 2001) .......................................................37

*Pharmaceutical Research & Mfrs. of America v. Walsh*,
  538 U.S. 644 (2003)...................................................................................25

*Plummer v. American Institute of Certified Public Accountants*,
  97 F.3d 220 (7th Cir. 1996) .......................................................................37

*Public Citizen v. Foreman*,
  471 F. Supp. 586 (D.D.C. 1979) ...............................................................32

*Reiter v. Cooper*,
  507 U.S. 258 (1993)..............................................................................25, 26

*Sandoz Pharmaceuticals Corp. v. Richardson-Vicks, Inc.*,
  902 F.2d 222 (3d Cir. 1990) ......................................................................32

*In re Sealed Case*,
  67 F.3d 965 (D.C. Cir. 1995) .....................................................................34

*Shield v. Zuccarini*,
  254 F.3d 476 (3d Cir. 2001).......................................................................37

*Syntek Semiconductor Co., Ltd. v. Microchip Technology Inc.*,
    307 F.3d 775 (9th Cir. 2002) ........................................................26

*Techworld Dev. Corp. v. D.C. Preservation League*,
    648 F. Supp. 106 (D.D.C. 1986) ................................................39

*Texas & Pac. Ry. Co. v. Abilene Cotton Oil Co.*,
    204 U.S. 426 (1907)....................................................................33

*Thompson v. Texas Mexican Ry. Co.*,
    328 U.S. 134 (1946)....................................................................33

*Troy Corp. v. Browner*,
    120 F.3d 277 (D.C. Cir. 1997) ...................................................30

*United Distribution Cos. v. F.E.R.C.*,
    88 F.3d 1105 (D.C. Cir. 1995) .............................................17, 20

*United States ex rel. Taylor v. Gabelli*,
    345 F. Supp. 2d 340 (S.D.N.Y. 2004)..........................................2

*United States v. An Article of Device . . . 27 Diapulse*,
    650 F.2d 908 (7th Cir. 1981) ......................................................29

*United States v. Anderson Seafoods, Inc.*,
    622 F.2d 157 (5th Cir. 1980) ......................................................16

*United States v. Articles of Food and Drug*,
    444 F. Supp. 266 (E.D. Wis. 1977)............................................16

*Weinberger v. Bentex Pharm., Inc.*,
    412 U.S. 645 (1973)....................................................................30

*Western Pac. R.R. Co.*,
    352 U.S. at 64.............................................................................25

*Williams v. Nat'l R.R. Passenger Corp.*,
    392 F. Supp. 2d 790 (E.D. Tex. 2005)........................................24

*Williams Pipe Line Co. v. Empire Gas  Corp.*,
    76 F.3d 1491 (10th Cir. 1996) ...................................................31

*Wisconsin Gas Co. v. FERC*,
    758 F.2d 669 (D.C. Cir. 1985) ...................................................37

*Young v. Community Nutrition Inst.*,
    476 U.S. 974 (1986) ..................................................................................................16

## STATE CASES

*Allen v. Grafton*,
    164 N.E.2d 167 (Ohio 1960) ....................................................................................35

*Delahanty v. Hinckley*,
    564 A.2d 758 (D.C. 1989) ........................................................................................35

*District of Columbia v. Greater Washington Central Labor Council*,
    442 A.2d 110 (D.C. 1982) ........................................................................................39

*East Penn Mfg. Co. v. Pineda*,
    578 A.2d 1113 (D.C. 1990) ......................................................................................34

*Friedman v. Merck & Co.*,
    107 Cal. App. 4th 454 (Cal. Ct. App. 2003) ...........................................................34

*Heller v. Coca-Cola Co.*,
    230 A.D.2d 768 (N.Y. App. Div. 1996) .............................................................32, 33

*McConnell v. United States*,
    537 A.2d 211 (D.C. 1988) ..................................................................................39, 40

*Strauss v. Belle Realty Co.*,
    482 N.E.2d 34 (N.Y. 1985) ......................................................................................34

*Zhou v. Jennifer Mall Restaurant*,
    534 A.2d 1268 (D.C. 1987) ......................................................................................34

## FEDERAL STATUTES

5 U.S.C. §§ 704, 706 ............................................................................................................29

7 U.S.C. § 4504(b) ...............................................................................................................19

21 U.S.C. § 321(n) ...............................................................................................................28

21 U.S.C. § 341 ......................................................................................................................5

21 U.S.C. § 342 ...............................................................................................................15, 16

21 U.S.C. § 343-1 ................................................................................................6, 9

21 U.S.C. § 348................................................................................................11, 14

21 U.S.C. § 372(a) ...............................................................................................28

21 U.S.C. § 467e...................................................................................................9

21 U.S.C. § 601 *et seq*.........................................................................................8

District of Columbia Self-Government and Governmental Reorganization Act,
    Pub. L. No. 93-198, 87 Stat. 774 (1973)...............................................38

Food Allergen Labeling and Consumer Protection Act of 2004,
    Title II, Pub. L. No. 108-282, 118 Stat. 905 (2004)..............................37

Food Drug and Cosmetic Act, 21 U.S.C. § 301 *et seq* ......................................26

Fluid Milk Promotion Act of 1990, 7 U.S.C. § 6401 *et seq* ....................2, 18, 19

Nutrition Labeling and Education Act, Pub. L. No. 101-535, 104 Stat. 2353 (1990) .............11, 17

The Dairy Production Stabilization Act of 1983, 7 U.S.C. § 4501 *et seq* ....................18

U.S. Const. art. I, § 8, cl. 17.................................................................................39

U.S. Const. art. VI, cl. 2.......................................................................................6

## FEDERAL REGULATIONS

7 C.F.R. §§ 1160.209(d), 1160.111 ....................................................................19

7 C.F.R. Part 1150 .........................................................................................18, 19

21 C.F.R. Part 131................................................................................................5, 8

21 C.F.R. § 100.1(c)(4)........................................................................................6, 8

21 C.F.R. § 101.17(d) ..........................................................................................15

21 C.F.R. § 10.25(b) ............................................................................................29

21 C.F.R. § 10.30(b) ............................................................................................28

21 C.F.R. § 10.33(b) ............................................................................................28

21 C.F.R. § 1.21(b) ...........................................................................................................28

21 C.F.R. § 170.3(i) ..........................................................................................................11

21 C.F.R. § 70.3(i) ............................................................................................................11

21 C.F.R. § 7.45 ................................................................................................................28

21 C.F.R. § Part 100 *et seq* ..............................................................................................26

39 Fed. Reg. 27317 (July 26, 1974) .................................................................................14

44 Fed. Reg. 37212 (June 26, 1979) ................................................................................14

49 Fed. Reg. 13679 (Apr. 6, 1984) ..................................................................................15

56 Fed. Reg. 28592 (June 21, 1991) .................................................................14, 22, 31

56 Fed. Reg. 60689 (Nov. 27, 1991) ...............................................................................13

57 Fed. Reg. 22984 (May 29, 1992) ................................................................................16

58 Fed. Reg. 2302 (Jan. 6, 1993) .....................................................................................21

58 Fed. Reg. 2850 (Jan. 6, 1993) .....................................................................14, 21, 22, 30

59 Fed. Reg. 51030 (Oct. 6, 1994) ..................................................................................15

61 Fed. Reg. 3118 (Jan. 30, 1996) .......................................................................11, 12, 13

65 Fed. Reg. 64954 (Oct. 31, 2000) ................................................................................11

65 Fed. Reg. 76092 (Dec. 5, 2000) .................................................................................15

68 Fed. Reg. 46364 (Aug. 5, 2003) ...................................................................14, 23, 31

68 Fed. Reg. 46403 (Aug. 5, 2003) .................................................................................13

## LEGISLATIVE MATERIALS

119 Cong. Rec. 22,947 (1973) .........................................................................................39

H.R. Rep. No. 85-2284 (1958) .........................................................................................12

H.R. Rep. No. 101-538 (1990) ............................................................................21

H.R. Rep. No. 108-608 (2004) ...........................................................................37

S. Rep. No. 101-84 (1989) .................................................................................27

## MISCELLANEOUS

FDA, *Center for Food Safety and Applied Nutrition Overview* (Feb. 2001) ...........................27,28

FDA, *Public Meeting on the Challenge of Labeling Food Allergens* (Aug. 13, 2001) ................29

FDA, *Food Allergen Awareness: An FDA Priority* (2001) ..........................................29

FDA, *Guideline for Industry:  Questions and Answers Regarding Food Allergens,
      Including the Food Allergen Labeling and Protection Act of 2004* (Oct. 5, 2005) ..........29

Peter Barton Hutt, *Symposium on the History of Fifty Years of Food Regulation Under
      the Federal Food, Drug, and Cosmetic Act: A Historical Introduction*, 45 Food
      Drug Cosm. L.J. 17, 18 (1990) ........................................................26

National Institute of Allergy and Infectious Disease, *Food Allergy: An Overview*
      (Jul. 2004) ...........................................................................35

NDIC, *Gas in the Digestive Tract* (Mar. 2004) ....................................................35

Restatement (Second) of Torts § 402A, comment i (1965) ........................................35

USDA & HHS, *Dietary Guidelines for Americans* (2005) .........................................19

Defendants Giant Of Maryland, LLC, Safeway Inc., Horizon Organic Holding Corporation, Dean Foods Company, Nestle Holdings, Inc., Farmland Dairies, LLC, Shenandoah's Pride, LLC, and Stonyfield Farm, Inc. (collectively "Defendants") submit this memorandum in support of their motion to dismiss Plaintiffs' complaint.

## I.    Background

This putative class action lawsuit was filed by ten named Plaintiffs through their counsel the Physicians Committee for Responsible Medicine ("PCRM").  Claims are asserted against seven dairy processors and two grocery store retailers on behalf of "all lactose intolerant persons who, unaware of their condition, purchased milk in Washington, D.C., and suffered the consequences of its consumption."  (Compl. ¶ 29.)  The Complaint alleges that the "majority of the residents of the District of Columbia are lactose intolerant" and that "the class numbers in the hundreds of thousands."  (*Id.*)

The Complaint seeks an injunction barring Defendants from selling milk without "warnings such as the following" on each and every carton of milk sold in the District:

**WARNING -- IF YOU EXPERIENCE DIARRHEA OR STOMACH CRAMPS AFTER CONSUMING MILK, YOU MAY BE LACTOSE INTOLERANT. CHECK WITH YOUR PHYSICIAN**

**WARNING -- LACTOSE INTOLERANT INDIVIDUALS MAY EXPERIENCE BLOATING, DIARRHEA, OR OTHER GASTROINTESTINAL DISCOMFORT FROM CONSUMING MILK.  CHECK WITH YOUR PHYSICIAN.**

(Compl. ¶ 69.)

