# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| MILTON MILLS, M.D., RASHID GHOLSON, HUA-WEI CHERNG, NORMA HUMPHRIES, LYNETTE GARNER, DARRELL BRANSOME, PAUL MILLER, GLENDA COSTNER, SYBIL HAROLD, ELIZABETH RUSSELL, for themselves and on behalf of all other District of Columbia residents similarly situated, | Case No.: 05-CV-2211 (HHK) |
| Plaintiffs, | **Declaration of R. Douglas Rhoads** |
| v. | |
| GIANT OF MARYLAND, LLC, SAFEWAY INC., HORIZON ORGANIC, DEAN FOODS CO., NESTLE HOLDINGS, INC., FARMLAND DAIRIES, LLC, SHENANDOAH'S PRIDE, LLC, STONYFIELD FARM, INC., CLOVERLAND FARMS DAIRY, INC., | |
| Defendants. | |

**EXHIBIT J**



## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| MILTON MILLS, M.D., RASHID GHOLSON, HUA-WEI CHERNG, NORMA HUMPHRIES, LYNETTE GARNER, DARRELL BRANSOME, PAUL MILLER, GLENDA COSTNER, SYBIL HAROLD, ELIZABETH RUSSELL, for themselves and on behalf of all other District of Columbia residents similarly situated,<br><br>        Plaintiffs,<br><br>    v.<br><br>GIANT OF MARYLAND, LLC, SAFEWAY INC., HORIZON ORGANIC, DEAN FOODS CO., NESTLE HOLDINGS, INC., FARMLAND DAIRIES, LLC, SHENANDOAH'S PRIDE, LLC, STONYFIELD FARM, INC., CLOVERLAND FARMS DAIRY, INC.,<br><br><br>        Defendants. | Case No.: 05-CV-2211 (HHK)<br><br><br><br><br>**Declaration of R. Douglas Rhoads** |

**EXHIBIT K**

**(CD-ROM FILED WITH CLERK'S OFFICE)**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| MILTON MILLS, M.D., RASHID GHOLSON, HUA-WEI CHERNG, NORMA HUMPHRIES, LYNETTE GARNER, DARRELL BRANSOME, PAUL MILLER, GLENDA COSTNER, SYBIL HAROLD, ELIZABETH RUSSELL, for themselves and on behalf of all other District of Columbia residents similarly situated, | Case No.: 05-CV-2211 (HHK) |
| Plaintiffs, | |
| v. | **Declaration of R. Douglas Rhoads** |
| GIANT OF MARYLAND, LLC, SAFEWAY INC., HORIZON ORGANIC, DEAN FOODS CO., NESTLE HOLDINGS, INC., FARMLAND DAIRIES, LLC, SHENANDOAH'S PRIDE, LLC, STONYFIELD FARM, INC., CLOVERLAND FARMS DAIRY, INC., | |
| Defendants. | |

## EXHIBIT L

## (CD-ROM FILED WITH CLERK'S OFFICE)

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

MILTON MILLS, M.D., RASHID GHOLSON,
HUA-WEI CHERNG, NORMA HUMPHRIES,
LYNETTE GARNER, DARRELL
BRANSOME, PAUL MILLER, GLENDA
COSTNER, SYBIL HAROLD, ELIZABETH
RUSSELL, for themselves and on behalf of all other
District of Columbia residents similarly
situated,

        Plaintiffs,

        v.

GIANT OF MARYLAND, LLC, SAFEWAY
INC., HORIZON ORGANIC, DEAN FOODS
CO., NESTLE HOLDINGS, INC.,
FARMLAND DAIRIES, LLC,
SHENANDOAH'S PRIDE, LLC,
STONYFIELD FARM, INC., CLOVERLAND
FARMS DAIRY, INC.,

        Defendants.

Case No.: 05-CV-2211 (HHK)

**Declaration of R. Douglas Rhoads**

**EXHIBIT M**

Federal Bureau of Investigation - Press Room - Congressional Testimony



Federal Bureau of Investigation
www.fbi.gov

FBI Priorities
About Us
Press Room
What We Investigate
Counterterrorism
Directorate of Intelligence
Most Wanted
Law Enforcement Services
Your Local FBI Office
Reports & Publications
FBI History
For the Family
FOIA Library / Requests
Employment
How Do I...
Search
Home

Submit A Tip
Apply Today
Links
Contact Us
Site Map
Privacy Policy

## Congressional Testimony

**Statement of
John E. Lewis
Deputy Assistant Director, Counterterrorism
Division
Federal Bureau of Investigation
Before the
Senate Committee on Environment and Public
Works
May 18, 2005**

Good morning Chairman Inhofe, Ranking Member Jeffords, and members of the Committee. I am pleased to have the opportunity to appear today and to discuss the threat posed by animal rights extremists and eco-terrorists in this country, as well as the measures the FBI and its partners are taking to address this threat.

One of today's most serious domestic terrorism threats come from special interest extremist movements such as the Animal Liberation Front (ALF), the Earth Liberation Front (ELF), and Stop Huntingdon Animal Cruelty (SHAC) campaign. Adherents to these movements aim to resolve specific issues by using criminal "direct action" against individuals or companies believed to be abusing or exploiting animals or the environment.

"Direct action" is often criminal activity that destroys property or causes economic loss to a targeted company. Traditional targets have ranged from, but have not been limited to, research laboratories to restaurants, fur farmers to forestry services. Extremists have used arson, bombings, theft, animal releases, vandalism, and office takeovers to achieve their goals.

The distinctions between constitutionally protected advocacy and violent, criminal activity are extremely important to recognize, and law enforcement officials should be solely concerned with those individuals who pursue animal rights or environmental protection through force, violence, or criminal activity. Law enforcement only becomes involved when volatile talk turns into criminal activity. Unfortunately, the FBI has seen a significant amount of such criminal activity. From January 1990 to June 2004, animal and environmental rights extremists have claimed credit for more than 1,200 criminal incidents,

Top Story
Recent Stories
National Press Releases
Local Press Releases
**Congressional Testimony**
- 2005
- 2004
- 2003
- 2002
- 2001
- 2000
- 1999
Major Executive Speeches
Web Chats
**Radio**
- FBI This Week
- Gotcha
**Contacts**
- FBI Headquarters
- FBI Local Offices
- FBI Overseas Offices
**Backgrounders**
- FBI Priorities
- FBI History
- Reports & Publications
- FOIA and Reading Room

Federal Bureau of Investigation - Press Room - Congressional Testimony

resulting in millions of dollars in damage and monetary loss.

While most animal rights and eco-extremists have refrained from violence targeting human life, the FBI has observed troubling signs that this is changing. We have seen an escalation in violent rhetoric and tactics. One extremist recently said, "If someone is killing, on a regular basis, thousands of animals, and if that person can only be stopped in one way by the use of violence, then it is certainly a morally justifiable solution."

Attacks are also growing in frequency and size. Harassing phone calls and vandalism now co-exist with improvised explosive devices and personal threats to employees. ELF's target list has expanded to include sports utility vehicle dealerships and new home developers. We believe these trends will persist, particularly within the environmental movement, as extremists continue to combat what they perceive as "urban sprawl."

Preventing such criminal activity has become increasingly difficult, in large part because extremists in these movements are very knowledgeable about the letter of the law and the limits of law enforcement. Moreover, they are highly autonomous. Lists of targets and instructions on making incendiary devices are posted on the Internet, but criminal incidents are carried out by individuals or small groups acting unilaterally. Criminal activity by animal rights extremists and eco-terrorists in particular requires relatively minor amounts of equipment and minimal funding. Extremists of these movements adhere to strict security measures in both their communications and their operations.

The FBI has developed a strong response to domestic terrorism threats. Together with our partners, we are working to detect, disrupt, and dismantle the animal rights and environmental extremist movements that are involved in criminal activity.

Our efforts are headed by a headquarters-based team of national intelligence analysts, program managers, and seasoned field agents. We draw on the resources of our Terrorist Financing Operations Section to support field investigations into domestic terrorism, just as we do for international terrorism investigations. We also draw upon our expertise in the area of communication analysis to provide investigative direction.

Second, we have strengthened our intelligence

Federal Bureau of Investigation - Press Room - Congressional Testimony

capabilities. Since 2003, we have disseminated 64 raw intelligence reports to our partners pertaining to animal rights extremism and eco-terrorism activity. In addition, since 2004 we have disseminated 19 strategic intelligence assessments to our federal, state and local counterparts. And we have developed an intelligence requirement set for animal rights/eco-terrorism, enabling us to better collect, analyze, and share information.

Finally, we have strengthened our partnerships. We have combined our expertise and resources with those of our federal, state, and local law enforcement partners nationwide through our 103 Joint Terrorism Task Forces. We have increased training for JTTF members and have strong liaison with foreign law enforcement agencies.

Our challenges are significant, but so are our successes. Currently, 35 FBI offices have over 150 pending investigations associated with animal rights/eco-terrorist activities. Since the beginning of 2004, the FBI and its partners have made a number of high-profile arrests of individuals involved with animal rights extremism or eco-terrorism. These arrests have led to several successful prosecutions.

Let me give you a brief snapshot of our recent successes:

In 2005,

- An individual who had been a fugitive, was arrested and charged with two counts of Animal Enterprise Terrorism for a series of animal releases at mink farms in 1997;
- Three individuals were arrested for a series of arsons and attempted arsons of construction sites in California; and
- One individual was arrested for the 2003 arson of a McDonald's in Seattle.