In attempting to justify this relief, the Complaint openly challenges the United States government's endorsement of milk consumption as an important component of sound diet and nutrition.  The Complaint alleges that "the scope of the [lactose intolerance] problem has been covered up by the milk industry and *government's marketing efforts,*" and that "the industry's milk marketing campaign, *combined with government support of milk*, gives the false

impression that cows' milk is a necessary part of a healthy diet, for both children and adults." *Id.* ¶ 6 (emphasis added); *see also id.* ¶ 50 (consumers are "bombarded by the milk-promoting messages *of the federal government* and by the dairy industry…") (emphasis added).)

Accordingly, whereas the United States Congress has explicitly found that "fluid milk products are basic foods and are a primary source of required nutrients such as calcium, and otherwise are a valuable part of the human diet" (7 U.S.C. § 6401(a)(1)), PCRM and the Plaintiffs contend that "a diet free of dairy products is healthier for children and adults" and that "cows' milk consumption causes a host of problems that make it anything but a healthy beverage." (Compl. ¶¶ 7, 11; *see also id.* ¶ 36 ("Aside from humans, no mammalian species drinks…the milk of another species").)

Groups composed of doctors concerned about minority health have taken a far different stance than Plaintiffs' on the subject of milk consumption. For example, the National Medical Association ("NMA") is the nation's largest and oldest organization addressing the health issues affecting African American and underserved populations, and represents the interests of more than 30,000 physicians primarily of African descent in more than 25 medical specialties. NMA issued a Report in December 2004 encouraging 3-4 servings of lowfat dairy a day for all African Americans to reduce chronic disease risk. http://www.nmanet.org/pr_120704.htm. [1]

---

[1]    A court considering a primary jurisdiction motion is permitted to consider matters outside the pleadings in deciding the motion. *United States ex rel. Taylor v. Gabelli*, 345 F. Supp. 2d 340, 351-52 n.49 (S.D.N.Y. 2004) (citing *Nat'l Communications Ass'n v. Am. Tel. & Tel. Co.*, 46 F.3d 220, 222-23 (2d Cir. 1995) (considering parties' affidavits in reviewing district court's primary jurisdiction decision)).

In addition, courts may consider matters of public record without converting a motion to dismiss into one for summary judgment. *Anheuser-Busch, Inc. v. Schmoke*, 63 F.3d 1305, 1312 (4th Cir. 1995), *affirmed after remand by* 101 F.3d 325 (4th Cir. 1996). Courts thus "may take (continued…)

According to the NMA Report, "The vast majority of African Americans (86 percent) get only about half of the daily recommended amount of calcium and only half eat one or more servings of dairy a day.  Of particular concern, 83 percent of African-American children (ages 2-17) are not getting enough calcium."  *Id.*  The NMA also cited new study data showing that the majority of African Americans do not classify themselves as lactose intolerant and that "lactose intolerance doesn't mean dairy intolerance."  *Id.*

NMA "recommend[s] that you find the dairy options that work best for you. Everyone could try a smaller glass of milk with food or enjoy an aged cheese like Swiss that is naturally low in lactose."  *Id.*  "At home, parents have a great opportunity to be positive role models and reverse the trend of low calcium intake among African-American kids, as parents who drink milk have kids who drink milk."  *Id.*

The vehemence of Plaintiffs' objections to milk consumption is explained by the nature of the entity through which this lawsuit is brought, PCRM.  PCRM solicited individuals to become plaintiffs in this lawsuit through advertisements posted in the Metro system and on PCRM's own Website.  (Decl. of R. Douglas Rhoads ¶¶ 23, 24.)   While ostensibly an organization comprised of "physicians" with an interest in "responsible medicine," fewer than five percent of PCRM's members are physicians, and PCRM's interest is not "responsible medicine" but an "animal rights" agenda under which no animals or animal products are consumed and no animals are used in medical research.  (*Id.* ¶¶ 7-9.)

---

judicial notice of 'records and reports of administrative bodies.'"  *Mack v. South Bay Beer Distribs., Inc.*, 798 F.2d 1279, 1282 (9th Cir. 1986), *abrogated on other grounds by Astoria Federal Sav. & Loan Ass'n v Solimino*, 501 U.S. 104 (1991).

PCRM's activities have thus routinely brought it in conflict with medical researchers, *see* Letter from James S. Todd, Executive Vice President of the American Medical Association to Neal Barnard, President of PCRM, of 7/26/90, at 2 ("[T]he American Medical Association calls upon the Physicians Committee for Responsible Medicine to immediately terminate the inappropriate and unethical tactics your organization uses to manipulate public opinion."), and PCRM has engaged in numerous attacks on the dairy industry, *e.g.,* testimony to the federal Food and Drug Administration claiming that cheese is "dairy crack" and "heroin on a cracker;" letter from PCRM to the U.S. Senate (expressing "deep concern over [the] proposal to put milk vending machines in school hallways"); *see also* Statement by PCRM spokesman Jerry Vlasak (advocating the assassination of medical researchers conducting animal experiments). (Rhoads Decl. ¶¶ 10, 11, 13.)

The Complaint sets forth two counts, one a common law claim for negligent failure to warn causing personal injury, and the other a common law product liability claim for personal injury. (Compl. ¶¶ 52-69.)   The Complaint seeks monetary damages for the named Plaintiffs in an amount less than $100,000, and as noted, "a permanent injunction requiring defendants to place warning labels on all packaging of milk sold in the District of Columbia, notifying consumers that the contents may sicken them."  (*Id.* ¶ 8.)

The instant complaint should be dismissed on six independent grounds.  First, the warnings Plaintiffs request are preempted by the express preemption provisions of the Federal Food, Drug and Cosmetics Act ("FD&C Act").  Second, Plaintiffs' warnings are preempted because they stand as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress with respect to the encouragement of milk consumption and the avoidance of excessive consumer warnings.   Third, even if Plaintiffs' claims were not

preempted, the doctrine of primary jurisdiction dictates that they be referred to the federal agency tasked with determining appropriate food labeling, the federal Food and Drug Administration ("FDA").   Fourth, Plaintiffs have failed to state a valid common law claim for failure to warn.   Fifth, the named Plaintiffs have not stated a proper claim for injunctive relief. Sixth, the relief Plaintiffs seek would violate the D. C Home Rule Act.

## ARGUMENT

## II.     PLAINTIFFS' CLAIMS ARE EXPRESSLY PREEMPTED BY THE FEDERAL FOOD, DRUG & COSMETICS ACT.

### A.     Milk Is The Subject Of A Standard Of Identity.

FD&C Act Section 401, 21 U.S.C. § 341, provides for the promulgation of federal "regulations fixing and establishing for any food…a reasonable definition and standard of identity."   Since passage of the FD&C Act in 1938, FDA has adopted standards of identity for a number of discrete foods.   These standards, which appear in Parts 131 to 169 of Chapter 21 of the Code of Federal Regulations, typically define the permissible composition of the food, prescribe a method of production or formulation, assign names under which conforming products shall be sold, *and* prescribe the labeling requirements applicable to the food.

The very first standard of identity set forth in FDA regulations is that for "Milk and Cream." 21 C.F.R. Part 131.   The Milk and Cream standard sets forth the compositional and labeling requirements applicable to milk and several other dairy-derived products such as cream, eggnog and yogurt.  *Id.*

### B.     A State May Not Impose Labeling Requirements In Addition To Those Set Forth In A Standard Of Identity.

In 1990, Congress explicitly accorded FDA's standards of identity preemptive effect.   The Nutritional Labeling & Education Act of 1990 ("NLEA") added section 403A to the FD&C Act, which provides, *inter alia*, that "no State or political subdivision of a State may

directly or indirectly establish…(1) any requirement for a food which is the subject of a standard of identity established under section 401 of this title that is not identical to such standard of identity." 21 U.S.C. § 343-1.

Under FDA's implementing regulations, the prohibition against state law requirements "not identical to" the federal standards of identity extends to any state requirement that—

> directly or indirectly imposes obligations or contains provisions concerning the composition *or labeling of food*…that:
>
> (i) Are not imposed by or contained in the applicable provision (including any implementing regulation) of section 401 or 403 of the [FD&C Act]; or
>
> (ii) Differ from those specifically imposed by or contained in the applicable provision (including any implementing regulation) of section 401 or 403 of the act. 21 C.F.R. § 100.1(c)(4) (2005) (emphasis added).

Section 403A contains an exception that gives States the right to petition FDA to exempt certain non-identical state and local requirements from preemption. 21 U.S.C. § 343-1(b). Such petitions will be granted if the state or local law: "(1) would not cause [the] food to be in violation of … federal law, (2) would not unduly burden interstate commerce, and (3) is designed to address a particular need for information which was not met by" the federal standard of identity or any of the other labeling requirements, such as those pertaining to nutrition labeling (which also come within the purview of section 401A(a)). *Id.* The District has never sought or been granted an exemption pursuant to these procedures with respect to milk labeling.

The Supremacy Clause of the United States Constitution provides that "the Laws of the United States…shall be the Supreme Law of the Land." U.S. Const. art. VI, cl. 2. The Supremacy Clause "invalidates state laws 'that interfere with, or are contrary to the laws of Congress.'" *Greater Washington Bd. Of Trade v. District Of Columbia*, 948 F.2d 1317, 1320

- 6 -

(D.C. Cir. 1991), *aff'd*, 506 U.S. 125 (1992) (citations omitted).  Preemption "may be either express or implied, and [it] is compelled whether Congress' command is explicitly stated in the statute's language or implicitly contained in its structure and purpose." *Id.* (internal quotation marks and citations omitted).

Whether a Court should construe a federal statute to displace a particular state law is a question of congressional intent.  *Barnett Bank of Marion County, N.A. v. Nelson*, 517 U.S. 25, 31 (1996).  When Congress has expressly included a broadly worded pre-emption provision in a statute, the "task of discerning congressional intent is considerably simplified." *Ingersoll-Rand Co. v. McClendon*, 498 U.S. 133, 138 (1990).  Where Congress has broadly preempted state law "requirements," that preemption invalidates requirements sought to be imposed by statute or regulation or under common law, including through damages actions alleging a purported failure to warn.  *E.g., Cipollone v. Liggett Group, Inc.*, 505 U.S. 504, 521 (1992) ("the phrase '[n]o requirement or prohibition' sweeps broadly and suggests no distinction between positive enactments and common law; to the contrary, those words easily encompass obligations that take the form of common-law rules.").