In 2004,

- Two individuals were arrested for arson on the campus of Brigham Young University in Utah;
- Seven individuals associated with SHAC were arrested in New Jersey, California, and Washington State;
- An individual was arrested and indicted for arsons of logging and construction equipment;
- William Cottrell was indicted and convicted last month in California for conspiracy to

commit arson, seven counts of arson; and

- Two individuals were arrested in Virginia during an attempt to firebomb a car dealership.

These are just some of our many accomplishments, but we have much more work ahead of us. One of our greatest challenges has been the lack of federal criminal statutes to address multi-state campaigns of intimidation, threats, and damage designed to shut down legitimate businesses.

On the legislative front, we are interested in working with you to examine federal criminal statutes, specifically 18 USC 43, "Animal Enterprise Terrorism." The statute provides a framework for the prosecution of animal rights extremists, but in practice, it does not cover many of the criminal acts that extremists have committed.

Additionally, the statute only applies to criminal acts committed by animal rights extremists, but does not address criminal activity related to eco-terrorism.

Therefore, the existing statutes may need refinements to make them more applicable to current animal rights/eco-extremist actions and to give law enforcement more effective means to bring criminals to justice.

Investigating and preventing animal rights extremism and eco-terrorism is one of the FBI's highest domestic terrorism priorities. We are committed to working with our partners to disrupt and dismantle these movements and to bring to justice those who commit crime in the name of animal or environmental rights. Chairman Inhofe and Members of the Committee, I appreciate the opportunity to discuss the challenges we face and the ways we can overcome them. I would be happy to answer any questions you may have.

Thank you.

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

MILTON MILLS, M.D., RASHID GHOLSON,
HUA-WEI CHERNG, NORMA HUMPHRIES,
LYNETTE GARNER, DARRELL
BRANSOME, PAUL MILLER, GLENDA
COSTNER, SYBIL HAROLD, ELIZABETH
RUSSELL, for themselves and on behalf of all other
District of Columbia residents similarly
situated,

          Plaintiffs,

          v.

GIANT OF MARYLAND, LLC, SAFEWAY
INC., HORIZON ORGANIC, DEAN FOODS
CO., NESTLE HOLDINGS, INC.,
FARMLAND DAIRIES, LLC,
SHENANDOAH'S PRIDE, LLC,
STONYFIELD FARM, INC., CLOVERLAND
FARMS DAIRY, INC.,

                    Defendants.

Case No.: 05-CV-2211 (HHK)

**Declaration of R. Douglas Rhoads**

**EXHIBIT N**

# PCRM

PHYSICIANS
COMMITTEE
FOR
RESPONSIBLE
MEDICINE

5100 WISCONSIN AVENUE, NW · SUITE 400
WASHINGTON, DC 20016
(202) 686-2210 · FAX: (202) 686-2216
WWW.PCRM.ORG

September 20, 2001

Executive Director
Tokyon Fujimi Bldg
11-2 Fujimi 1 Chome
Chiyoda-ku
Tokyo 102-8172, Japan

Dear Executive Director:

This letter is written on behalf of the Physicians Committee for Responsible Medicine (PCRM) and Stop Huntingdon Animal Cruelty (SHAC). PCRM is a health advocacy non-profit organization that promotes preventive medicine and higher standards for ethics and effectiveness in research. It is comprised of 5,000 physicians and more than 100,000 laypersons. SHAC is an animal protection non-profit organization campaigning to close the Huntingdon Life Sciences (HLS) facility because of its documented abuses to animals and inappropriate animal experimentation. These two organizations would like to share with you two scientific critiques of animal experiments conducted at HLS. These scientific reviews, written by PCRM physicians, show what we believe to be the irrelevance and inappropriateness of some of the studies done at HLS.

May I ask you to please read the enclosed studies? As a company that is striving to bring products to the market that may improve or enhance people's lives, we ask you to make an honest assessment as to the extent that HLS has served you, their customer, and the public fairly and safely when given a contract to test various products, chemicals, and life altering drugs.

Although animal tests are routinely used to test compounds for toxicity or carcinogenicity, or alternatively, for their possible therapeutic effect, these tests are poor indicators for safety and effectiveness in humans. Animal studies cannot be reliably used to understand human pharmacokinetics because of the myriad anatomical, physiological, and pathological differences between humans and other animals. For instance, the significantly shorter gestational periods of rodents, compared to humans, contribute to the marked differences in developmental toxicity of drugs that often occur between test animals and humans. On the other hand, epidemiological data provide much more reliable risk assessments and can be applied directly to human populations.

Extrapolating carcinogenicity data generated by animal studies to humans is especially problematic. Not only are humans and other species prone to developing different cancers, most human cancers behave differently from artificially produced animal models. Moreover, rodents in carcinogenicity tests sometimes develop cancer from chemicals given in extremely high doses that are harmless to humans at normal exposure levels because these doses cause artificial tissue irritation and cell

proliferation, which result in cancer. In other instances, potentially useful drugs may be overlooked because of ineffectiveness or harmful effects in animals used in testing. For these and other reasons outlined in the enclosed critiques, reliance on nonhuman animals to provide toxicity and carcinogenicity data for human risk assessment constitutes a faulty scientific method.

Because we realize your company is committed to public safety and sound science, we hope you will take the time to contact PCRM or SHAC with any questions or concerns you may have. Below you will find contact information for SHAC. We extend a sincere hope to hear from your company soon.

Sincerely,

Neal D. Barnard, M.D.
President
PCRM

Kevin Kjonaas
SHAC
P.O. Box 22398
Philadelphia, PA 19110
(T) 215-951-9593

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

MILTON MILLS, M.D., RASHID GHOLSON,
HUA-WEI CHERNG, NORMA HUMPHRIES,
LYNETTE GARNER, DARRELL
BRANSOME, PAUL MILLER, GLENDA
COSTNER, SYBIL HAROLD, ELIZABETH
RUSSELL, for themselves and on behalf of all other
District of Columbia residents similarly
situated,

        Plaintiffs,

        v.

GIANT OF MARYLAND, LLC, SAFEWAY
INC., HORIZON ORGANIC, DEAN FOODS
CO., NESTLE HOLDINGS, INC.,
FARMLAND DAIRIES, LLC,
SHENANDOAH'S PRIDE, LLC,
STONYFIELD FARM, INC., CLOVERLAND
FARMS DAIRY, INC.,

        Defendants.

Case No.: 05-CV-2211 (HHK)

**Declaration of R. Douglas Rhoads**

**EXHIBIT O**

1

```
 1          IN THE CIRCUIT COURT OF COOK COUNTY ILLINOIS
              COUNTY DEPARTMENT - CHANCERY DIVISION
 2                   CASE NO.  02008079

 3   MARILYN DUNGAN, ANTHONY STELLATO      :      VIDEO
     VICTORIA SZOTT, MARSH USA, INC.,          DEPOSITION UPON
 4   GUY CARPENTER & COMPANY, INC.         :  ORAL EXAMINATION
     and SEABURY & SMITH, INC.,                      OF
 5                                         :    KEVIN KJONAAS
                      Plaintiffs,
 6                                         :

 7                 vs                       :

     STOP HUNTINGDON ANIMAL CRUELTY,        :
 8   a/k/a "SHAC," a/k/a CLOSING
     ANIMAL ABUSERS NOW, SHAC USA,          :
 9   SHAC-CHICAGO, MICHAEL DURSCHMID
     JOSHUA C. SCHWARTZ, IVER R.            :
10   JOHNSON, III, ISABELE ESTERMAN
     AIMEE GRENIER and JENNICA E.           :
11   TAIT,

12                 Defendants.             :
     ---------------------------------
13
```

16                    TRANSCRIPT of the deposition of

17   KEVIN KJONAAS, before ANDREA NOCKS, a Certified

18   Shorthand Reporter, Certified Realtime Reporter and

19   Notary Public of the State of New Jersey, at the

20   offices of McCarter & English, LLP, Four Gateway

21   Center, 100 Mulberry Street, Newark, New Jersey, on

22   Wednesday, October 9, 2002, commencing at 9:51 a.m.

23

24

25

2

```
 1    A P P E A R A N C E S:

 2         QUARLES & BRADY
           500 West Madison Street
 3         Chicago, Illinois  60661
           BY:  JAMES HULTQUIST, ESQ.
 4         -and-
           McCARTER & ENGLISH, LLP
 5         Four Gateway Center
           100 Mulberry Street
 6         Newark, New Jersey  07012
           BY:  LOUIS A. CHIAFULLO, ESQ.
 7         Attorneys for Plaintiffs

 8         WILLIAM STRAZZA
           2004 Morris Avenue
 9         Union, New Jersey  07083
           Attorneys for witness and SHAC USA

10

11    ALSO PRESENT:  KARL PETRY, Videographer

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

3