Section 403A of the FD&C Act clearly and explicitly provides for federal preemption of state law requirements.  It prohibits any "State or political subdivision of a State [from] directly or indirectly establish[ing]…(1) any requirement for a food which is the subject of a standard of identity established under section 401 that is not identical to such standard of identity…."  Language such as this has "explicit preempt[ive]" effect.  *Jones v. Rath Packing Co.*, 430 U.S. 519, 530 (1977); *accord Kraft Foods North America, Inc. v. Rockland County Dep't of Weights and Measures*, No. 01 Civ. 6980 (WHP), 2003 WL 554796, at * 5 (S.D.N.Y. Feb. 26, 2003) (interpreting and applying the 1990 amendments to the FD&C Act).

By its plain terms, Section 403A(a)(1) prohibits the District from directly or indirectly imposing any requirements for milk that are not identical to the standard of identity in 21 C.F.R. Part 131, unless the District obtains an exemption from FDA.  As noted at p. 7, state requirements are not "identical to" a federal standard of identity if they "[a]re not imposed by or contained in" the standard, or if they "[d]iffer from those specifically imposed by or contained in" the standard.  *See* 21 C.F.R. 100.1(c)(4).  The labeling requirements Plaintiffs seek clearly are not identical to the Standard of Identity for milk under this test.

Under the Supremacy Clause, Plaintiffs accordingly may not seek to impose the labeling requirements they desire.  That principle governed the Supreme Court's disposition in *Jones v. Rath Packing*.  There, the controversy surrounded a California statute and regulation pertaining to the labeling of the weight of packaged meats that differed in one respect from a federal regulation implementing the Federal Meat Inspection Act ("FMIA"), as amended, 21 U.S.C. § 601 *et seq*.  Whereas the federal regulation made allowance for variations in package weight cause by manufacturing deviations *and* moisture loss during good distribution practice, the California requirement permitted only manufacturing deviations, not moisture losses.  The Court held that section 408 of FMIA, which proscribes States from imposing marking, labeling, packaging, or ingredient requirements "in addition to, or different than," those made under the Act, dictated the result: because the California requirement did not include allowance for moisture loss, it was "different than" the federal requirement, and preempted.  430 U.S. at 530-31.

Here, because Plaintiffs would impose a mandatory labeling requirement where the federal regulation does not, it is preempted, like the California law in *Jones v. Rath Packing*.  The FD&C Act provision forbidding state requirements that are "not identical" to those set forth

in the standards of identity is legally indistinguishable from the language interpreted in *Jones v. Rath Packing* to convey a clear congressional intent to supplant inconsistent state regulation. *See Nat'l Broiler Council v. Voss*, 44 F.3d 740, 744-45 (9th Cir. 1994) (comparing nearly ten federal preemption statutory provisions and concluding that "there is no indication…that Congress intends substantive differences to flow from minor wording changes [*e.g.,* use of 'in addition to, or different than' rather than 'not identical to'] in [the] various [operative] clauses").

Other precedents in addition to *Jones v. Rath Packing* dictate that Plaintiffs' claims are preempted.  In *Goya De Puerto Rico, Inc. v. Santiago*, 59 F. Supp. 2d 274 (D. P.R. 1999), the court addressed whether a requirement of the Puerto Rico Department of Agriculture for the labeling of pigeon peas fell afoul of the preemptive provisions of 21 U.S.C. § 343-1(a)(2), a provision of the FD&C Act that is a sister to the one at issue here, 21 U.S.C. § 343-1(a)(1). Section 343-1(a)(2) forbids States from adopting labeling requirements that are "not identical to" the labeling requirements in section 403(e) of the FD&C Act.  The Puerto Rican regulation required that the name and address of both the canner *and* the importer be printed on the label, whereas FD&C Act section 403(e) gives businesses discretion to choose whether to include on the label the name and place of business of the importer, packer, *or* distributor.  59 F. Supp. 2d at 280.  In light of this difference, the court had little difficulty  holding the Puerto Rican law preempted, since the federal law "was quite clear about the kind of information that state labeling laws could require."  *Id.*  Precisely the same reasoning applies to this case.

In *Northwestern Selecta, Inc. v. Munoz*, 106 F. Supp. 2d 223 (D. P.R. 2000), the court considered whether a different provision of Puerto Rico law was preempted by section 467e of the Poultry Products Inspection Act ("PPIA"), 21 U.S.C. § 467e, which forbids any "[m]arking, labeling, packaging, or ingredient requirements" imposed by any State, Territory, or

the District of Columbia that is "in addition to, or different than," federal requirements imposed

under the PPIA.  Puerto Rico regulations required persons importing poultry into the jurisdiction

to obtain certificates from establishments operating under USDA's poultry inspections service

that showed the date the products were inspected.  The U.S. Secretary of Agriculture, however,

had promulgated regulations specifying an exact legend that certificates were required to bear,

which did not include the date of inspection.  The court held that the Puerto Rican regulation

imposed a "marking requirement" in addition to those demanded by federal law, and was

therefore preempted by section 467e.  *Munoz*, 106 F. Supp. 2d at 231.

Other courts faced with nearly identical issues have reached the same results.

*See*, *e.g.*, *Grocery Manufacturers of America, Inc. v. Gerace*, 755 F.2d 993, 1002-03 (2d Cir.

1985) (New York law mandating the precise size of letters in, and relative location of, the word

"imitation" on package labels held preempted, because it did not "comport exactly" with the

federal labeling specifications regarding the size and placement of this term that were established

under the FMIA and PPIA), *aff'd*, 474 U.S. 801 (1985); *Nat'l Broiler Council v. Voss*, 44 F.3d

740, 744-45 (9th Cir. 1994) (California regulation prohibiting poultry products to be labeled as

"fresh" if stored at temperatures below 26 degrees preempted where federal regulations

promulgated under the PPIA permitted such labeling); *Cook Family Foods, Ltd. v. Voss*, 781 F.

Supp. 1458, 1468 (C.D. Cal. 1991) (California regulation of weight standards that provided for

optional consideration of reasonable moisture loss allowance held preempted where language of

the federal regulation explicitly stated that such allowances "*will* be recognized") (emphasis in

original); *Kraft Foods*, 2003 WL 554796, at *7 (New York's method of enforcing state food

regulations, which effectively imposed minimum weight requirements that differed from various

federal regulations, held displaced by the express preemption provisions of the Fair Packaging and Labeling Act, the FD&C Act, the PPIA, and the FMIA).

As with each of the cases cited above, the explicit preemption language in FD&C Act Section 403A unmistakably demonstrates that the labeling requirements that Plaintiffs seek to impose are preempted by the federal standard of identity for milk.

C. **Plaintiffs' Statements Do Not Constitute Warning Statements About Safety And Therefore Do Not Fall Under The FD&C Act's Exception To Preemption.**

The FD&C Act's sweeping preemption provision with respect to foods for which a standard of identity has been established (Section 403A) contains a narrow exception for "a warning concerning the safety of the food or component of the food."  NLEA § 6(c), Pub. L. No. 101-535, 104 Stat. 2353, 2364 (1990).  This exception does not apply to Plaintiffs' proposed labeling because as a matter of law, statements about gastrointestinal discomfort caused by lactose intolerance do not under the FD&C Act constitute "warning" statements about food "safety."

Under the FD&C Act, "safe" means a "reasonable certainty" of "no harm."  This definition is derived from the legislative history of the Food Additives Amendment of 1958 (*see, e.g.,* 61 Fed. Reg. 3118, 3119 (Jan. 30, 1996); 65 Fed. Reg. 64954, 64956 (Oct. 31, 2000)) and is specifically adopted in FDA's regulations for food and color additives.[2]  With the exception of certain substances such as food and color additives which must first be approved by FDA (*see* 21 U.S.C. §§ 348 and 379e), conventional foods such as milk are presumed to be *safe* and do not

---

[2]    *See* 21 C.F.R. § 170.3(i) (defining "safe" or "safety" to mean "that there is a reasonable certainty in the minds of competent scientists that the substance is not harmful under the intended conditions of use"); *see also* 21 C.F.R. § 70.3(i) (defining "safe" for color additives to mean that "there is convincing evidence that establishes with reasonable certainty that no harm will result from the intended use of the color additive").

require a safety review or approval before they may be marketed to the public. When the safety of a conventional food is questioned, the applicable standard is whether there is reasonable certainty that the food is not harmful.

Importantly, this safety standard does not require a demonstration of absolute harmlessness. *See* 61 Fed. Reg. at 3119 (citing H.R. Rep. No. 85-2284, at 4-5 (1958); S. Rep. No. 85-2422, at 2 (1958)). Rather, "harm" has been clearly defined and interpreted to mean "the capacity to *injure* or otherwise *damage* the health of individuals" *Id.* (emphasis added). More specifically, a food that is "harmful" is one that is "*hazardous* to the health of man or animal" (*id.* (emphasis added) (quoting H.R. Rep. No. 85-2284 at 4 (1958)) or can cause "*significant adverse health consequences.*" *Id.* at 3168 (emphasis added).

Even assuming *arguendo* for purposes of this motion only the accuracy of Plaintiffs' allegations, the "harm" allegedly caused by lactose intolerance includes diarrhea, stomach cramps, bloating, or other gastrointestinal discomfort. For purposes of food safety under the FD&C Act, "harm" simply does not include undesirable effects of this kind. FDA has specifically explained that "an effect is harmful if it affects health, not if it is simply an undesirable or unexpected effect that has no adverse health consequences." 61 Fed. Reg. at 3120.

The FD&C Act's definition of "safety" as *excluding* the specific physical effects identified by Plaintiffs with respect to milk was made explicit in FDA's review and approval of olestra, a food additive used to replace conventional fats and oils. Like the asserted effect of milk consumption for the lactose intolerant, the "consumption of olestra causes GI symptoms such as bloating, loose stools, abdominal cramps, and diarrhea-like symptoms." 61 Fed. Reg. at 3159. But FDA explicitly rejected the notion that such "an effect that is undesirable" constitutes

an effect that is "harmful or adverse," rising to the level of a "safety" concern.  Rather, "an effect

is harmful if it affects health, not if it is simply an undesirable or unexpected effect that has no

adverse health consequences."  FDA accordingly concluded that the effects of olestra did not

"represent adverse health consequences" and did not constitute "safety" concerns.  *Id.* at 3120,

3160, 3167, 3168.  "FDA finds no safety concerns with respect to the effect of olestra on the

[gastrointestinal] tract."  *Id.* at 3159.