```
1                        I N D E X

2    WITNESS                              DIRECT

3    KEVIN KJONAAS

4         By Mr. Hultquist                    5

5                      E X H I B I T S

6    NUMBER        DESCRIPTION        IDENTIFICATION
```

```
7    P-5    Subpoena                          4
     P-6    Leaflet                          80
8    P-7    Leaflet                          95
     P-8    Leaflet                          95
9    P-9    Leaflet                          95
     P-10   Website printout                113
10   P-11   Temporary Restraining Order     113
     P-12   Plaintiff's Verified Complaint
11          for Injunctive Relief           113
     P-13   Copy of driver's license        131
12   P-14   Preliminary Injunction Order
            in California                    134
13   P-15   Amendment to California
            Complaint                        134
14   P-16   20 terror tactics               171
     P-17   Preliminary Injunction Order
15          in Texas                         173
     P-18   Amended Petition in Texas        173
16   P-19   Affidavit of Facts              176
     P-20   Order to Show Cause and
17          Restraining Order, New York     177
     P-21   Summons and Complaint           177
18   P-22   Summons and Restraining Order   177
     P-23   Plaintiff's Verified Complaint,
19          Boston                          177
     P-24   Website printout                189
20   P-25   Website printout                193
     P-26   Website printout                194
21   P-27   Website printout                196
     P-28   Wanted posters                  198
22   P-29   www.go-veggie.org website
            printout                        220
```