        FDA's approval of olestra was questioned by public interest groups.  *See* 68 Fed.

Reg. 46403, 46407 (Aug. 5, 2003).  It was asserted that olestra-related effects have an "adverse

effect on people's lives and interfere with their daily activities."  *Id.* (quoting an objection by the

Center for Science in the Public Interest).  As FDA recognized, the core of this objection

concerned the meaning of "harm" for purposes of determining food "safety."  *Id.* at 46407-

46408.  The agency reiterated that, under the "safety" standard in the FD&C Act, "none of

[olestra's] effects is harmful to health."  *Id.* at 46408.

        FDA's olestra decision shows that the gastrointestinal effects purportedly caused

by milk consumption by the lactose intolerant do not constitute "safety" concerns under the

FD& C Act.  Indeed, FDA has characterized the effects of lactose intolerance merely as ones of

"discomfort."  *See* 56 Fed. Reg. 60689, 60698 (Nov. 27, 1991).[3]   A statement about the effects

---

[3]       Although FDA approved olestra based on a finding that its gastrointestinal effects were
not harmful, given that olestra was a newly created food additive unknown to the public, the
agency nevertheless temporarily required a label statement about olestra's gastro-intestinal
effects.  But this action was explicitly taken under FDA's powers to address matters *other* than
safety concerns, *see* 61 Fed. Reg. at 3159-3161 & n 83 (FDA is "not requiring the labeling of
olestra-containing foods in order to ensure the safe use of olestra"). As discussed above, FD&C
Act Section 403A's preemption provisions place limitations on a state that do not apply to FDA
itself, with the state's powers limited to "safety" issues as defined in the FD&C Act.  FDA later
withdrew the olestra labeling requirement, again emphasizing that the gastrointestinal effects of
(continued…)

of lactose intolerance therefore does not constitute a statement about "safety" as defined in the FD&C Act.    Accordingly, the Plaintiffs' statements do not fall within the "safety warning" exception to the express preemption provisions of Section 403A of the FD&C Act.

FDA's treatment of the "safety" of olestra is consistent with its longstanding application of its authority under Section 409(c)(1)(A) of the FD&C Act (21 U.S.C. § 348(c)(1)(A)) to prescribe the conditions of safe use of a food additive.    FDA has used that power to require a warning statement only when needed to address true "harm."    For example, in the case of aspartame, FDA required that all foods containing this food additive bear a prominent and conspicuous notice to phenylketonurics that the food contains L-phenylalanine, a substance which cannot be metabolized by such persons and poses a serious risk to health if ingested by them.    *See* 39 Fed. Reg. 27317, 27318 (July 26, 1974).    Similarly, in the approval of FD&C Yellow No. 5, FDA required that foods containing this color additive declare the presence of the additive in the ingredient list because FD&C Yellow No. 5 can cause "serious allergic-type responses" with "serious health implication[s]" in certain susceptible individuals.    *See* 44 Fed. Reg. 37212, 37213 (June 26, 1979).    *See generally* 58 Fed. Reg. 2850, 2872 (Jan. 6, 1993) (warning statements on food labels are not required "except in specific instances where there is scientifically based evidence of a potential *health hazard*") (emphasis added); *see also* 56 Fed. Reg. 28592, 28615 (June 21, 1991) ("FDA is unwilling to require a warning statement in the absence of clear evidence of a hazard.").

The purported gastrointestinal effects of milk for lactose intolerant consumers are fundamentally different from the safety concerns that result in safety warning statements.    For

---

olestra had never constituted a "safety" issue as defined under the FD&C Act.    68 Fed. Reg. 46364, 46385 n. 45 (Aug. 5, 2003).

example, certain protein products must bear a warning that very low calorie protein diets may cause serious illness or death. *See* 21 C.F.R. § 101.17(d). This warning is required based on FDA's conclusion that there is an association between very low calorie protein diets and sudden and unexpected deaths due to cardiac arrhythmias. *See* 49 Fed. Reg. 13679, 13680 (Apr. 6, 1984). Similarly, certain iron-containing dietary supplements must warn consumers that accidental overdose of iron-containing products is the leading cause of fatal poisoning in children under six years of age. *See* 21 C.F.R. § 101.17(e). Some of the health hazards of iron poisoning identified by the agency included kidney failure, edema in the lung, hemorrhage, coma from damage to the brain, and death. *See* 59 Fed. Reg. 51030, 51031 (Oct. 6, 1994). In another example, shell eggs are required to bear a "safe handling instruction" statement on their label to warn about the risks presented by eggs contaminated with *Salmonella Enteridis*. *See* 21 C.F.R. 101.17(h). This warning is intended to protect consumers from the risk of serious illness or death from consumption of raw or undercooked eggs. *See* 65 Fed. Reg. 76092, 76093 (Dec. 5, 2000). Other warning statements required by FDA caution consumers about unpasteurized juice posing risks of serious illness caused by pathogens (*e.g.*, *Escherichia coli* O157:H7, *Salmonella* species, *Cryptosporidium*, and *Vibrio cholerae*) (*see* 21 C.F.R. § 101.17(g)) and the risk of esophageal obstruction and asphyxiation from the ingestion psyllium husk without adequate liquids. 21 C.F.R. § 101.17(f).

FDA's definition of "safety" as a "reasonable certainty" of "no harm," where "harm" means a true health hazard, is also illustrated by the adulteration provisions in Section 402 of the FD&C Act. 21 U.S.C. § 342. This section demonstrates that food "safety" relates to whether the food contains poisonous or deleterious substances that are *injurious to health*; whether the food consists of any filthy, putrid, or decomposed substance, or is otherwise unfit for

food; whether the food was prepared, packed, or held under unsanitary conditions whereby it may have become contaminated with filth or rendered *injurious to health*; or whether it contains an unsafe food additive, color additive, chemical pesticide residue. 21 U.S.C. § 342(a)(1) and (2). Substances identified by the agency as "poisonous" or "deleterious" are substances capable of inflicting serious harm or injury, including the risk of death. For example, the "ordinarily injurious" standard is generally applied to toxins that occur naturally in food (*e.g.*, poisons in certain mushrooms, cyanide in amygdalin). *See, e.g.*, 57 Fed. Reg. 22984, 22988 (May 29, 1992); *United States v. Articles of Food and Drug*, 444 F. Supp. 266, 274 (E.D. Wis. 1977). The "may render injurious" standard is most frequently used to regulate the presence in food of added and unavoidable environmental contaminants such as lead, mercury, dioxin, and aflatoxin through action levels or tolerance levels. *See, e.g.*, *Young v. Community Nutrition Inst.*, 476 U.S. 974, 977-78 (1986) (aflatoxin); *Continental Seafoods, Inc. v. Schweiker*, 674 F.2d 38, 40 (D.C. Cir. 1982) (salmonella in shrimp); *United States v. Anderson Seafoods, Inc.*, 622 F.2d 157 (5th Cir. 1980) (mercury in swordfish).

In summary, the meaning of "safety" has been clearly and consistently defined by multiple FD&C Act statutory provisions and regulations to mean a "reasonable certainty" of "no harm," with "harm" defined as a health hazard or serious adverse health effect, and not merely "an undesirable or unexpected effect that has no adverse health consequences." Multiple examples, including FDA's approval of olestra, its required warning statements in § 101.17, and the adulteration provisions of the FD&C Act, clearly demonstrate a threshold for harm that does not include minor health effects. Because gastro-intestinal effects such as diarrhea, bloating, flatulence, and stomach cramps are not regarded by FDA as constituting "harm," they do not rise to the level of a "safety" issue.

- 16 -

Accordingly, Plaintiffs' requested labeling regarding the alleged gastrointestinal effects of lactose intolerance are not statements concerning the "safety" of milk or lactose. As a result, they are not "safety warning" statements that fall within the exception to the otherwise sweeping preemption set forth in Section 403A of the FD&C Act.

## III. PLAINTIFFS' REQUESTED RELIEF IS PREEMPTED BECAUSE IT WOULD STAND AS AN OBSTACLE TO THE ACCOMPLISHMENT OF IMPORTANT FEDERAL OBJECTIVES.

A state statutory or common law requirement must give way either due to "express" preemption, such as that set forth in FD&C Act Section 403A, *see* Section II *supra*, or "conflicts preemption." Conflicts preemption arises when a state requirement would "stand[] as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *United Distribution Cos. v. F.E.R.C.*, 88 F.3d 1105, 1155 (D.C. Cir. 1995) (internal quotation marks and brackets omitted). The FD&C Act itself made clear that Section 403A's express preemption provisions did not displace conflicts preemption arising under other provisions of the FD&C Act or other federal laws. NLEA § 6(d), Pub. L. No. 101-535, 104 Stat. 2353, 2364 (1990).

Conflicts preemption can arise either directly from the purposes set forth in a federal statute, or through a federal agency's substantive regulations adopted pursuant to "its own delegated authority" from Congress. *City of New York v. FCC*, 486 U.S. 57, 64 (1988). "A pre-emptive regulation's force does not depend on express congressional authorization to displace state law." *Fidelity Federal Sav. & Loan Ass'n v. De la Cuesta*, 458 U.S. 141, 154 (1982).

Here, the labeling sought by Plaintiffs would stand as an obstacle to the accomplishment of at least three congressional and regulatory objectives: Congress's strong encouragement of milk consumption; its explicit determination not to require lactose-related

labeling; and its explicit policy to avoid an overabundance of warning statements that may desensitize the general public to safety concerns and cause warning statements to lose their value as a means of informing the consumer about true potential health hazards.

A.   **Congress Has Manifested A Clear Objective Of Promoting Milk Consumption, Which Plaintiffs' Proposed Labeling Is Openly Designed to Undercut.**

The federal government has adopted a clear objective of promoting milk consumption as an essential part of a healthy and nutritious diet.  Plaintiffs themselves conceded as much.  (*See* Compl. ¶ 6 (noting "government support of milk"); ¶ 49 (referring to fact that milk is "promoted as part of a healthy diet by . . . government"); ¶ 51 (alleging that consumers are "[b]ombarded by the milk-promoting messages of the federal government").)