```
23

24

25
```

55

1    A    Yes, I do.

2    Q    What does it mean to be an animal

3    rights activist?

4    A    In my opinion for me it means that I

5    am active to promote an awareness for and -- for

6    animal rights and to seek animal rights and the way

7    I primarily do that is to campaign to shutdown

8    Huntingdon Life Sciences.

9    Q    Beyond your work for SHAC USA do you

10   do anything else to support animal rights --

11   A    I --

12   Q    -- currently?

13   A    I have a vegan diet which means I

14   don't eat any animal products, whether that be

15   milk, eggs, meat.  I don't wear leather or fur.

16   Q    Other than those things, do you do

17   anything else to support animal rights currently?

18   A    Buy cruelty-free products.  That's

19   about it.

20   Q    Are you familiar with the

21   organization, the Animal Liberation Front?

22   A    I know of it.

23   Q    In the past you had been a spokesman

24   for ALF, correct?

25   A    I had a college internship with the

1    ALF press office and so, yeah.  I did speak out in

2    support of the ALF during that internship.

3         Q        And that was what, in 1999 just prior

4    to graduation?

5         A        Yes.  That was my final semester.

6         Q        Since acting as a spokesman for ALF

7    prior to your graduation in 1999 have you had any

8    other affiliation with the ALF since that time?

9         A        No.

10        Q        What rights do you believe animals

11   have?

12        A        The rights not to be -- it's the right

13   to have a live free of exploitation whether that be

14   exploited for the purpose of being eaten, worn,

15   used in entertainment or tested on.  I think

16   animals are sentient, they have the capacity to

17   feel and understand pain and they have a right not

18   to be exposed to pain for human -- for human wants

19   and desires.

20        Q        Are you personally opposed to killing

21   animals under any circumstances?

22        A        No.  That's not true.

23        Q        So you would agree with me that there

24   are certain circumstances where killing animals is

25   justified?

59

1    activity, not in relation to SHAC USA or Huntingdon

2    Life Sciences.  I spoke about who the Animal

3    Liberation Front is or what it is, rather, that was

4    not in any way related to Huntingdon Life Sciences

5    or SHAC USA.

6         Q       What is the Animal Liberation Front?

7         A       It's autonomous cells of anonymous

8    people that choose to break the law to free animals

9    from exploitation or to damage the mechanisms of

10   abuse.  It could be any group of people or person

11   so long as they don't hurt any animal or any person

12   in the activity that breaks into some place to free

13   an animal, whether that be a garage where they're

14   being kept cruelly or a lab or a person that even

15   goes to the extent of burning down a slaughter

16   house or something to that nature.  So as long as

17   animals and people aren't hurt, it's non-violent.

18        Q       Do you support ALF?

19        A       I support -- I don't support violence,

20   but I support people that choose to risk life,

21   liberty and freedom to try to save animals and end

22   animal exploitation.

23        Q       Does violence include property damage?

24        A       In my opinion, it does not.

25        Q       So when you say that you

Case 1:05-cv-02211-HHK    Document 11-4    Filed 11/21/2005    Page 20 of 66

Dec-03-02   10:31   From-Exec. Offices.

166

1    A    It does.

2    Q    How does it do that?

3    A    By vocally saying or by, I'm sorry, by
4  writing that it does support the Animal Liberation
5  Front, by stating it.

6    Q    On its website?

7    A    When I gave speeches either personally
8  on my behalf or when I'm representing SHAC for a
9  presentation, if that question comes up, SHAC USA
10  does support the Animal Liberation Front.

11    Q    Does SHAC USA provide the Animal
12  Liberation Front with any money?

13    A    No.

14    Q    Does the Animal Liberation Front
15  provide SHAC USA with any money?

16    A    No.

17    Q    Other than posting information on the
18  website, does SHAC USA support the Animal
19  Liberation Front in any other way?

20    A    SHAC USA has T-shirts that supports
21  Animal Liberation Front.

22    Q    What do the T-shirts say?

23    A    There's pictures of a number of
24  different animals that have been taken out of
25  laboratories and slaughter houses by the Animal

167

1    Liberation Front post-action and it's a number of

2    pictures and across the top it says Tell These

3    Animals You Don't Support the Animal Liberation

4    Front.

5                   There are pictures dating back as

6    early as the early '80s or as far back as the early

7    '80s.

8         Q         Are those T-shirts for sale through

9    SHAC USA?

10        A         I believe so.

11        Q         How does one go about purchasing one

12   of those T-shirts?

13        A         I think you have to have the SHAC USA

14   newsletter, 'cause that's my understanding it's the

15   only place where it's mentioned.

16        Q         And is there an address on a

17   newsletter where somebody can order a T-shirt?

18        A         I think it's the PO Box.

19        Q         Are you responsible for -- strike

20   that.

21                  Do you have any involvement in the

22   providing or ordering of T-shirts?

23        A         I have sent a couple for free to

24   people that are my friends.

25        Q         You've sent them.  What do you mean.

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

MILTON MILLS, M.D., RASHID GHOLSON,
HUA-WEI CHERNG, NORMA HUMPHRIES,
LYNETTE GARNER, DARRELL
BRANSOME, PAUL MILLER, GLENDA
COSTNER, SYBIL HAROLD, ELIZABETH
RUSSELL, for themselves and on behalf of all other
District of Columbia residents similarly
situated,

          Plaintiffs,

          v.

GIANT OF MARYLAND, LLC, SAFEWAY
INC., HORIZON ORGANIC, DEAN FOODS
CO., NESTLE HOLDINGS, INC.,
FARMLAND DAIRIES, LLC,
SHENANDOAH'S PRIDE, LLC,
STONYFIELD FARM, INC., CLOVERLAND
FARMS DAIRY, INC.,

          Defendants.

Case No.: 05-CV-2211 (HHK)

**Declaration of R. Douglas Rhoads**

**EXHIBIT P**

05-26-04 -- SHAC -- Indictment -- News Release

# Militant Animal Rights Group, Seven Members Indicted for National Campaign to Terrorize Company and Its Employees

NEWARK, N.J. -- A militant animal rights organization and seven of its members have been charged in a federal indictment - and all were arrested today - in connection with their campaign to terrorize officers, employees and shareholders of a company that used animals for laboratory research and testing, U.S. Attorney Christopher J. Christie announced.

The stated goal of Stop Huntingdon Animal Cruelty (SHAC) was to drive Huntingdon Life Sciences (HLS), a publicly traded company based in East Millstone, N.J., out of business by encouraging its members and others to "operate outside the confines of the legal system," according to the Indictment. Among other methods, SHAC recommended "direct actions" that included its "top 20 terror tactics" to intimidate and harass and to destroy personal and real property, as described on its websites.

The methods were used against not only Huntingdon officers, employees and shareholders but other individuals and companies doing business with Huntingdon, including an insurer, financial services and investment firms as well as a California pharmaceutical company, according to the Indictment, which was returned on May 20 and unsealed with today's arrests.

Among SHAC's "top 20 terror tactics" recommended and publicized on its websites: invading offices, vandalizing property and stealing documents; physical assault, including spraying cleaning fluid into someone's eyes; smashing windows of a target's home or flooding the home while the individual was away; vandalizing or firebombing cars and bomb hoaxes; and threatening telephone calls or letters, including threats to kill or injure someone's partner or children.

The five-count Indictment charges SHAC and seven of its members with animal enterprise terrorism, which carries a maximum penalty of three years in prison and a $250,000 fine. Counts Two through Five charge SHAC and three of its members with conspiracy to engage in interstate stalking, which carries a maximum penalty of five years in prison and a $250,000 fine, and three counts of interstate stalking, which carries a maximum penalty of five years in prison and a $250,000 fine for each count.

Arrested today by Special Agents of the FBI were: Kevin Kjonas, 26; Lauren Gazzola, 25; and Jacob Conroy, 28, each of Pinole, Calif; Joshua Harper, 29, of Seattle, Wash.; Andrew Stepanian, 25, of Huntington, N.Y.; Darius Fullmer, 27, of Hamilton, N.J., and John McGee, 25, of Edison, N.J.

Fullmer, McGee and Stepanian are expected to make initial appearances today at 3 p.m. before U.S. Magistrate Judge Madeline Cox Arleo in Newark. The defendants in California and Washington will make initial appearances in those states.

"This is not activism. This is a group of lawless thugs attacking innocent men, women and children," said Christie. "We will not stand by and let any group or individuals violate federal law through violence and intimidation, no matter what cause they profess to advocate for in the process."

The Indictment describes numerous acts of vandalism, harassment and intimidation committed by individuals after postings on the SHAC websites. Among the incidents described in the Indictment:

• overturning the car of a Huntingdon employee, in the driveway of his New Jersey home, vandalizing another car and throwing rocks through windows of person's home in 2001.

• smoke-bombing the offices of two companies in Seattle, Wash. on July 10, 2002, resulting in the evacuation of two high-rise office buildings.

• destruction of putting greens at Meadowbrook Golf Club in Long Island, New York where SHAC had announced that a director of a company that provided insurance services for Huntingdon was scheduled to be for a golf tournament in the summer of 2002.

On Aug. 1, 2002, according to the Indictment, the SHAC website praised the destruction of four putting greens at Meadowbrook stating in part:

"... League of Justice wreaked havoc upon the course, sabotaging all of the PGA's week long tournament [sic].... Damages from this action may in fact exceed hundreds of thousands of dollars between the damage to the well-maintained golf course, the disruption to the PGA event and to the club itself."

In early 2002, SHAC had listed the insurance company as a target and stated: "Hitting their insurance company will keep HLS on the defensive ... and show SHAC sets the pace ... [L]et (the company) know that we are about to raise the premium on pain."

The next month, according to the Indictment, SHAC listed the names and addresses of various employees of the company around the United States on its website. In some instances, SHAC also listed home phone numbers; names of employees' spouses; the names, ages and birth dates of their children and where the children attended school; license plate numbers and churches attended by employees and their families.

As part of the alleged conspiracy to put Huntingdon out of business, SHAC would name a "target of the week" - companies either doing business with or customers of Huntingdon - and encourage its members and supporters to take "direct action" against them as well. Like Huntingdon, those companies and its employees would, at a minimum, be subject to telephone, email and fax blitzes and other methods designed to overwhelm or shut down office systems in the campaign to harm or end the companies' relationship with Huntingdon, according to the Indictment.

In July 2001, according to the Indictment, SHAC targeted a securities market maker for