Congress has manifested its intent to promote milk consumption through two separate federal statutes.  The Dairy Production Stabilization Act of 1983, 7 U.S.C. § 4501 *et seq.* (the "Dairy Act"), established a national dairy product promotion, research, and nutrition education program ("the Dairy Program"). Congress specifically found that "dairy products are basic foods that are a valuable part of the human diet" and that "dairy products must be readily available and marketed efficiently to ensure that the people of the United States receive adequate nourishment."  7 U.S.C. § 4501(a);  *see also* 7 C.F.R. Part 1150 (regulations governing the Dairy Program).

Similarly, the Fluid Milk Promotion Act of 1990, 7 U.S.C. § 6401 *et seq.* (the "Fluid Milk Act") authorized the creation of a national dairy processor program for generic fluid milk promotion and education (the "Fluid Milk Program").  Congress expressly found that "(1) fluid milk products are basic foods and are a primary source of required nutrients such as calcium, and otherwise are a valuable part of the human diet; [and] (2) fluid milk products must be readily available and marketed efficiently to ensure that the people of the United States

receive adequate nourishment."   7 U.S.C. § 6401(a).   The Fluid Milk Act established the National Fluid Milk Processor Promotion ("Fluid Milk") Board, *see* 7 U.S.C. § 4504(b), tasked with adopting "advertising or other means devoted to educating consumers about the desirable characteristics of fluid milk products and directed toward increasing the general demand for fluid milk products."   7 C.F.R. §§ 1160.209(d), 1160.111. *See also* 7 C.F.R. Part 1160 (regulations governing the Fluid Milk Promotion Program).

Congress through both the Fluid Milk Act and the Dairy Act has thus expressly adopted the goal of promoting milk consumption.   This objective is further reflected in the federal government's "Dietary Guidelines for Americans 2005," a joint publication of the United States Department of Agriculture ("USDA") and the Department of Health and Human Services ("HHS").[4]   The stated purpose of the Guidelines is to "provide[] science-based advice to promote health and to reduce risk for major chronic diseases through diet and physical activity."   USDA & HHS, *Dietary Guidelines for Americans*, at v (2005).   In a chapter dedicated to "Food Groups to Encourage," the federal government states that "[i]ncreased intakes of . . . fat-free or low-fat milk and milk products are likely to have important health benefits for most Americans."   *Id.* at 23.

Indeed, earlier today, the Food and Nutrition Service of the United States Department of Agriculture published  in the Federal Register an interim rule "implement[ing] legislative provisions to prohibit direct or indirect restrictions on the sale or marketing of fluid milk on school premises or at school-sponsored events, at any time or in any place, in schools participating    in    the    National    School    Lunch    Program."    *See*

---

[4]      *Available at* http://www.health.gov/dietaryguidelines/dga2005/document/pdf/ DGA2005.pdf.

http://a257.g.akamaitech.net/7/257/2422/01jan20051800/edocket.access.gpo.gov/2005/pdf/05-22952.pdf.

Plaintiffs' tort suit and the labeling they seek to require on milk products in the District of Columbia is designed to counteract the federal government's objective of promoting milk consumption, and thus clearly "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *United Distribution,* 88 F.3d at 1155. Indeed, Plaintiffs themselves openly predicate their demand for relief on the claim that "the industry's milk marketing campaign, *combined with government support of milk,* gives the false impression that cows' milk is a necessary part of a healthy diet, for both children and adults" and that consumers are "bombarded by the milk-promoting messages *of the federal government* and by the dairy industry…" (Compl. ¶¶ 6, 50 (emphasis added).) Plaintiffs openly pursue the relief sought in this lawsuit in order to counter this governmental message, and to advance their dissenting view that "cows' milk consumption causes a host of problems that make it anything but a healthy beverage" and that "a diet free of dairy products is healthier for children and adults." (Compl. ¶¶ 7, 11.)

State law may not be so invoked to thwart federal objectives. For example, a Florida statute prohibiting the use of a direct molding process to duplicate unpatented boat hulls was preempted because it conflicted with a strong federal policy favoring free competition in ideas that did not merit federal patent protection. *Bonito Boats, Inc. v. Thunder Craft Boats, Inc.*, 489 U.S. 141 (1989). The Florida statute was "aimed directly" at "substantially restricting the public's ability to exploit ideas" that the federal system mandated should be free for all to use. *Id.* at 167. As a result, the Florida statute posed "a substantial threat to the patent system's

- 20 -

ability to accomplish its mission of promoting progress in the useful arts," and was preempted. *Id.* at 161.

Plaintiffs' lawsuit here is "aimed directly" at reducing milk consumption, and thus likewise poses "a substantial threat" to the accomplishment of the federal government's mission, expressed in two federal statutes, of promoting milk consumption.

**B.    The Federal Government Has Determined That Lactose Labeling Is Inappropriate.**

In 1990, Congress amended the FD&C Act through the NLEA in order to: "(1) To make available nutrition information that can assist consumers in selecting foods that can lead to healthier diets, (2) to eliminate consumer confusion by establishing definitions for nutrient content claims that are consistent with the terms defined by the Secretary [of Health and Human Services], and (3) to encourage product innovation through the development and marketing of nutritionally improved foods." Final Rule, 58 Fed. Reg. 2302, 2302 (Jan. 6, 1993); *see also* H.R. Rep. No. 101-538, at 8-10 (1990), *reprinted in* 1990 U.S.C.C.A.N. 3336, 3337-38.

In response to the NLEA, FDA (through the authority delegated it by the Secretary of HHS) issued a final rule "amending its food labeling regulations to make ingredient labeling more useful to consumers." Final Rule, 58 Fed. Reg. 2850, 2850 (Jan. 6, 1993). This final rule expressly addressed the issue of lactose labeling. Specifically, FDA stated that lactose must be listed on a food label whenever it is used as an ingredient of food, however it need not be listed "when present as a component of an ingredient (e.g., whey, nonfat dry milk)." *Id.* at 2859. FDA also affirmatively declined to issue regulations to require labeling products as "lactose free." *Id.* Particularly relevant here is the fact that FDA found both requirements unnecessary "because lactose intolerant consumers know to avoid milk and milk products." *Id.*

- 21 -

Given that FDA, through its final rule on the subject, has expressly decided that food labeling need not list lactose as a food component or warn the lactose intolerant against milk consumption, any state requirement mandating the listing of lactose as a food component would necessarily conflict with the federal government's formally stated decision to forego such regulation.  A "federal decision to forgo regulation in a given area may imply an authoritative federal determination that the area is best left *un*regulated, and in that event would have as much pre-emptive force as a decision *to* regulate." *Arkansas Elec. Co-op Corp. v. Arkansas P.S.C.*, 461 U.S. 375, 384 (1983) (emphasis in original).  It necessarily follows, then, that a state requirement that goes a step further -- by mandating a warning related to component lactose -- likewise conflicts with the federal government's determination and is also federally preempted.  Such a requirement, of course, is precisely what Plaintiffs' seek to impose through their lawsuit.  (*See, e.g.,* Compl. ¶ 69.)

> **C.    Plaintiffs' Lawsuit Frustrates The Federal Government's Objectives Regarding Warning Statements For Food Products.**

Plaintiffs' attempt to impose a lactose-intolerance warning on milk products would also frustrate the federal government's policy specifically designed to minimize the risks of over-warning consumers.   In promulgating its regulations to carry out the purposes of the NLEA, FDA stated in its proposed rule that--

> FDA is unwilling to require a warning statement in the absence of clear evidence of a hazard.  If the agency were to require warnings for ingredients that only cause mild idiosyncratic responses, it is concerned that it would overexpose consumers to warnings.  As a result, consumers may ignore, and become inattentive to, all such statements.

56 Fed. Reg. 28592, 28615 (June 21, 1991).  FDA subsequently formally adopted this policy in issuing its final rule carrying out the NLEA.  *See* 58 Fed. Reg. 2850, 2872 (Jan. 6, 1993) (affirming "FDA's position not to require warning statements in the absence of clear evidence of

a health hazard" and further noting that "an overabundance of warning statements may desensitize the general public to safety concerns and subsequently cause warning statements to lose some of their value as a means of informing the consumer about potential health hazards").

As Plaintiffs allege, the symptoms of lactose intolerance result from an individual's "inability to digest the milk sugar lactose."  (Compl. ¶ 2.)  And while bloating, cramps, and diarrhea are admittedly unpleasant, such symptoms cannot fairly be characterized as health hazards.  *Cf.* Final Rule, 68 Fed. Reg. 46364, 46396 (Aug. 5, 2003) (noting that potential gastrointestinal effects of Olestra "do not represent health hazards").  As a result, lactose intolerance is a quintessential example of the type of "mild idiosyncratic response[]" for which FDA has expressly decided not to require warnings, out of fear that such warnings would undercut the effectiveness of other warnings addressing true health risks.

FDA's decision is particularly apt with respect to milk, given the federal government's determination, expressed in no less than two federal statutes, as well as federally-promulgated dietary guidelines, that milk consumption has beneficial health effects.  Requiring a lactose intolerance warning, therefore, presents the very real risk of unnecessarily turning consumers away from milk entirely, leading to increased risk of more serious health problems, such as hypertension and osteoporosis.

Whether Plaintiffs agree with the assessment that milk consumption provides health benefits is entirely irrelevant to the federal preemption analysis.  That the federal government holds this view -- rightly or wrongly -- is determinative.  Plaintiffs seek to undermine this delicate risk/benefit balance through their lawsuit, which would discourage consumption of a product the federal government views as beneficial and expressly intends to promote.

- 23 -

The decision in *Norfolk & Western Railway Co. v. Public Utilities Commission of Ohio*, 926 F.2d 567 (6th Cir. 1991), is illustrative of this principle. There, a state commission ordered an interstate rail carrier to provide walkways and railings for trainmen at certain locations. *Id.* at 568. Through a 1977 pronouncement, however, the Federal Railroad Administration ("FRA") had explicitly declined to require such walkways and railings. *Id.* at 570. The court held that the FRA's "explicit refusal to adopt a regulation requiring railroad bridge walkways was a determination that a regulation requiring bridge walkways was not appropriate, and thus, amounted to negative preemption." *Id.* Similarly, the court in *Williams v. National Railroad Passenger Corporation* found a plaintiff's state law negligence claims related to passenger car safety to be preempted, relying on federal regulations that were explicitly limited in scope, thus evincing a federal decision *not* to regulate the area in question. 392 F. Supp. 2d 790, 794 (E.D. Tex. 2005) ("The FRA, in making its 'comprehensive' set of regulations, decided that requiring padding for older cars would not be cost effective. The court must therefore conclude that federal law covers the subject matter of passenger car safety on this issue."); *see also Geier v. Am. Honda Motor Co.*, 529 U.S. 861, 880 (2000) (finding petitioner's tort action, which would have imposed a duty on car manufacturers to install airbags rather than other passive restraint devices, to be federally preempted because federal regulations did not regulate in this manner, and instead sought a "variety and mix of devices").