action. On July 11, 2001, the computer server the company was compromised and in a matter of hours, over two million e-mails were sent through its computer, causing damage to its operations.

The SHAC website also identified another company as a target and, according to the Indictment, stated: "We know where you are, we know what you look like we know where you socialize and best of all we know where you live!"

In the ensuing months, SHAC boasted that it had "swarmed" the neighborhood of an employee "taking over her street." Following another demonstration announced on the SHAC website, the group declared: "at about 12 am we bid him a fond farewell and left questioning ... did you tuck your family into bed and explain why we were out there, or were you too cowardly to be home. Either way, we win. Because WE ALWAYS WIN."

The defendants will be arraigned on the Indictment sometime over approximately the next two weeks.

Despite Indictment, every defendant is presumed innocent, unless and until found guilty beyond a reasonable doubt, following a trial at which the defendant has all of the trial rights guaranteed by the U.S. Constitution and federal law.

Christie credited Special Agents of the FBI, under the direction of Special Agent in Charge Joseph Billy Jr., with bringing the case against the defendants.

The case is being prosecuted by Executive Assistant U.S. Attorney Charles B. McKenna and Assistant U.S. Attorney Ricardo Solano.

-end-

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

UNITED STATES OF AMERICA            :    Criminal No.

                v.                  :    18 U.S.C. §§ 43, 371, 2261A,
                                              and 2
STOP HUNTINGDON ANIMAL              :
CRUELTY USA, INC.,
KEVIN KJONAAS, a/k/a                :
"Kevin Jonas," a/k/a "Steve
Shore," a/k/a "Jim Fareer,"         :
LAUREN GAZZOLA,
a/k/a "Angela Jackson," a/k/a       :
"Danielle Matthews,"                :    INDICTMENT
JACOB CONROY,
JOSHUA HARPER,                      :
ANDREW STEPANIAN,
DARIUS FULLMER, and                 :
JOHN MCGEE

        The Grand Jury in and for the District of New Jersey,

sitting at Newark, charges:

                            COUNT ONE

        1.  At times relevant to this Indictment:

INDIVIDUALS AND ENTITIES

        a.  Huntingdon Life Sciences ("HLS") was a corporation

organized under the laws of the State of Delaware with its

principal place of business at the Princeton Research Center, 100

Mettlers Lane, East Millstone, New Jersey.  HLS trades on the

stock exchange as company symbol LSRI.  HLS was started and

maintains facilities in the United Kingdom.  It is one of the

leading pharmaceutical testing companies.  As part of its drug

testing procedures, many of which are mandated by law, HLS uses

animals for, among other things, testing the safety of drugs and

chemicals that various manufacturers seek to bring to market. HLS is an "animal enterprise" as that term is defined by Title 18, United States Code, Section 43(d)(1), in that it is a commercial enterprise that uses animals for research and testing. As part of its business operation, HLS utilizes a website as well as e-mail.

b. Stop Huntingdon Animal Cruelty, USA ("SHAC") was a not-for-profit corporation incorporated under the laws of the State of Delaware, with its principal place of business located in New Jersey. SHAC is an organization first started in the United Kingdom and then incorporated in the United States. SHAC was formed to interrupt the business of HLS and ultimately to force it to cease operations altogether due to its use of animals for research and testing. SHAC has used a multi-pronged attack against HLS targeting its workers and shareholders as well as companies (and their employees) which received services from, or provided them to, HLS. SHAC distributed a newsletter and operated a series of websites that disseminated its animal rights ideology and furthered its mission by, among other things, posting information relating to individuals and organizations that SHAC targeted for action. This information included the names, addresses and other personal information about individuals who were employed by HLS and other targeted companies. These websites included www.shacusa.net; www.shacamerica.com; www.shacamerica.net; www.shacamerica.org; www.stephenskills.com;

2

and www.december1.com (hereinafter sometimes collectively referred to as the "SHAC Website"). The activities of SHAC and the SHAC Website were chosen and coordinated at various times by the defendants KEVIN KJONAS, a/k/a "Kevin Jonas," a/k/a "Steve Shore," a/k/a "Jim Fareer," LAUREN GAZZOLA, a/k/a "Angela Jackson," a/k/a "Danielle Matthews," JACOB CONROY, JOSHUA HARPER, ANDREW STEPANIAN, and DARIUS FULLMER.

c.  Defendant KEVIN KJONAS, a/k/a "Kevin Jonas," a/k/a "Steve Shore," a/k/a "Jim Fareer" was the President of SHAC and resided in New Jersey.

d.  Defendant LAUREN GAZZOLA, a/k/a "Angela Jackson," a/k/a "Danielle Matthews" was the campaign coordinator for SHAC and resided in New Jersey.

e.  Defendant JACOB CONROY was affiliated with SHAC and resided in New Jersey.

f.  Defendant JOSHUA HARPER was affiliated with SHAC and resided in Seattle, Washington.

g.  Defendant ANDREW STEPANIAN was affiliated with SHAC and resided in New York.

h.  Defendant DARIUS FULLMER was affiliated with SHAC and resided in New Jersey.

i.  Defendant JOHN MCGEE was affiliated with SHAC and resided in New Jersey.

j.  "S. Inc." was an investment banking firm with its principal place of business in Little Rock, Arkansas.  As part of

3

its business operation, S. Inc. utilized a website as well as e-mail.

k. "M. Corp." was a company with its principal place of business in New York, New York, which provided insurance brokerage services on behalf of large corporations and others. As part of its business operation, M. Corp. utilized a website as well as e-mail.

l. "Q" was a company headquartered in New York, New York, involved in investing in companies on behalf of clients. As part of its business operation, Q utilized a website as well as e-mail.

m. "W. Corp." was a company headquartered in Jersey City, New Jersey, involved in trading the stock of publicly traded companies on behalf of clients. As part of its business operation, W. Corp. utilized a website as well as e-mail.

n. "BNY" was a financial institution having its principal place of business in New York, New York, which provided financial services to individuals and corporations. As part of its business operation, BNY utilized a website as well as e-mail.

o. "C. Corp." was a global pharmaceutical company headquarted in Emeryville, California. As part of its business operation, C. Corp. utilized a website as well as e-mail.

2. From at least as early as October, 2001, through February, 2004, at Somerset, in the District of New Jersey, and elsewhere, defendants

4

STOP HUNTINGDON ANIMAL CRUELTY, USA INC.,
KEVIN KJONAAS, a/k/a "Kevin Jonas,"
a/k/a "Steve Shore," a/k/a "Jim Fareer,"
LAUREN GAZZOLA,
a/k/a "Angela Jackson," a/k/a "Danielle Matthews,"
JACOB CONROY,
JOSHUA HARPER,
ANDREW STEPANIAN
DARIUS FULLMER, and
JOHN MCGEE

did knowingly and willfully combine, conspire and agree with one another and others to use a facility in interstate and foreign commerce for the purpose of causing physical disruption to the functioning of HLS, an animal enterprise, and intentionally damage and cause the loss of property used by HLS, in an amount exceeding $10,000.

## OBJECT OF THE CONSPIRACY

3. It was the object of the conspiracy to physically disrupt the operations of HLS and drive it out of business either by: (a) directly disrupting the business of HLS or (b) disrupting the business of companies that either provided services to, or purchased services from, HLS, thereby forcing those businesses to cease doing business with HLS and make it impossible for HLS to conduct its business.

## MANNER AND MEANS

4. It was part of the conspiracy that the defendants embarked on a campaign to enlist animal rights activists to engage in activity meant to harm the business of HLS in any manner available.

5

5. It was further part of the conspiracy that e-mail and web-based communications were used to disseminate information and coordinate the campaign to shut down HLS.

6. It was further part of the conspiracy that the defendants espoused and encouraged others to engage in "direct action," which as described by SHAC involved activities that "operate outside the confines of the legal system." For instance, the SHAC Website posted what it termed the "top 20 terror tactics," which described "direct actions" that could be taken against companies or individuals such as:

demonstrations at one's home using a loudspeaker;

abusive graffiti, posters and stickers on one's car and house;

invading offices and, damaging property and stealing documents;

chaining gates shut, and blocking gates;

physical assault including spraying cleaning fluid into one's eyes;

smashing the windows of one's house while the individual's family was at home;

flooding one's home while the individual was away;

vandalizing one's car;

firebombing one's car;

bomb hoaxes;

threatening telephone calls and letters including threats to kill or injure one's partner or children;

e-mail bombs in an attempt to crash computers;

sending continuous black faxes causing fax machines to burn out;

telephone blockades by repeated dialing to prevent the use of the telephone; and

arranging for an undertaker to call to collect one's body.

7. It was further part of the conspiracy to conduct telephone and e-mail blitzes, fax blitzes and computer blockades against HLS in order to divert HLS employees from their regular work.

8. It was further part of the conspiracy that information would be disseminated through the SHAC Website to coordinate computer attacks on HLS with the intent of causing damage to, or shutting down, HLS' computer systems.

9. It was further part of the conspiracy that SHAC would post the names, addresses, home telephone numbers and other personal information of HLS employees on the SHAC Website and encourage people to engage in acts of harassment and intimidation against those HLS employees at their homes, through mailings, telephone calls, home demonstrations, vandalism of their real and personal property and other "direct action," in an attempt to place them in reasonable fear of serious bodily injury and/or death and cause targets to resign from HLS and thereby further disrupt HLS' business activities.

10. It was further part of the conspiracy that acts of intimidation and vandalism perpetrated on HLS employees would be reported on the SHAC Website in a manner designed to foster additional acts against those same employees as well as others whose personal information had been posted on the SHAC Website.

11. It was further part of the conspiracy that acts perpetrated on HLS and its employees, which were reported on the SHAC Website, would be used as examples in order to intimidate, harass and threaten other individuals and companies and place individuals in a reasonable fear of serious bodily injury and/or death.

12. It was further part of the conspiracy that each week SHAC designated a company that was either doing business with HLS or was a customer of HLS as the "target of the week" in order to make that company the victim of "direct action" by animal rights supporters and force the company to cease its business relationship with HLS.

13. It was further part of the conspiracy that SHAC targeted certain companies on an ongoing basis in order to pressure those companies into ceasing their business relationships with HLS. SHAC and the defendants selected as "ongoing targets" certain companies deemed vital to HLS' ability to maintain its business operation.

14. It was further part of the conspiracy that once a company was either a "target of the week" or an ongoing target of the campaign to shut down HLS, those companies would be subject to many of the same "direct actions" that HLS itself was subjected to. Thus, these target companies would be the recipients of telephone and e-mail blitzes, fax blitzes and computer blockades designed to harm their businesses and thereby force them to cease doing business with HLS.