Through their lawsuit, Plaintiffs seek to require labeling that FDA has consciously decided is unnecessary, and, indeed, harmful, in that it would diminish the efficacy of other, more important warning labels. As a result, Plaintiffs' claims are preempted.

IV.   **ASSUMING *ARGUENDO* THAT PLAINTIFFS' LAWSUIT IS NOT PREEMPTED, THE DOCTRINE OF PRIMARY JURISDICTION DICTATES THAT THE ISSUES RAISED IN THIS LAWSUIT BE REFERRED TO THE FDA.**

Primary jurisdiction is a doctrine "specifically applicable to claims properly cognizable in court that contain some issue within the special competence of an administrative agency." *Reiter v. Cooper*, 507 U.S. 258, 268 (1993). At its core, the doctrine "seeks to produce better informed and uniform legal rulings by allowing courts to take advantage of an agency's specialized knowledge, expertise, and central position within a regulatory regime." *Pharmaceutical Research & Mfrs. of America v. Walsh*, 538 U.S. 644, 646 (2003). "Expertise, of course, is not merely technical but extends to the policy judgments needed to implement an agency's mandate." *Allnet Communication Service, Inc. v. Nat'l Exchange Carrier Ass'n*, 965 F.2d 1118, 1120 (D.C. Cir. 1992). Thus, under the doctrine, federal courts "should refrain from deciding an issue if an agency is best suited to make the initial decision on the issues in dispute." *Dial A Car, Inc. v. Transportation, Inc.*, 82 F.3d 484, 490 (D.C. Cir. 1996) (Edwards, J. concurring) (internal quotation marks and citation omitted).

"No fixed formula exists for applying the doctrine of primary jurisdiction." *Western Pac. R.R. Co.*, 352 U.S. at 64. "In every case the question is whether the reasons for the existence of the doctrine are present and whether the purposes it serves will be aided by its application in the particular litigation." *Id.* Courts traditionally assess the following four factors to aid in determining when the doctrine applies: "(1) whether the issue is within the conventional expertise of judges; (2) whether the issue lies within the agency's discretion or requires the exercise of agency expertise; (3) whether there is a substantial danger of inconsistent rulings; and (4) whether a prior application to the agency has been made." *APCC Servs., Inc. v. WorldCom, Inc.*, 305 F. Supp. 2d 1, 13 (D.D.C. 2001).

Courts applying the primary jurisdiction doctrine typically dismiss the civil lawsuit, without prejudice. *Syntek Semiconductor Co., Ltd. v. Microchip Technology Inc.*, 307 F.3d 775, 782 (9th Cir. 2002) ("Normally, if the court concludes that the dispute which forms the basis of the action is within the agency's primary jurisdiction, the case should be dismissed without prejudice so that the parties may pursue their administrative remedies."); *Allnet,* 965 F.2d at 1123 (dismissing lawsuit on primary jurisdiction grounds, rather than holding it in abeyance, because the court "discern[ed] no present prejudice to either party from dismissal"); *see also Reiter*, 507 U.S. at 268-69 (a court may dismiss the case without prejudice under the primary jurisdiction doctrine "if the parties would not be unfairly disadvantaged").

A.    **FDA Is The Preeminent Organization Responsible For Ensuring The Safety Of The Nation's Food Supply And Unquestionably Has The Authority, Experience, And Expertise Necessary To Address Plaintiffs' Claims.**

The labeling of all food products shipped in interstate commerce is regulated by the FD&C Act, 21 U.S.C. § 301 *et seq.*, and its implementing regulations promulgated by FDA. 21 C.F.R. § Part 100 *et seq.* As its mission statement makes clear, FDA "is responsible for protecting the public health by assuring the safety, efficacy, and security of . . . our nation's food supply . . . [and] helping the public get the accurate, science-based information they need to use . . . foods to improve their health." FDA Mission Statement.[5] FDA has pursued this mission since its establishment in 1930, and the organization that is now the FDA has been a functioning, integrated, regulatory agency for over a century.[6]

---

[5]    *Available at* http://www.fda.gov/opacom/morechoices/mission.html.

[6]    FDA traces its roots back to 1862, when Congress created the Department of Agriculture ("USDA") and the agricultural division of the Patent Office was transferred to this new department. The first Commissioner of Agriculture immediately established the Chemical Division, which became the Division of Chemistry in 1890, the Bureau of Chemistry in 1901, the Food, Drug, and Insecticide Administration in 1927, and the FDA in 1930. In 1940, the FDA (continued…)

FDA undertakes broad and comprehensive initiatives to fulfill its mandate. Under its foods program, for example, FDA "sets food standards; evaluates food additives and packaging for potential health hazards; conducts research to reduce food-borne disease, to determine specific health impacts of hazardous substances in food and to develop methods for detecting them in foods; and maintains surveillance over foods through plant inspections, laboratory analyses, and legal action where necessary." S. Rep. No. 101-84 (1989). FDA has a wide variety of resources at its disposal to carry out these tasks, ranging from "field investigators, all of whom must have education in the physical or biological sciences, to chemists, microbiologists, engineers, medical officers, and scientists from many other disciplines. Similarly, FDA utilizes a variety of laboratory facilities, both to test products for safety and to conduct the research necessary to evaluate health hazards and to develop the means to detect product hazards and prevent them." *Id.*

In addition, the organizational structure of FDA includes six product-oriented centers, separate and apart from its nationwide field force, that carry out the agency's mission of consumer protection. One such center is the Center for Food Safety and Applied Nutrition ("CFSAN"), which, along with FDA's field staff, is tasked with ensuring that the nation's food supply is, *inter alia*, "honestly labeled." *See* FDA, *Center for Food Safety and Applied Nutrition Overview* (Feb. 2001) [hereinafter "CFSAN Overview"].[7] CFSAN has over 800 employees,

---

was transferred from the USDA to the Federal Security Agency, and subsequently to the Department of Health Education and Welfare ("HEW") in 1953. HEW became the Department of Health and Human Services in 1979, and is where the FDA currently resides. *See* Peter Barton Hutt, *Symposium on the History of Fifty Years of Food Regulation Under the Federal Food, Drug, and Cosmetic Act: A Historical Introduction*, 45 Food Drug Cosm. L.J. 17, 18 (1990).

[7]    *Available at* http://www.cfsan.fda.gov/~lrd/cfsan4.html.

including highly specialized professionals, "such as chemists, microbiologists, toxicologists, food technologists, pathologists, molecular biologists, pharmacologists, nutritionists, epidemiologists, mathematicians, and sanitarians." *Id.*

Aside from the significant technical resources and scientific expertise at its disposal, FDA also has considerable statutory authority to ensure food safety. FDA has broad authority under Section 403(a)(1) of the FD& C Act to prohibit the sale of any food whose "labeling is false or misleading in any particular," 21 U.S.C. § 343(a)(1), and has the power to prohibit material omissions from food labels. *See* 21 U.S.C. § 321(n) (stating that a food product is misbranded if its labeling "fails to reveal facts . . . material with respect to consequences which may result from the use of the article").

FDA has a variety of specific tools necessary to fulfill its statutory mission. For example, FDA has the power to (1) conduct examinations and investigations into the labeling of food products, 21 U.S.C. § 372(a); (2) request the institution of voluntary recalls when, among other things, the product at issue "presents a risk of . . . gross consumer deception," 21 C.F.R. § 7.45; and (3) require the disclosure of material facts previously omitted from a product's labeling, 21 C.F.R. § 1.21(b). FDA can also conduct consumer studies and focus groups, laboratory research, and education/outreach efforts to carry out its responsibility of ensuring food safety. *See* CFSAN Overview, *supra* note 7.

Moreover, if any member of the public feels that FDA should address a matter, he or she may bring it to FDA's attention by submitting a "citizen petition" to the agency, requesting that the Commissioner "issue, amend, or revoke a regulation or order or take or refrain from taking any other form of administrative action." 21 C.F.R. § 10.30(b). If dissatisfied with the agency's response, the petitioner may request reconsideration under 21

C.F.R. § 10.33(b), or seek judicial review of a final agency action, or, in appropriate circumstances, agency inaction. *See* 5 U.S.C. §§ 704, 706.

Finally, given the subject matter of this lawsuit, it bears mention that FDA regularly addresses the specific issue of food sensitivities. Indeed, just last month, FDA issued a Guidance for Industry regarding food allergens, specifically addressing compliance with the recently enacted Food Allergen Labeling and Consumer Protection Act of 2004. *See* FDA, *Guidance for Industry: Questions and Answers Regarding Food Allergens, Including the Food Allergen Labeling and Consumer Protection Act of 2004* (Oct. 5, 2005).[8] This Guidance is a "first edition," and FDA "expects to issue subsequent editions." *Id.* FDA has also grappled with the policy considerations and challenges presented by labeling for food sensitivities. *See, e.g.,* FDA, *Public Meeting on the Challenge of Labeling Food Allergens* (Aug. 13, 2001).[9] Indeed, in 2001, FDA increased its activity on food allergen awareness and officially made it a priority for CFSAN. *See* FDA, *Food Allergen Awareness: An FDA Priority* (2001).[10]

Given FDA's scientific expertise and significant enforcement resources, it is unsurprising that, by federal regulation, FDA is accorded "primary jurisdiction to make the initial determination on issues within its statutory mandate." 21 C.F.R. § 10.25(b). Leaving such initial determinations to FDA is both "sensible and proper because courts are not expert on the medical and scientific issues which must be explored in order to produce accurate labeling." *United States v. An Article of Device . . . 27 Diapulse*, 650 F.2d 908, 910 (7th Cir. 1981) (internal

---

[8]    *Available at* http://www.cfsan.fda.gov/~dms/alrguid.html.

[9]    A transcript of this hearing is available at http://www.fda.gov/ohrms/dockets/dockets/00p_1322/tr00001_01.pdf.