8

15. It was further part of the conspiracy that information would be disseminated through the SHAC Website to coordinate computer attacks on certain "targets of the week" or "ongoing targets" in order to cause damage to, or shut down, the computer systems of the target company.

16. It was further part of the conspiracy that once a company was either a "target of the week" or an "ongoing target," employees of those companies would be subject to many of the same "direct actions" that HLS employees were subjected to. Thus, the names, addresses, home telephone numbers and other personal information of employees of the target companies would be posted on the SHAC Website, and viewers of the website were encouraged to engage in acts of harassment and intimidation against those employees at their homes, through mailings, telephone calls, home demonstrations and vandalism of their real and personal property. This was done to threaten and intimidate individuals employed by companies doing business with HLS to place them in reasonable fear of serious bodily injury and/or death and to cause them to resign their positions. The defendants thereby intended to disrupt the operations of the target companies and force them to cease doing business with HLS, which in turn would disrupt HLS' business.

17. It was further part of the conspiracy that the SHAC Website reported on acts perpetrated on "targets of the week" or "ongoing targets" and their employees, to be used as examples to intimidate, harass and threaten other individuals and

companies and place individuals in a reasonable fear of serious bodily injury and/or death.

18. It was further part of the conspiracy that defendants and others would take steps to conceal their conduct by, among other things, using false names; using computer programs designed to scramble e-mail messages so that they could not be read or understood by anyone other than an individual having the proper code; burning documents; falsely attributing conduct to other entities; and using computer software to wipe information from computer hard drives.

<u>OVERT ACTS</u>

In furtherance of the conspiracy and in order to effect its object, the following acts were committed in the District of New Jersey and elsewhere:

I.   <u>THE ATTACKS ON HLS AND ITS EMPLOYEES</u>

19. On or about February 15, 2001, the SHAC Website posted an announcement which stated in part: "we'll be at their offices, at their doorsteps, on their phones or in their computers. There will be no rest for the wicked."

20. On or about March 6, 2001, the SHAC Website listed the "top 20 terror tactics" that could be used against organizations and individuals in order to harm HLS and ultimately cause it to shut down.

21. On or about March 31, 2001, after the SHAC Website postings described above, protesters appeared at the New Jersey

residence of HJ, an HLS employee, and banged on the windows and doors at his home.

22.  On or about April 2, 2001, after the SHAC Website postings described above, rocks were thrown through windows of HJ's home; one of the cars in HJ's driveway was overturned and vandalized; and a second car in HJ's driveway was also vandalized.

23.  On or about May 30, 2001, defendant JOHN MCGEE and another slashed the tires on the car of DD, an HLS employee, and spray painted on his house.

24.  After the May 30, 2001 attack on the home of DD, the SHAC Website posted names and home addresses of HLS employees and stated with respect to DD that his home "was visited several times, had car windows broke, tires slashed, house spray painted with slogans.  His wife is reportedly on the brink of a nervous breakdown and divorce."

25.  In or about June, 2002, the SHAC Website announced an electronic form of attack against HLS and posted a computer application designed to cause certain commands to be sent automatically to the HLS website.

26.  In or about June, 2002, individuals using the above utility caused HLS' server to overload, rendering it, and hence the HLS website, inoperable.

27.  On or about July 12, 2002, the SHAC Website announced that its "multi pronged attack on the workers,

shareholders and clients" of HLS was being successfully carried out.

28.  In or about October, 2002, the SHAC Website posted an announcement listing the home address and telephone number of CA, an HLS employee.

29.  On or about October 21, 2002, the SHAC Website posted an announcement relating to signs that were posted in and around the Princeton, New Jersey area, which referred to CA as "deluded and deranged" and listed her home address and telephone number.

30.  On or about November 17, 2002, the SHAC Website posted an announcement stating, in part, that HJ and another HLS employee "resigned after months of pressure, including protests, property destruction, [and] phone blockades at home and work."

31.  In or about December, 2003, individuals engaged in a "Distributed Denial of Service" against HLS known as a "Zombie Attack," which caused the HLS website to be inoperable.

32.  In or about December, 2003, the SHAC Website reported on the "Zombie Attack" on HLS, attributing the attack to Russian computer hackers.

II.  THE ATTACK ON S. INC.

33.  In or about October, 2000, SHAC caused the website www.stephenskills.com to be launched in order to apply pressure on S. Inc. to cease doing business with HLS.

34.  On or about February 28, 2001, the SHAC Website announced a successful electronic attack against S. Inc. which

12

"saw over a thousand activists activate a floodnet program from their computers that enabled them to 'flood' S. Inc.'s website several times per minute with download requests thereby slowing down and clogging up the system."

35.  On or about January 3, 2002, the SHAC Website, claiming that it received an anonymous report, announced that the home of WS, the head of S. Inc., was vandalized in the early morning hours of January 3.  Specifically, the web-posting stated that activists "jumped over his gate to gain access to the front of the house .... quickly smashed out his porch lights and windows, and as an alarm went off, plastered the front of his house with over 15 paint bombs .... then spray painted PUPPY KILLER on the sidewalk and ran off."

III.  THE ATTACK ON M. CORP.

36.  In or about February 10, 2002, the SHAC Website listed M. Corp. as a target.  The SHAC website stated, "hitting their insurance company will keep HLS on the defensive ... and show SHAC sets the pace ... [L]et M*** know that we are about to raise the premium on pain."  The website posting also advised readers to "stay tuned for office addresses and internal phone numbers."

37.  In or about March, 2002, the SHAC Website listed the names and addresses of various M. Corp. employees around the United States including SD and MR.  In addition, the SHAC website listed, in certain instances, the home telephone numbers of M. Corp. employees; the names of their spouses; the names, ages and

13

dates of birth of their children; where these children attended school; license plate numbers of the employees' cars; and the churches that the employees and their families attended.

38. On or about March 9, 2002, the home of SD, an employee of M. Corp., was vandalized.

39. On or about March 10, 2002, the SHAC Website posted a report of the vandalism at the home of SD.

40. On or about March 9, 2002, the home of MR, an employee of M. Corp., was vandalized.

41. On or about March 10, 2002 the SHAC Website posted a report of the vandalism at the home of MR.

42. On or about August 3, 2002 and dates thereafter, individuals harassed MH and protested at the home of MH, an employee of a subsidiary of M. Corp., whose home address had been posted on the SHAC Website.

43. On or about July 29, 2002, the SHAC Website announced that FT, a Director at M. Corp., was scheduled to be at the Lightpath Golf Tournament at the Meadowbrook Golf Club in New York from July 29 through August 4, 2002. The web posting also listed FT's home address and home telephone and fax number.

44. On or about July 30, 2002, the Meadowbrook Golf Club was vandalized; its putting greens were destroyed and the words "FT pup-killer wuz hea" were dug into the grass on one of the greens.

45. On or about August 1, 2002, the SHAC Website posted the following message:

14

The FT Commando Division of the Animal Liberation Front claims responsibility for the destruction of 4 greens and 4 holes at the Meadowbrook Golf Club/PGA Lightpath classic. FT, BMOC to M Corp., and his super friends /League of Justice wreaked havoc upon the course, sabotaging all of the PGA's week long tournement [sic]. The FT commandos dug 3 foot deep holes at 4 of the 18 holes, removed the metal casings and flags, scarred each putting green with different trenches and holes.

. . . .

Damages from this action may in fact exceed hundreds of thousands of dollars between the damage to the well-maintained golf course, the disruption to the PGA event and to the club itself.

46.  On or about September 17, 2002, the SHAC Website posted the following: "25 activists paid a visit to the posh Plandome home of FT, director at M. Corp.... Chants of 'blood money! - his beach!, blood money! - his pool!, blood money! - his yacht!' and bullhorn speakouts describing his role in the murder of 500 animals daily drove neighbors out of their houses to see what was all the commotion...."

47.  On or about September 19, 2002, individuals vandalized the home of FT, spray painting the words "murder," "leave town," and "M*** pull out of HLS" on his and his neighbor's property.

48.  On or about September 21, 2002, the SHAC Website posted the following:

Last evening members of the Animal Liberation Front, paid a visit to the home of FT, honorary director to M Corp. We have been monitoring the protection and home for quite

15

some time now, FT we were well aware of the
security patrols at your home, the guards and
their shift changes and the fact that last
week they cut the security from 24 hrs. a
day, every day, to fri/sat/Sunday and then
decided to go back to full time security. Did
you think that armed guards or the
installation of motion sensors, cameras,
lights, and steel grating around your
basement windows would somehow make the
animal liberation movement go away?  Of
course not!

Last evening we waited for your security
guard to fall asleep then went right in under
their noses and got to painting, leaving your
house a red bloody mess, just like your
hands!

FT's home was donned with anti-HLS and ALF
slogans, the words "killer" and "murderer
leave town" can be seen all the way across
the harbor.

The posting went on to threaten that this was "only the

beginning."

49.  On or about June 15, 2002, individuals vandalized

the home of RH, an employee of M. Corp.

50.  On or about August 10, 2002, members of the

conspiracy, including defendant LAUREN GAZZOLA, assembled outside

the home of RH, an employee of M. Corp. and, using a megaphone,

threatened RH, his wife and family with burning down their home.

51.  On or about August 11, 2002, SHAC Website posted a

report of the demonstration at the home of RH.

52.  On or about April 21, 2002, individuals assembled

outside the home and on the deck and private property surrounding

the home of ML, an M. Corp. employee.  The demonstrators banged

16

on the home and its windows, and shouted that they knew where ML worked, knew where ML lived and would be back.

53.  On or about July 10, 2002, a smoke bomb was set off at the offices of a subsidiary of M. Corp. in Seattle, Washington causing the evacuation of a high-rise office tower, and a second smoke bomb was set off at the offices of M. Corp. in Seattle, Washington, causing the evacuation of that high-rise office tower as well.  After these events, the SHAC Website posted a report about the smoke bomb attacks.

IV.  THE ATTACK ON Q