[10]    *Available at* http://www.cfsan.fda.gov/~dms/alrgawar.html.

quotation marks and citation omitted); *accord Troy Corp. v. Browner*, 120 F.3d 277, 283 (D.C. Cir. 1997) (Courts "review scientific judgments of the agency not as the chemist, biologist, or statistician that we are qualified neither by training nor experience to be, but as a reviewing court exercising our narrowly defined duty of holding agencies to certain minimal standards of rationality") (internal quotation marks and citation omitted).

As a result, this Court should defer to the specialized expertise of FDA for the initial determination whether a lactose intolerance warning on milk products is necessary.  *See Weinberger v. Bentex Pharm., Inc.*, 412 U.S. 645, 654 (1973) ("Threshold questions within the peculiar expertise of an administrative agency are appropriately routed to the agency, while the court stays its hand."); *Continental Airlines, Inc. v. United Air Lines, Inc.*, 120 F. Supp. 2d 556, 574 (E.D. Va. 2000) (primary jurisdiction doctrine "serves to delay the judicial decision until the court can take advantage of the agency's expertise") (internal quotation marks and citation omitted).

**B.    The Complaint Raises Issues Not Within The Conventional Expertise Of Judges And Requiring The Exercise Of Agency Discretion.**

Even a cursory review of the Complaint makes clear that the resolution of this lawsuit on the merits would require an assessment of (1) the extent of knowledge among consumers regarding lactose intolerance, particularly its symptoms and causes; and (2) the relative risks and benefits of requiring a lactose-intolerance warning on milk products.  Through its resources and accumulated expertise, FDA is particularly well-suited to make both of these assessments.

Any decision on whether the warning Plaintiffs seek is necessary requires consideration of data substantiating or refuting the claim that lactose intolerant consumers need a lactose warning on milk labeling.  *Cf.* Final Rule, 58 Fed. Reg. 2850, 2859 (Jan. 6, 1993) (noting

that data to substantiate the claim that lactose intolerant consumers need a "lactose free" declaration to determine which foods they can safely consume "would be necessary for FDA to require a statement that a product is 'lactose free'").

Unlike a federal court, FDA has the ability to conduct focus group research, consumer perception studies, and tracking surveys to determine the extent of consumer awareness and knowledge regarding lactose intolerance and has experience extrapolating conclusions from such data. *See, e.g.,* Final Rule, 68 Fed. Reg. 46364, 46396 (Aug. 5, 2003) (noting that in determining the wording of warning statement for unpasteurized juices, FDA relied on focus group research); *id.* (discussing consumer perception studies and tracking surveys showing "a high degree of awareness about olestra and its ability to cause GI effects" in context of repealing olestra label requirement).

Moreover, whatever conclusions the data warrant must be considered within the overall scheme of federal regulation of food warning statements. This would involve not only assessing the importance of milk to a healthy diet, but also balancing the risks and benefits of requiring a warning versus the fear that such warnings would undercut other warnings of a serious nature. *Cf.* 56 Fed. Reg. 28592, 28615 (June 21, 1991) ("If [FDA] were to require warnings for ingredients that only cause mild idiosyncratic responses, it is concerned that it would overexpose consumers to warnings. As a result, consumers may ignore, and become inattentive to, all such statements.")

These are precisely the type of policy decisions that require the exercise of FDA's administrative discretion. Indeed, it is difficult to imagine a more quintessential example of a set of policy determinations that would benefit from initial review by a federal agency tasked with making precisely these types of judgment calls. *See Williams Pipe Line Co. v. Empire Gas*

*Corp.*, 76 F.3d 1491, 1496 (10th Cir. 1996) ("[C]ourts apply primary jurisdiction to cases involving technical and intricate questions of fact and policy that Congress has assigned to a specific agency."); *Sandoz Pharmaceuticals Corp. v. Richardson-Vicks, Inc.*, 902 F.2d 222, 231 (3d Cir. 1990) ("Because agency decisions are frequently of a discretionary nature or frequently require expertise, the agency should be given the first chance to exercise that discretion or to apply that expertise.") (internal quotation marks and citation omitted).

Indeed, courts have routinely deferred labeling issues to FDA under the doctrine of primary jurisdiction. *See, e.g., Heller v. Coca-Cola Co.*, 230 A.D.2d 768, 769-70 (N.Y. App. Div. 1996) (trial court properly applied the doctrine of primary jurisdiction in referring issues regarding the appropriateness of aspartame labeling to FDA in order to ensure national uniformity and "utilize the special expertise of the FDA"); *Bernhardt v. Pfizer, Inc.*, No. 00 CIV 4042, 2000 WL 1738645, at *3 (S.D.N.Y. Nov. 22, 2000) (deferring to FDA, under doctrine of primary jurisdiction, the question whether a notice of warning should be issued to drug users); *see also Bradley v. Weinberger*, 483 F.2d 410, 416-17 (1st Cir. 1973) (although court arguably had the power to decide issue of misleading drug labeling under applicable statutes and regulations, question referred back to FDA because of, *inter alia*, deference to agency expertise); *Public Citizen v. Foreman*, 471 F. Supp. 586, 594 (D.D.C. 1979) (invoking the doctrine of primary jurisdiction to defer issue related to color additives to FDA).

The fact that Plaintiffs seek monetary damages, along with equitable relief, in their Complaint presents no obstacle to the Court's application of the primary jurisdiction doctrine. The doctrine of primary jurisdiction is applicable even where the agency in question does not have the power to award the damages sought in the court action. *See Alberta Gas Chem., Ltd. v. Celanese Corp.*, 650 F.2d 9, 13-14 (2d Cir. 1981) ("The Supreme Court has

consistently followed this approach by remanding cases for initial resolution by administrative agencies, when it was undisputed that those agencies did not have the power to award the damages sought in the federal court action."); *Heller*, 230 A.D. 2d at 770 (rejecting "plaintiffs' claim that primary jurisdiction should not be applied because the FDA cannot grant compensatory damages"); *see also Thompson v. Texas Mexican Ry. Co.*, 328 U.S. 134, 151 (1946) (in action for injunction and damages, remanding to agency despite assertion that it lacked the power to grant the relief sought).

> **C.    A Failure To Dismiss This Lawsuit Would Present A Substantial Risk Of Inconsistent Rulings.**

Plaintiffs allege a broad lack of awareness among the general public regarding lactose intolerance, not limited to any particular geographic area. And, it is axiomatic that milk is sold throughout the United States. (*See, e.g.,* Compl. ¶¶ 42-51.) Yet Plaintiffs have purported to state claims arising solely under the laws of the District of Columbia and to seek relief only applying therein.

Where, as here, a regulated product is sold throughout the United States, labeling content should not be dictated by the diverse common law or statutory provisions of the different states. *See Texas & Pac. Ry. Co. v. Abilene Cotton Oil Co.*, 204 U.S. 426 (1907) (uniform rates could not be achieved if judges and juries throughout the country were to determine the reasonableness of a carrier's established rate schedule); *Allnet,* 965 F.2d at 1120 ("The primary jurisdiction doctrine rests . . . on a concern for uniform outcomes (which may be defeated if disparate courts resolve regulatory issues inconsistently).") (citation omitted). FDA is in the best position to address Plaintiffs' allegations because, unlike resolution of the present lawsuit, only FDA can ensure national uniformity in the labeling of all milk products.

This Court should dismiss the Complaint under the doctrine of primary jurisdiction.

## V.    DEFENDANTS HAVE NO DUTY TO WARN UNDER D.C. TORT LAW

Plaintiffs' Complaint is defective for the independent reason that it fails to state a claim under D.C. common law.  In a failure to warn case based on either negligence or products liability theories, the plaintiff must establish, *inter alia*, that the defendant had a legal duty to warn.  *East Penn Mfg. Co. v. Pineda*, 578 A.2d 1113, 1119-23 (D.C. 1990) (explaining that duty of "ordinary care" applies in both types of cases and that negligence and products cases differ only in defenses available to Defendant).  The existence of a legal duty is a question of law to be determined by the Court.  *See, e.g.*, *In re Sealed Case*, 67 F.3d 965, 968 (D.C. Cir. 1995) (citing *Zhou v. Jennifer Mall Restaurant*, 534 A.2d 1268, 1274 (D.C. 1987)).

"It is 'the responsibility of courts[,] in fixing the orbit of duty, to limit the legal consequences of wrongs to a controllable degree and to protect against crushing exposure to liability.'" *McCarthy v. Olin Corp.*, 119 F.3d 148, 157 (2d Cir. 1997) (quoting *Strauss v. Belle Realty Co.*, 482 N.E.2d 34, 36 (N.Y. 1985)). *Cf. Friedman v. Merck & Co.*, 107 Cal.App.4th 454, 468-69 (Cal. Ct. App. 2003) (dismissing failure to warn action where vegetarian plaintiff allegedly suffered emotional reaction to taking tuberculosis test that contained animal products).

Milk has of course played a central role in the American diet for hundreds of years.  As a matter of law, Plaintiffs cannot establish that Defendants have a legal duty to warn consumers regarding the consumption of milk.  Plaintiffs do not base their claims on an allegation that the Defendants have sold D.C. consumers adulterated milk or milk that is in a deleterious condition.  Instead, Plaintiffs allege that selling milk *as milk* is tortious unless accompanied by a warning, including graphic descriptions of the purported likely symptoms of lactose intolerance.  However, Plaintiffs' theory of duty finds no support in the case law.

Many foods carry some risk of harm related to their consumption, unrelated to any contamination or other unwholesome condition.  But no rule of law imposes a duty on producers or sellers of food to warn of these risks.  In fact, the case law and Restatement (Second) of Torts steadfastly refuse to impose a duty to warn of these risks.  For instance, the Restatement provides that "[o]rdinary sugar is a deadly poison to diabetics," but that fact does not render sugar unreasonably dangerous if unaccompanied by a warning.  Restatement (Second) of Torts § 402A, *comment i* (1965); *see also Delahanty v. Hinckley*, 564 A.2d 758, 760 (D.C. 1989) (applying Restatement (Second) of Torts § 402A).  Likewise, "[g]ood butter is not unreasonably dangerous merely because, if such be the case, it deposits cholesterol in the arteries and leads to heart attacks."  Restatement (Second) of Torts § 402A, *comment i* (1965); *see also Pelman v. McDonald's Corp.*, 237 F. Supp. 2d 512, 535-36 (S.D.N.Y. 2003) (dismissing complaint alleging that McDonalds unreasonably failed to warn consumers of the unhealthy attributes of its food).  *Cf. Allen v. Grafton*, 164 N.E.2d 167, 170 (Ohio 1960) ("If such food was reasonably fit to eat, it is difficult to see how the defendant could, apart from violation of some statute, ever be said to be negligent in selling to for food.").