54.  On or about October 23, 2001, an e-mail was sent to animal rights activists targeting Q as an "hls: Investor of the week."  The e-mail also listed personal information regarding PQ, a principal of Q, including his home address; home telephone number; the address of his vacation home and its telephone number; the make and license plate number of his automobile; a description of him and his wife; the name of his dog; and his brother's name, address and home telephone number.  The e-mail stated:

> Now more than ever, we need to hit hls's other two original investors who have callously stood by the lab through two damning undercover investigations.  In the Financial Times article P***** Q****** is quoted as saying, 'We have received a lot of harassment, but it hasn't changed our position."  Since both have been listed as Investor of the Week before and have not budged from their backing of animal cruelty, we have decided to be more stern in our tactics and strategic in our focus.  Below is not only the contact information for Q's office but also personal information

anonymously leaked to SHAC-USA that include the phone numbers and addresses of his homes.

55.  On or about February 3, 2002, individuals broke windows and splashed paint at the building where PQ resided.

56.  In or about February, 2002, the SHAC Website reported the vandalism that occurred at the residence of PQ.

V.  THE ATTACK ON W. CORP.

57.  In or about July, 2001, the SHAC Website listed W. Corp. as a Market Maker of the Week, thereby targeting W. Corp. for direct action.

58.  On or about July 11, 2001, in a matter of hours over 2 million e-mails were sent through W. Corp.'s computer. This barrage of e-mails compromised the computer server and caused damage to W. Corp.'s operations.

59.  On or about September 10, 2002, W. Corp. received a letter from SHAC, signed by Angela Jackson, an alias utilized by defendant LAUREN GAZZOLA, requesting written confirmation that W. Corp had ceased as a Market Maker of HLS stock stating:  "If we can obtain a statement, on company letterhead confirming that [W. Corp.] no longer acts as a Market Maker for LSRI, and has no intention of doing so in the future, we are happy to contact our supporters and confirm that the campaign against [W. Corp] has ended.  This should bring a prompt end to the phone calls and faxes and e-mails your company is receiving."

VI.  THE ATTACK ON BNY

60.  From at least as early as in or about April, 2001, the SHAC Website listed BNY as a target.

18

61. On or about May 13, 2001, defendants KEVIN KJONAAS, LAUREN GAZZOLA, ANDREW STEPANIAN, DARIUS FULLMER and others appeared at the doorstep of BNY employee TP's home and shouted, cursed and threatened his wife.

62. After the May 13, 2001 verbal attack upon TP's wife, the SHAC Website reported the incident.

63. On or about July 24, 2001, the home of BR, a BNY employee, was vandalized and his boat was damaged. According to a SHAC press release: BR's "Amerikkkan Flag was lowered and discarded like the trash it is, and replaced with the only flag that matters, a pirate flag!"

## VI. THE ATTACK ON C. CORP.

64. On or about May 29, 2003, the SHAC Website announced that C. Corp., a global pharmaceutical company, was a target of the SHAC campaign. Referring to C. Corp. employees, the SHAC Website stated: "We know where you are, we know what you look like we know where you socialize and best of all we know where you live!"

65. On or about August 18, 2003, the SHAC Website announced that animal rights activists had demonstrated at the home of KS, a C. Corp. employee, and that they had "swarmed her neighborhood, taking over her street..."

19

66.  On or about August 21, 2003, the SHAC Website announced that animal rights activists had demonstrated at the home of KS and spent time "littered throughout her surrounding neighborhood, talking out on the bullhorn..."

67.  On or about September 16, 2003, the SHAC Website announced that animal rights activists had demonstrated at the home of KS and stated "at about 12 am we bid him a fond goodnight and left questioning: So K****, did you tuck your family into bed and explain why we were out there, or were you too cowardly to be home?  Either way, we win.  Because WE ALWAYS WIN."

68.  On or about October 15, 2003, the SHAC Website posted the following:

> K**** "the killer" S****** of C. Corp.'s toxicology department has been infiltrated. She is a longtime treasurer of the Cascade Orienteering Club.... The Club's Officers; board members; co-ordinators, and members have all been written polite e-mails explaining the nature of K**** S******* dirty business.  They were then asked for personal or embarrassing information on K****.  When no one responded in days they were bombarded with e-mails depicting K**** as the cold-blooded killer she is.  The Club's e-mail list had also been infiltrated, and now nothing is secret.

The web posting went on to list information about the club and its members including their names, home addresses, home telephone numbers and personal e-mail addresses.

69.  On or about the late evening of May 15, 2003, and the early morning hours of May 16, 2003, animal rights activists protested at the home of AH with bullhorns.

20

70. On or about May 16, 2003, the SHAC Website posted a report of the demonstration at the home of AH stating:

> Very early this morning C[. Corp.] employees
> and board members woke up to the sounds of
> activists screaming though bullhorns,
> personal alarms blaring in the front yards
> and to find flyers with their pictures, names
> and addresses posted up around their
> neighborhoods exposing the sick animal
> killing scum that they are.

71. On or about August 18, 2003, individuals went to the home of AH and, pounded on her front door, rang her doorbell and shouting "open the door you fucking bitch."

In violation of Title 18, United States Code, Section 43.

COUNT TWO

1.   Paragraphs 1, 6, 9-14, 16-18, 36-39, 42, 49-51 of Count One of this Indictment are repeated and realleged as if fully set forth herein.

2.   From at least as early as March, 2001 through in or about December, 2002 at Somerset, in the District of New Jersey, and elsewhere, the defendants

STOP HUNTINGDON ANIMAL CRUELTY, USA, INC.
KEVIN KJONAAS, a/k/a "Kevin Jonas,"
a/k/a "Steve Shore," a/k/a "Jim Fareer,"
LAUREN GAZZOLA, a/k/a "Angela Jackson,"
a/k/a "Danielle Matthews," and
JACOB CONROY

did knowingly and wilfully combine, conspire and agree with one another and with others to use a facility in interstate and foreign commerce to engage in a course of conduct that placed a person, a member of the immediate family of that person, or a spouse or intimate partner of that person, in reasonable fear of death or serious bodily injury to any of the persons described above, with the intent to place a person in another State in reasonable fear of the death of, or serious bodily injury to, that person or any of the persons described above, contrary to Title 18, United States Code, Section 2261A(2).

3.   Defendants and others committed overt acts in furtherance of the conspiracy as set forth in paragraphs 1, 6, 9-14, 16-18, 36-39, 42 and 49-51 of Count One of this Indictment in order to effect its object.

In violation of Title 18, United States Code, Section 371.

22

23

## COUNT THREE

1.  Paragraphs 1, 6, 9-14 and 36-39 of Count One of this Indictment are repeated and realleged as if fully set forth herein.

2.  From at least as early as March 9, 2002 through in or about December, 2002 at Somerset, in the District of New Jersey, and elsewhere, the defendants

STOP HUNTINGDON ANIMAL CRUELTY, USA, INC.
KEVIN KJONAAS, a/k/a "Kevin Jonas,"
a/k/a "Steve Shore," a/k/a "Jim Fareer,"
LAUREN GAZZOLA, a/k/a "Angela Jackson,"
a/k/a "Danielle Matthews," and
JACOB CONROY

did knowingly and with the intent to place a person in another State in reasonable fear of death or serious bodily injury to that person, specifically SD, or a member of the immediate family of SD, or a spouse or intimate partner of SD, use a facility in interstate and foreign commerce to engage in a course of conduct that placed SD in reasonable fear of the death of, or serious bodily injury to, SD or a member of the immediate family of SD, or a spouse or intimate partner of SD.

In violation of Title 18, United States Code, Sections 2261A and 2.

## COUNT FOUR

1.   Paragraphs 1, 6, 9-14 and 42 of Count One of this Indictment are repeated and realleged as if fully set forth herein.

2.   From at least as early as August 3, 2002 through in or about December, 2002 at Somerset, in the District of New Jersey, and elsewhere, the defendants

STOP HUNTINGDON ANIMAL CRUELTY, USA, INC.
KEVIN KJONAAS, a/k/a "Kevin Jonas,"
a/k/a "Steve Shore," a/k/a "Jim Fareer,"
LAUREN GAZZOLA, a/k/a "Angela Jackson,"
a/k/a "Danielle Matthews," and
JACOB CONROY

did knowingly and with the intent to place a person in another State in reasonable fear of death or serious bodily injury to that person, specifically MH, or a member of the immediate family of MH, or a spouse or intimate partner of MH, use a facility in interstate and foreign commerce to engage in a course of conduct that placed MH in reasonable fear of the death of, or serious bodily injury to, MH or a member of the immediate family of MH, or a spouse or intimate partner of MH.

In violation of Title 18, United States Code, Sections 2261A and 2.

COUNT FIVE

25

bodily injury to, RH or a member of the immediate family of RH,
or a spouse or intimate partner of RH.

In violation of Title 18, United States Code, Sections
2261A and 2.

A TRUE BILL

_____
FOREPERSON

_____
CHRISTOPHER J. CHRISTIE
United States Attorney

27

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

MILTON MILLS, M.D., RASHID GHOLSON,
HUA-WEI CHERNG, NORMA HUMPHRIES,
LYNETTE GARNER, DARRELL
BRANSOME, PAUL MILLER, GLENDA
COSTNER, SYBIL HAROLD, ELIZABETH
RUSSELL, for themselves and on behalf of all other
District of Columbia residents similarly
situated,

               Plaintiffs,

        v.

GIANT OF MARYLAND, LLC, SAFEWAY
INC., HORIZON ORGANIC, DEAN FOODS
CO., NESTLE HOLDINGS, INC.,
FARMLAND DAIRIES, LLC,
SHENANDOAH'S PRIDE, LLC,
STONYFIELD FARM, INC., CLOVERLAND
FARMS DAIRY, INC.,

               Defendants.

Case No.: 05-CV-2211 (HHK)

**Declaration of R. Douglas Rhoads**

**EXHIBIT Q**

MARK GOLDOWITZ, #96418
PAUL CLIFFORD, #119015
CALIFORNIA ANTI-SLAPP PROJECT
2903 Sacramento Street
Berkeley, CA 94702
Phone:   (510) 486-9123 x 301
Fax:      (510) 486-9708
mg@casp.net

Special Counsel for Defendant
STOP HUNTINGDON ANIMAL CRUELTY, USA, INC.

SUPERIOR COURT OF THE STATE OF CALIFORNIA FOR THE COUNTY OF ALAMEDA

(UNLIMITED JURISDICTION)

CHIRON CORP.,

        Plaintiff,

      vs.

STOP HUNTINGDON ANIMAL CRUELTY,
USA, INC., a Delaware Corporation, a/k/a SHAC
USA, a/k/a SHAC, a/k/a STOP HUNTINGDON
ANIMAL CRUELTY; and DOES 1-100,
inclusive,

        Defendants.

Case No.: No. RG 04142768

DECLARATION OF PAMELYN FERDIN

Date:   September 3, 2004
Time:  2:00 pm
Dept:  31
Judge: Hon. Steven A. Brick

Action Filed: February 25, 2004
Trial Date:   None Set

DECLARATION OF PAMELYN FERDIN

I, Pamelyn Ferdin, declare as follows:

1.     All of the facts recited herein are of my own personal knowledge and, if called as a witness, I could and would testify competently under oath to all of the facts recited herein.

2.     I currently serve as the President of Stop Huntingdon Animal Cruelty USA, Inc. (SHAC USA)  Kevin Kjonaas resigned as President on August 2, 2004, and I formally accepted said office on August 14, 2004.  The abbreviated name for the organization is SHAC USA and it is duly incorporated in Delaware.

3.     SHAC USA gave permission to the San Francisco *Animal Rights Direct Action Coalition* (ARDAC) to advertise ARDAC's weekend of protest activities on August 13-15, 2004, to SHAC USA email subscribers only after assurances were given by ARDAC that the events were planned to be lawful.  SHAC USA was never told that any of this protest activity was to be directed towards Chiron or its employees.

4.     SHAC USA did not authorize, ratify, direct, or participate in the demonstration near William Green's home in Orinda on August 15th, 2004, which I understand was organized by ARDAC.