Milk is far from unique in its purported potential to cause some negative reaction in some humans.  A number of foods, including beans, broccoli, whole grains, and asparagus, among others, can cause bloating and excess intestinal gas, which Plaintiffs attribute to milk as well.  *See* NDIC, *Gas in the Digestive Tract* (Mar. 2004), *available at* http://www.digestive.niddk.nih.gov/ddiseases/pubs/gas/.  Other foods, like eggs, shellfish, wheat gluten, and peanuts, among others, can cause much more serious and potentially life threatening effects, such as anaphylactic shock.  *See* National Institute of Allergy and Infectious Disease,

*Food    Allergy:    An    Overview    6    (Jul.    2004),    available    at* http://www.niaid.nih.gov/publications/pdf/foodallergy.pdf.

A partial listing of foods with potential physical effects includes the following:

| Food | Possible Reactions |
|---|---|
| Wheat | Hives, cerebral symptoms, generalized immune response ("hay fever"), Migraines |
| Citrus | Hives, Migraines, Eczema |
| Corn | Hives, cerebral symptoms |
| Peanuts | Shock |
| Eggs | Shock, Eczema,  generalized immune response ("hay fever") |
| Soy (tofu, miso, tempeh, etc.) | Cerebral symptoms, generalized immune response ("hay fever") |
| Shellfish | Shock, Hives, generalized immune response ("hay fever") |
| Chocolate | Generalized immune response ("hay fever"), migraines |
| Nuts | Shock, generalized immune response ("hay fever"), |
| Beef | Generalized immune response ("hay fever") |
| Beans, broccoli, whole grains, asparagus | Bloating and excess intestinal gas |
| Mangoes | Hives, generalized immune response ("hay fever") |
| Tomatoes | Hives, eczema |
| Strawberries | Hives, shock[11] |

Yet our research discloses *no case in any jurisdiction* in which a producer or retailer has been found liable for a plaintiff's sensitivity to an uncontaminated, wholesome, and

---

[11]    Sources: International Food Information Council, Understanding Food Allergy, http://www.ific.org/publications/brochures/allergybroch.cfm; National Institutes of Allergy and Infectious Diseases, *Food Allergy: An Overview* (Jul. 2004), *available at* http://www.niaid.nih.gov/publications/pdf/foodallergy.pdf; Allergic Diseases Resource Center, *Food Allergy* (Apr. 21, 2004), *available at*, http://www.worldallergy.org/professional/allergic_ diseases_center/foodallergy/index.shtml; NDDIC, *Gas in the Digestive Tract* (Mar. 2004), *available    at*    http://www.digestive.niddk.nih.gov/ddiseases/pubs/gas/;    *see    also* http://www.allergyescape.com/food-allergy.html.

properly identified food.  Neither have we found a single case granting an injunction requiring additional labeling informing the consumer of the potential consequences of consuming food, such as that requested here.

This void in the case law is consistent with the Restatement cited above, as well as federal rule that a producer or manufacturer need only identify what a particular food item is. For instance, the Food Allergen Labeling and Consumer Protection Act of 2004 ("FALCPA") safeguards individuals with food sensitivities, including those with potentially fatal sensitivities to peanuts and shellfish, by requiring packaged food containing those foods to disclose their presence in "plain English."  *See* H.R. Rep. No. 108-608, at 3 (2004); *see also* FALCPA §§ 202-203, 21 U.S.C. § 343.

Thus, the law is clear that there is no duty to warn, where, as here, Plaintiffs merely allege a food sensitivity to an uncontaminated, wholesome, properly identified food item.

## VI.    THE NAMED PLAINTIFFS HAVE NOT STATED A PROPER CLAIM FOR INJUNCTIVE RELIEF

The named Plaintiffs are not entitled to the prospective relief they seek.  "The standard for issuing a permanent injunction requires the district court to find that… plaintiffs would suffer irreparable injury in the absence of injunctive relief."  *A.W. Chesterton Co. v. Chesterton*, 128 F.3d 1, 5 (1st Cir. 1997); *accord e.g., Wisconsin Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985) (stating that injunction will not be granted unless plaintiffs show an imminent, irreparable harm is likely to occur); *Plummer v. American Institute of Certified Public Accountants*, 97 F.3d 220, 229 (7th Cir. 1996); *Shield v. Zuccarini,* 254 F.3d 476, 482 (3d Cir. 2001)*; Pepsi-Cola Bottling Co. of Pittsburg, Inc. v. Pepsico, Inc.*,  175 F. Supp. 2d 1288, 1293 (D. Kan. 2001) ("To obtain injunctive relief, plaintiff must show that (1) plaintiff faces a reasonable probability of irreparable future injury…").

Each of the named Plaintiffs alleges that an injury from consuming milk prior to acquiring knowledge of lactose intolerance.  (Compl. ¶¶ 10-16.)  Presumably, Plaintiffs will retain their belief that milk purportedly will cause them discomfort in the future should they consume it.  The named Plaintiffs accordingly are no longer at risk of buying dairy products unwitting of their "dangers."  Thus, an injunction requiring that warnings about the purported dangers of lactose intolerance cannot provide them with any benefit.  *See Cruz v. American Airlines, Inc.*, 356 F.3d 320, 328 (D.C. Cir. 2004) (dismissing claim for prospective injunction forbidding defendants from enforcing company policy where it was unlikely that plaintiffs would suffer a future injury as a result of that policy); *see also Does I through III v. District of Columbia*, 216 F.R.D. 5, 10 (D.D.C. 2003) (Kennedy, J.).  "Put another way, "[i]n order to obtain ... an injunction, a plaintiff cannot simply allege that [s]he was previously subjected to the defendant's actions;" plaintiff must instead show that "'there is a real and immediate threat of repeated injury.' "

Nor can a putative class representative who cannot herself state a claim for injunctive relief represent any members of the putative class seeking that same relief.  *Id.* at 330 (dismissing class action claim for injunction because named plaintiffs did not themselves have standing to seek injunctive relief); *Banks v. Multi-Family Management, Inc.*, 554 F.2d 127, 128 (4th Cir. 1977).

## VII. THE RELIEF PLAINTIFFS SEEK WOULD VIOLATE THE DISTRICT OF COLUMBIA SELF-GOVERNMENT AND GOVERNMENTAL REORGANIZATION ACT.

The injunctive relief sought is also inappropriate because it would violate the District of Columbia Self-Government and Governmental Reorganization Act, Pub. L. No. 93-198, 87 Stat. 774 (1973) (as amended) ("Home Rule Act").  The United States Constitution empowers Congress "[t]o exercise exclusive Legislation in all Cases whatsoever, over... the Seat

- 38 -

of the Government of the United States ...." U.S. Const., art. I, § 8, cl. 17.  In the Home Rule Act, Congress delegated to the D.C. Council the power to "legislate[] upon essentially local District matters," subject to "retention by Congress of the ultimate legislative authority" over the District of Columbia.  Home Rule Act § 102 (D.C. Code § 1-201.02).  While Congress intended to relieve its burden of legislating about "essentially local" matters,[12] the Home Rule Act provides that "[t]he Council shall have no authority to ... [e]nact any act… which is not restricted in its application exclusively in or to the District."  Home Rule Act § 602(a)(3) (D.C. Code § 1-206.02, formerly § 1-233).

"[T]he limitation of § 1-233 is included to ensure that the local government does not encroach on matters of national concern."  *Techworld Dev. Corp. v. D.C. Preservation League*, 648 F. Supp. 106, 114-15 (D.D.C. 1986). "Congress intended matters not exclusively related to the District of Columbia to be beyond the District's legislative reach."  *McConnell v. United States*, 537 A.2d 211, 215 n. 4 (D.C. 1988); *see also District of Columbia v. Greater Washington Central Labor Council*, 442 A.2d 110, 116 (D.C. 1982) ("Congress intended in s 1-233(a)(3) to withhold from local officials the authority to affect or to control decisions made by federal officials in administering federal laws that are national in scope as opposed to laws that relate solely to the District of Columbia"); *see generally Banner v. United States*, __ F.3d __; 2005 WL 2897351, at *4 (D.C. Cir. Nov. 4, 2005) ("Congress *is* the District's government, *see* U.S. Const. art. I, § 8, cl. 17").

---

[12]    *See* 119 Cong. Rec. 22,947 (1973) (Senator Eagleton stating, "I believe it is not in the interest of this body, nor is it in the interest of the citizens of the United States we are elected to represent ... that the time of the U.S. Senate be spent preparing, holding hearings, considering, and debating matters that are purely local in nature.").

Thus, in *McConnell*, the court struck down as violative of § 1-233(a)(3) a District law that "work[ed] an effective repeal" of narcotic "legislation national in scope." 537 A.2d at 215. The court did so notwithstanding its explicit recognition that "the repeal would affect enforcement of the legislation only within the District's jurisdiction." *Id.*

Here, the burden of affixing special warning labels to milk would be felt entirely outside the District, given that no bottling plants are located in the jurisdiction. Moreover, the proper labeling of milk products is a "matter of national concern," as demonstrated by FDA's jurisdiction over, and close attention to, food labeling issues (*see* pp. 5-17 *supra*). Thus, the requested relief is beyond that permitted by the Home Rule Act.

Although the Home Rule Act facially limits the City Council's authority to act, *see* §1-206.02(a), the Act's limitations have also been applied to citizen initiatives, *see McConnell*, and would also extend to legal duties sought to be imposed through common law actions, *see, e.g., Cipollone*, *supra*.

## CONCLUSION

For all the foregoing reasons, the Complaint should be dismissed.

Respectfully Submitted,

/s/ Steven J. Rosenbaum
Steven J. Rosenbaum (D.C. Bar No. 331728)
Derron J. Blakely (D.C. Bar No. 483733)
Nadia I. Shihata (D.C. Bar No. 493448)
COVINGTON & BURLING
1201 Pennsylvania Ave., N.W.
Washington, D.C. 20004
(202) 662-6000

Attorneys for Defendants Giant Of Maryland, LLC,
Safeway Inc., Horizon Organic Holding Corporation,
Dean Foods Company, Nestle Holdings, Inc., Farmland
Dairies, LLC, Shenandoah's Pride, LLC, and Stonyfield
Farm, Inc.

DATED:  November 21, 2005