5.     SHAC USA did not create the banner carried at the August 15 demonstration, nor did it give permission to print its website URL on this banner or to display the banner at the demonstration.  I have notified ARDAC that it must, in the future, obtain prior written permission before using SHAC USA's name and the domain names owned by SHAC USA at its events.

6.     I did not vandalize, nor do I know who vandalized, the property owned by Mr. William Green.

7.     SHAC USA did not authorize anyone to speak on its behalf at the demonstrations in the San

//

//

1

DECLARATION OF PAMELYN FERDIN

Francisco Bay Area on the weekend of August 13-15, 2004, and to my knowledge and understanding,

no one purported to do so.

I declare under penalty of perjury under the laws of the State of California that the foregoing is

true and correct.

Executed on August 25th, 2004 in Los Angeles, California.

Pamelyn Ferdin

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

MILTON MILLS, M.D., RASHID GHOLSON,
HUA-WEI CHERNG, NORMA HUMPHRIES,
LYNETTE GARNER, DARRELL
BRANSOME, PAUL MILLER, GLENDA
COSTNER, SYBIL HAROLD, ELIZABETH
RUSSELL, for themselves and on behalf of all other
District of Columbia residents similarly
situated,

               Plaintiffs,

        v.

GIANT OF MARYLAND, LLC, SAFEWAY
INC., HORIZON ORGANIC, DEAN FOODS
CO., NESTLE HOLDINGS, INC.,
FARMLAND DAIRIES, LLC,
SHENANDOAH'S PRIDE, LLC,
STONYFIELD FARM, INC., CLOVERLAND
FARMS DAIRY, INC.,

               Defendants.

Case No.: 05-CV-2211 (HHK)

**Declaration of R. Douglas Rhoads**

**EXHIBIT R**



171 PIER AVENUE, #453
SANTA MONICA, CA 90405
WWW.PCRM.ORG
(818) 216-1073
PFERDIN@PCRM.ORG

PAMELYN FERDIN, R.N.

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

MILTON MILLS, M.D., RASHID GHOLSON,
HUA-WEI CHERNG, NORMA HUMPHRIES,
LYNETTE GARNER, DARRELL
BRANSOME, PAUL MILLER, GLENDA
COSTNER, SYBIL HAROLD, ELIZABETH
RUSSELL, for themselves and on behalf of all other
District of Columbia residents similarly
situated,

               Plaintiffs,

           v.

GIANT OF MARYLAND, LLC, SAFEWAY
INC., HORIZON ORGANIC, DEAN FOODS
CO., NESTLE HOLDINGS, INC.,
FARMLAND DAIRIES, LLC,
SHENANDOAH'S PRIDE, LLC,
STONYFIELD FARM, INC., CLOVERLAND
FARMS DAIRY, INC.,

               Defendants.

Case No.: 05-CV-2211 (HHK)

**Declaration of R. Douglas Rhoads**

**EXHIBIT S**

**Physicians Committee for Responsible Medicine**

# Magazine

Home

PCRM

News

Health

PCRM Clinical Research

Research Controversies and Issues

Magazine

Resources

Search

## Spring/Summer 2002 (Volume XI, Number 2)



# Modernizing Trauma Training for Emergency Doctors

By Kathryn Kuhn

The trend away from animal-based training in trauma courses for surgeons is accelerating. In July 2001, PCRM reported that five medical centers offered Advanced Trauma Life Support (ATLS) courses using simulators and human cadavers, instead of live animals. Since then, we have learned that 14 more sites offer human anatomy-based training, bringing the total to 19.

PCRM's Jerry Vlasak, M.D., and Pamelyn Ferdin, R.N., were inundated with questions from surgeons interested in human-based training at the American College of Surgeons (ACS) annual meeting in New Orleans late last year. They distributed PCRM's *Innovations in Trauma Training* CD-ROM, along with other information on nonanimal trauma training to hundreds of surgeons, including many ATLS instructors.

  

During the conference, the ACS Committee on Trauma approved the use of anatomical human simulators in place of live animals for ATLS instruction. Simulab's Trauma Man™ surgical trainer (*www.Simulab.com*), designed to teach surgical procedures including open diagnostic peritoneal lavage (DPL), catheter DPL, chest tube insertion, pericardiocentesis, and cricothyroidotomy, is one of the

first simulators to receive ACS approval. Many instructors as well as surgeons seeking ATLS certification are enthusiastic about human anatomical simulators for teaching because they mirror the clinical situation, can be used repeatedly, and are highly cost effective.



Doctors interested in enrolling in or implementing nonanimal courses are now contacting PCRM following our advertisements in *The Journal of Trauma* and the *Journal of the American College of Surgeons*, which feature Henry Heimlich, M.D. Dr. Vlasak is working directly with interested course coordinators to bring cadaver- or simulator-based courses to their hospitals. A list of medical centers already offering such courses is available at *www.TraumaTraining.org*. Physicians and other healthcare professionals may receive a free copy of *Innovations in Trauma Training with Henry Heimlich, M.D.* by contacting PCRM at 202-686-2210, ext. 329, or *kkuhn@pcrm.org*.

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

MILTON MILLS, M.D., RASHID GHOLSON,
HUA-WEI CHERNG, NORMA HUMPHRIES,
LYNETTE GARNER, DARRELL
BRANSOME, PAUL MILLER, GLENDA
COSTNER, SYBIL HAROLD, ELIZABETH
RUSSELL, for themselves and on behalf of all other
District of Columbia residents similarly
situated,

               Plaintiffs,

         v.

GIANT OF MARYLAND, LLC, SAFEWAY
INC., HORIZON ORGANIC, DEAN FOODS
CO., NESTLE HOLDINGS, INC.,
FARMLAND DAIRIES, LLC,
SHENANDOAH'S PRIDE, LLC,
STONYFIELD FARM, INC., CLOVERLAND
FARMS DAIRY, INC.,

               Defendants.

Case No.: 05-CV-2211 (HHK)

**Declaration of R. Douglas Rhoads**

**EXHIBIT T**

Case 1:05-cv-02211-HHK    Document 11-4    Filed 11/21/2005    Page 62 of 66



MEDIA CENTER

Physicians Committee for Responsible Medicine

 

News Release Archive

Medical News Archive

PCRM Online Archive

Background Material

Experts

PSAs

Artwork

Media Coverage

Commentary

Subscribe

Contacts

Home

## News Release

Thursday, June 16, 2005
Contact: Jeanne S. McVey, 202-686-2210, ext. 316, or 415-509-1833.

## Spoof of Milk Mustache Ad Reaches Out to People with Lactose Intolerance
### *Nonprofit Will Provide Pro-Bono Legal Help to D.C. Consumers Sickened by Dairy Products*

WASHINGTON—The nonprofit Physicians Committee for Responsible Medicine (PCRM) is launching a new ad campaign to draw attention to the problem of lactose intolerance, especially among people of color, and to offer legal assistance to those who may have been sickened by dairy products. Scheduled to debut in mid-June on Metrorail platforms and inside trains and buses, the ad reads, "Got Lactose Intolerance? 75 percent of people do, particularly people of color. If you're lactose intolerant, you may have grounds for a lawsuit." PCRM is also launching a new Web site—www.MilkMakesMeSick.org—to support the ad campaign.

"About 75 percent of people worldwide are lactose intolerant, which means they naturally lose the ability to digest the milk sugar lactose after infancy. This is a normal shift in enzyme activity that comes as the person matures," says Tim Radak, R.D., Dr. P.H., nutrition director for PCRM. "The abdominal pain and other, often severe, digestive disturbances that can occur when a lactose intolerant person drinks milk, are the body's way of warning that milk is not an appropriate or desirable food for adults."

According to the American Academy of Family Physicians, 60-80 percent of African Americans, 50-80 percent of Latinos, and at least 90 percent of Asians and Native Americans are lactose intolerant and may suffer stomach cramps, diarrhea, and other painful or distressing gastrointestinal symptoms. Lactose intolerance occurs in 6-22 percent of people of northern European descent.

"Given the high rates of lactose intolerance, especially among people

Search:

[                    ] go

Other PCRM Sites ▼

Got Lactose
Intolerance ad (PDF)

Racial Bias in Federal
Nutrition Policy (PDF)

Recent Study in
*Pediatrics:* Dairy does
not promote bone
health

Lifestyle Factors and
Development of Bone
Mass and Bone
Strength in Young
Women

Case 1:05-cv-02211-HHK   Document 11-4   Filed 11/21/2005   Page 63 of 66

of color, it is clear that dairy products should carry warning labels,"
says Dan Kinburn, associate general counsel for PCRM. "Dairy
manufacturers are well aware that many consumers are sickened by
these products."

For an interview with Dan Kinburn, Esq., or Dr. Radak, please contact
Jeanne S. McVey at 202-686-2210, ext. 316, or 415-509-1833, or
jeannem@pcrm.org.

*Founded in 1985, the Physicians Committee for Responsible Medicine
is a nonprofit health organization that promotes preventive medicine,
especially good nutrition. PCRM also conducts clinical research
studies, opposes unethical human experimentation, and promotes
alternatives to animal research.*

Media Center | Health | Research | About PCRM | Catalog | Join Us |
Search | Site Index | Home

The site does not provide medical or legal advice. This Web site is for information
purposes only.
Full Disclaimer | Privacy Policy

Physicians Committee for Responsible Medicine          Phone: 202-686-2210
5100 Wisconsin Ave., N.W., Ste. 400, Washington, DC 20016     Email: pcrm@pcrm.org

## IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF COLUMBIA

MILTON MILLS, M.D., RASHID GHOLSON,
HUA-WEI CHERNG, NORMA HUMPHRIES,
LYNETTE GARNER, DARRELL
BRANSOME, PAUL MILLER, GLENDA
COSTNER, SYBIL HAROLD, ELIZABETH
RUSSELL, for themselves and on behalf of all other
District of Columbia residents similarly
situated,

        Plaintiffs,

        v.

GIANT OF MARYLAND, LLC, SAFEWAY
INC., HORIZON ORGANIC, DEAN FOODS
CO., NESTLE HOLDINGS, INC.,
FARMLAND DAIRIES, LLC,
SHENANDOAH'S PRIDE, LLC,
STONYFIELD FARM, INC., CLOVERLAND
FARMS DAIRY, INC.,

        Defendants.

Case No.: 05-CV-2211 (HHK)

**Declaration of R. Douglas Rhoads**

**EXHIBIT U**

# Got Lactose Intolerance?
# Take Legal Action

Do you suffer from the symptoms of **lactose intolerance?**
Are you a resident of Washington, D.C.?
### If so, you may have grounds for a lawsuit.



**More Resources >**

**About 75 percent of people worldwide are lactose intolerant,** which means they naturally lose the ability t digest the milk sugar lactose after infancy. This is a normal shift in enzyme activity that comes as the person matures. Symptoms include nausea, cramps, bloating, gas, diarrhea, and other gastrointestinal distress.

Lactose intolerance is especially common among people of color. In fact, according to the American Academy of Family Physicians, 60 to 80 percent of African Americans, 50 to 80 percent of Latinos, and at least 90 percent of Asians and Native Americans are lactose intolerant. For many, milk products cause stomach cramps, diarrhea, an other painful or distressing gastrointestinal symptoms. Lactose intolerance also occurs in 6 to 22 percent of peop northern European descent. Many affected children wonder why they are sick day after day, often having to visit nurse's office at school, when the problem actually came from a food product.

**But the dairy industry's deceptive marketing keeps the public in the dark about this common conditio It spends millions of dollars on advertising designed to give the false impression that milk is a neces: part of a healthy diet. The industry even encourages lactose-intolerant people to continue drinking m and consuming other dairy products.**

**Consumers deserve the truth:** There is no reason for people with lactose intolerance to drink milk. Milk does r offer any nutrients that cannot be found in more healthful foods, and dairy products can cause acute distress to lactose-intolerant people. All consumers can be harmed by the artery-clogging saturated fat and cholesterol in da products.

**That's why the Physicians Committee for Responsible Medicine intends to file suit against dairy producers on behalf of D.C. residents who are lactose intolerant.** In addition to seeking compensation for those who have been harmed, the lawsuit will seek a court order mandating that warning labels about lactose intolerance be placed on all milk sold in the District of Columbia.

Other PCRM Sites

# MilkMakesMeSick.or

**PCRM** Physicians Committee for Responsible Medicine

5100 Wisconsin Ave., NW, Suite 400, Washington, DC 2

Phone: 202-686-2210          E-mail: pcrm@pcrm.org