## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| )<br>MILTON MILLS, M.D., RASHID GHOLSON, )<br>AUGUSTIN CHERNG, NORMA )<br>HUMPHRIES, LYNETTE GARNER, )<br>DARRELL BRANSOME, PAULA MILLER, )<br>GLENDA COSTNER, SIBYL HAROLD, )<br>ELIZABETH RUSSELL, for themselves and on )<br>behalf of all other District of Columbia residents)<br>similarly situated, )<br>        Plaintiffs, )<br>)<br>    v. )<br>)<br>GIANT OF MARYLAND, LLC, SAFEWAY )<br>INC., HORIZON ORGANIC HOLDING )<br>CORPORATION, DEAN FOODS CO., )<br>NESTLE HOLDINGS,INC., FARMLAND )<br>DAIRIES, LLC, SHENANDOAH'S PRIDE, )<br>LLC, STONYFIELD FARM, INC., )<br>CLOVERLAND FARMS DAIRY, INC., )<br>)<br>        Defendants. )<br>) | Case No.: 05-CV-2211 (HHK) |

**PLAINTIFFS' MEMORANDUM IN OPPOSITION TO THE MOTIONS OF
DEFENDANTS GIANT OF MARYLAND, LLC, SAFEWAY, INC., HORIZON
ORGANIC HOLDING CORPORATION, DEAN FOODS COMPANY, NESTLE
HOLDINGS, INC., FARMLAND DAIRIES, LLC, SHENANDOAH'S PRIDE, LLC,
STONYFIELD FARM, INC. AND CLOVERLAND FARMS DAIRY, INC. TO DISMISS**

TABLE OF CONTENTS

Page

I.    STATEMENT OF FACTS ....................................................................................1

II.   PLAINTIFFS' CLAIMS ARE NOT PREEMPTED BY
      THE FEDERAL FOOD, DRUG & COSMETIC ACT .................................................6

      A.    In *Bates v. Dow Agrosciences LLC*, The Supreme Court
            Established That Common Law Claims, Such As Those
            Asserted By Plaintiffs, Are Not Preempted By Federal
            Preemption Provision In FIFRA, Which Is Virtually Identical
            To The Preemption Provision In The FD & C Act ............................................6

      B.    Plaintiffs' Requested Warnings Are About Safety And Are
            Covered By The FD & C Act's Exception To Preemption..............................14

III.  PLANTIFFS' REQUESTED RELIEF IS NOT BARRED BY
      CONFLICTS PREEMPTION.....................................................................................16

      A.    Plaintiffs' Claims are Not Preempted by Congressional
            Objectives to Promote Milk Consumption....................................................17

      B.    Plaintiffs' Claims Are Not Preempted By FDA's Decision
            Regarding Ingredient Labeling ....................................................................18

      C.    Plaintiffs' Claims Are Not Preempted By The Federal
            Government's General Policy Against An Overuse of
            Warning Labels ...........................................................................................19

IV.   THE PRIMARY JURISDICTION DOCTRINE DOES NOT
      APPLY TO LAWSUITS SUCH AS THE ONE ALLEGING
      CLAIMS FOR PRODUCTS LIABILITY .................................................................20

      A.    Products Liability Determinations Under District of Columbia
            Law Do Not Require FDA's Expertise ..........................................................21

      B.    No Agency Assistance Is Necessary Because Products Liability
            Claims Are Within The Conventional Expertise Of Judges ...........................23

      C.    There Is No Risk Of Inconsistent Rulings Because Plaintiffs'
            Claims Do Not Require Resolution Of Regulatory Issues And
            The Factual Issue Is Narrow ........................................................................24

D.    Plaintiffs Have Made No Prior Application To FDA, And FDA's Adjudicatory Mechanisms Are Insufficient To Provide The Relief That Plaintiffs Seek .....................................................24

V.    PLAINTIFFS HAVE PROPERLY STATED CLAIMS UNDER PRODUCTS LIABILITY LAW...............................................................27

VI.    PLAINTIFFS HAVE STATED A VALID CLAIM FOR INJUNCTIVE RELIEF ...........................................................29

VII.    THE DISTRICT OF COLUMBIA SELF-GOVERNMENT AND GOVERNMENT REORGANIZATION ACT DOES NOT BAR THE RELIEF SOUGHT BY PLAINTIFFS .....................................................31

A.    The Home Rule Act Limits Legislative Authority And Does Not Apply To The Judicial Branch ....................................................31

B.    Even If The Home Rule Act Limited Judicial Authority, The Relief Sought By Plaintiffs Is Restricted In Its Application Exclusively In Or To The District.....................................................33

VIII.    THE IDENTIFICATION OF THE SPECIFIC DEFENDANTS WHO ARE LIABLE FOR MONETARY DAMAGES IS A DISCOVERY ISSUE, NOT A PLEADING REQUIREMENT.............................35

CONCLUSION....................................................................35

TABLE OF AUTHORITIES

CASES                                                        Page(s)

*APCC Serv., Inc. v. WorldCom, Inc.*,
305 F. Supp. 2d 1 (D.D.C. 2001) ........................................................26

*Air Conditioning and Refrigeration Institute v. Energy
Resources Conservation and Development Commission*,
410 F.3d 492 (9th Cir. 2005) ..............................................................11

*Allnet Communication Serv., Inc. v.
Nat'l Exchange Carrier Ass'n*, 965 F.2d 1118 (D.D.C. 1992) ....................................21,24

*Am. Civil Liberties Union v. Mineta*,
319 F. Supp. 2d 69 (D.D.C. 2004) ........................................................29

*American Council of Life Ins. v. District of Columbia*,
645 F. Supp. 84 (D.D.C. 1986) ............................................................33

*Atchinson v. District of Columbia*, 73 F.3d 418 (D.C. Cir. 1996) ....................................27

*Bates v. Dow Agrosciences LLC,* 125 S. Ct. 1788 (2005) ................................6,9,11,12,34

*Bonito Boats, Inc. v. Thunder Craft Boats, Inc.,*
489 U.S. 141 (1989)..........................................................................18

*Bradley v. Weinberger*, 483 F.2d 410 (1st Cir. 1973)......................................................23

*Brown v. McDonald's Corp,* 655 N.E.2d 440 (Ohio Ct. App. 1995) ..............................29

*Boyle v. Giral*, 820 A.2d 561 (D.C. 2003) ..........................................................34

*Cipollone v. Liggett Group, Inc.,* 505 U.S. 504 (1992) ............................................9,10,33

*Consumers Union of U.S., Inc v. Alta-Dena
Certified Dairy,* 6 Cal. Rptr. 2d 193 (1992).............................................13,22

*Continental Airlines, Inc. v. United Air Lines, Inc.*,
120 F. Supp. 2d 556 (E.D. Va. 2000) ..............................................24

*Cooper v. First Gov't Mortgage & Investors Corp.,*
206 F. Supp. 2d 33 (D.D.C. 2002) ....................................................27

*CSX Transp., Inc. v. Williams*, No. Civ. A. 05-338EGS,
2005 WL 902130 (D.D.C. Apr. 18, 2005)................................................34,35

*Dimond v. District of Columbia,*
618 F. Supp. 519 (D.D.C. 1984) ...................................................34

*Edwards v. Hop Sin, Inc.,* 140 S.W.3d 13 (Ky. App. 2003) .............................................28

*E. Penn Mfg. Co. v. Pineda*, 578 A.2d 1113 (D.C. 1990)..................................................27

*Jones v. Rath Packing,* 430 U.S. 519 (1977) ..................................................8,12

*Lakedreams v. Taylor*, 932 F.2d 1103 (5th Cir. 1991) ......................................30

*Livingston v. Marie Callender's, Inc.,*
85 Cal. Rptr. 2d 528 (Cal. Ct. App. 1999)..........................................28

*McConnell v. United States*, 537 A.2d 211 (D.C. 1988) .................................................33

*Medtronic, Inc. v. Lohr*, 518 U.S. 470 (1996) ..................................................13

*Mississippi Power & Light Co. v.*
*Transamerica Freight Lines, Inc.*, 532 F.2d 412 (5th Cir. 1978) ......................................22

*National Communications Ass'n v. AT&T Co.,*
46 F.3d 220 (2d Cir. 1995)..............................................................26

*National Broiler Council v. Voss*, 44 F.3d 740 (9th Cir. 1994)......................................8,12

*Rastall v. CSX Transp., Inc.,* 697 A.2d 46 (D.C. 1997)......................................................34

*Reiter v. Cooper*, 507 U.S. 258 (1993) ..................................................21,25

*Ross-Simons of Warwick, Inc. v. Baccarat, Inc.,*
217 F.3d 8 (1st Cir. 2000)................................................................30

*Russell v. G. A. F. Corp.,* 422 A.2d 989 (D.C. 1980) ..................................................27,29

*Sandoz Pharmaceuticals Corp. v. Richardson-Vicks, Inc.,*
902 F.2d 222 (3d Cir. 1990)..............................................................23

*Syntek Semiconductor Co. v. Microchip Technology Inc.,*
307 F.3d 775 (9th Cir. 2002) ...........................................................25

*Taylor v. Gabelli*, 345 F. Supp. 2d 340 (S.D.N.Y. 2004) .................................................24

*Texas & Pac. Ry. Co. v. Abilene Cotton Oil Co.,*
204 U.S. 426 (1907)........................................................................27

*Thompson v. Texas Mexican Ry. Co.,* 328 U.S. 134 (1946) ............................................26

*Tom Doherty Assocs., Inc. v. Saban Entm't, Inc.,*
60 F.3d 27 (2d Cir. 1995) ........................................................30

*United Distribution Cos. v. F.E.R.C.,*
88 F.3d 1105 (D.C. Cir. 1995) ................................................16

*United States v. An Article of Device Diapulse,*
650 F.2d 908 (7th Cir. 1981) ..................................................26

*United States v. McDonnell Douglas Corporation,*
751 F.2d 220 (8th Cir. 1984) ..................................................21

*United States v. Western Pac. R.R.,* 352 U.S. 59 (1956) ..................................23,25

*Wells v. Allstate Ins. Co.,* 210 F.R.D. 1 (D.D.C. 2002) ..................................34

*Williams Pipe Line Co. v. Empire Gas Corp.,*
76 F.3d 1491 (10th Cir. 1996) ................................................23,26

*Witczak v. Pfizer, Inc.,* 377 F.Supp.2d 726 (D. Minn. 2005)..................................14

STATUTES, RULES AND REGULATIONS

Food, Drug & Cosmetic Act ..................................................................6

Fed. R. Civ. P. 12(b)(6)..................................................................1

9 C.F.R. § 381.115..................................................................12

9 CFR § 381.132..................................................................12

21 CFR § 1.21..................................................................9

21 C.F.R. § 10.25(a) (2005)..................................................................24

21 C.F.R. § 10.30(e)(2)..................................................................25

21 C.F.R. § 10.45(d) (2005)..................................................................25

21 C.F.R. § 100.1(c)(4)..................................................................8

21 C.F.R. § 131.110..................................................................6,13

7 U.S.C. § 136v(b) ........................................................................................7

21 U.S.C. § 321 .........................................................................................6,9

21 U.S.C. § 341 ...........................................................................................6

21 U.S.C. § 343 ...................................................................................6,8,9,23

21 U.S.C. § 601 ...........................................................................................9

58 Fed. Reg. 2850, 2859 (Jan. 6, 1993) ......................................................19, 20

61 Fed. Reg. 3118-01, 3160-61 (Jan. 30, 1996) ..................................14,15,17,19

## MISCELLANEOUS

D.C. Code Ann. § 1-206.02(a)(3) (2005)....................................................32,33

NLEA S. 6(c), Pub. L. No. 101-535, 104 Stat. 2353, 2364 (1990) ...................14

FDA, Office of Regulatory Affairs,
ORA Field Management Directive No. 119 (1994)........................................25

## STATEMENT OF FACTS

Plaintiffs bring this action against the defendants, who annually sell millions of dollars worth of cows' milk in grocery stores throughout the District of Columbia without warning that milk can cause serious digestive illness for lactose intolerant consumers. As dairy processors and grocery retailers, Defendants knew, or should have known, that a substantial portion of the residents of the District of Columbia are likely lactose intolerant and that the public generally is unaware of lactose intolerance. Plaintiffs therefore seek warning labels alerting consumers about the possible risks of lactose intolerance. (Complaint ¶¶ 20–28, 42–48).

Plaintiffs, Milton Mills, Rashid Gholson, Augustin Cherng, Norma Humphries, Lynette Garner, Darrell Bransome, Paula Miller, Glenda Costner, Sibyl Harold, and Elizabeth Russell are residents of the District of Columbia, Maryland, or Virginia, suing for themselves and on behalf of all other lactose intolerant persons who, unaware of their condition, have purchased milk in Washington, D.C., and suffered the painful consequences of its consumption, as described below (the "Class").[1] Plaintiffs consumed milk that was purchased in the District of Columbia for a significant period of time before recognizing that they were lactose intolerant, all the while suffering from various combinations of severe pain, sickness, diarrhea, stomach cramps, flatulence, and bloating. (Complaint ¶¶ 10–16).

The Class of individuals affected by the actions of Defendants is so numerous that joinder of all persons is impractical, questions of law and fact common to the Class predominate over

---

[1] Defendants make a series of scurrilous and false allegations about the public charity supporting the suit, the Physicians Committee for Responsible Medicine ("PCRM"). Because these false claims are supported by an affidavit which must be disregarded on a motion under Fed. R. Civ. P. 12(b)(6), Plaintiffs will not respond in detail to these *ad hominen* attacks. It is sufficient to say that PCRM adheres to the highest ethical standards while working to protect the life and health of all living beings, and that PCRM rejects and abhors violence or threats of violence. PCRM's reputation in the scientific arena is best shown by the fact that it works with George Washington University in conducting clinical trials regarding nutrition, with funding from the National Institutes of Health. Thus, PCRM's nutrition advocacy work is funded in part by the United States government.

other issues, and the claims of Plaintiffs are typical of the claims of the Class.  Plaintiffs will

fairly and adequately protect the interests of the Class.  (Complaint ¶ 29–33).

In truth and in fact, the consumption of cows' milk can cause extreme pain for

unsuspecting lactose intolerant individuals.  (Complaint ¶ 2).

While some members of the general public have some knowledge about lactose

intolerance, the true scope of the problem has been covered up by the milk industry and

government's marketing efforts.  The industry's milk marketing campaign, combined with

government support of milk, gives the false impression that cows' milk is a necessary part of a

healthy diet, both for children and adults.  Milk manufacturers, including Defendants, are part

and parcel of this marketing effort--they pay for it, control the message, and go to great lengths

to stifle contrary information, despite being well aware of the misleading messages being

conveyed to the American public, including the residents of the District of Columbia.

(Complaint ¶ 6).

Just as human milk is for human infants, cows' milk is suited to the nutritional needs of

calves, who--unlike human infants--have four stomachs and grow from less than 100 pounds at

birth to over 1,000 pounds within two or three years.  Cows' milk is not appropriately composed

for human babies.  For humans, cows' milk consumption causes a host of problems that make it

anything but a healthy beverage.  Lactose intolerance is one of those problems.  (Complaint ¶ 7).

Lactose intolerance is the inability to digest the milk sugar lactose, causing

gastrointestinal symptoms that include flatulence, bloating, cramps, and diarrhea in individuals

after consuming milk (and milk-containing products).  Severity of lactose intolerance symptoms

varies according to the amount of milk consumed and the presence of other foods.  Some lactose-

intolerant individuals experience flatulence and bloating, while others may experience extreme stomach cramps and diarrhea.  (Complaint ¶ 2).

These symptoms result from an absence of the lactase enzymes that break down lactose. Virtually all mammalian infants are born with the lactase enzymes necessary to split lactose into simpler sugars that can be absorbed into the bloodstream.  All mammals, save certain relatively small populations of humans, then lose the ability to digest lactose as they pass the age of weaning.  In human beings, lactase activity decreases between the ages of two and three and may cease entirely between the ages of five and ten, although for many people the decline occurs in adulthood.  If a normal adult mammal continues to consume milk during adulthood, the results can be physically unpleasant.  Because the small intestine may not produce enough lactase to cope with the amount of lactose ingested, lactose will reach the large intestine in an undigested state. There, bacteria ferment the lactose, resulting in flatulence, bloating, abdominal pain, or diarrhea. Generally it takes only eight to twelve ounces of milk to produce such symptoms. (Complaint ¶¶ 3, 35–36).

Prior to the mid-1960s, the majority of American health professionals believed that lactase enzymes were present in most adults.  Since then it became known that 75% of the world's population, including 90% of Asian Americans, 90% of Native Americans, 60% to 80% of African Americans, 50% to 80% of Latinos, and 6% to 22% of Caucasians are lactose intolerant.  As reported in the 2000 census, 60% of the residents of the District of Columbia are African American, 31% are Caucasian American, and 3% are Asian American. The remaining population consists of people who listed themselves as "other" or of multiple races.  According to Census Bureau procedures, ethnicity (i.e., Hispanic or non-Hispanic) is described separately from race; 8% reported that they were Hispanic.  Estimating conservatively based on this census

data and the incidence of lactose intolerance according to race, a majority of the population of

the District of Columbia is likely lactose intolerant.  (Complaint ¶¶ 4, 40–41).

     People who are "lactase persistent" inherit a genetic mutation that allows their small

intestine to continue to make lactase enzymes well into adulthood.  Although only about 25% of

the world's population has this mutation, lactase persistence is more common in the United

States because a significant portion of the population is of northern European descent, the group

among which the mutation is most common.  (Complaint ¶ 38).

     Perhaps because Caucasians historically have been the largest racial group in the United

States, awareness of lactose intolerance has developed slowly, even among health professionals.

Because the symptoms of lactose intolerance appear in varying degrees, milk consumers may fail

to realize they are lactose intolerant and erroneously attribute their bloating, flatulence, cramps,

diarrhea, and physical discomfort to other sources.  For example, symptoms may vary according

to the amount of lactose consumed, the kind of milk products consumed, and whether the milk is

consumed alone or with other foods that help slow the speed at which the lactose is digested.

Certain antibiotics and other physical ailments, such as infectious diarrhea, also may interfere

with the ability to digest milk, the latter more so with children.  Even in adults who have been

able to comfortably consume milk for much of their lives, the ability to produce lactase, and

therefore to digest lactose, may decrease with age.  As a result, older adults may not realize that

cows' milk, which they have consumed without a problem for many years, is the source of their

pain and suffering.  (Complaint ¶¶ 42–43, 45–47).

     Not only is the public largely uninformed about lactose intolerance, it is also largely

misinformed about the necessity of including milk in a healthy diet.  A substantial portion of the

District's population may have reduced access to good health care and information about lactose

intolerance and proper nutrition.  According to the 2000 census, 22.2% of the District of Columbia population over age 25 did not have a high school diploma, 7.8% of the population over age 25 had less than a ninth grade education, and 20.2% of population lived below the poverty level.  Therefore, many consumers may not realize that they can obtain all of the nutrients found in milk by consuming nutrient-dense plant-based foods that do not lead to the unpleasant and painful bloating, flatulence, diarrhea, and cramps that come with consuming milk.  (Complaint ¶ 48).

Rather than being truthful about the health problems and risks of consuming milk, the milk industry falsely claims that everybody needs milk.  The National Dairy Council actively plays down the prevalence of lactose intolerance and states that lactose intolerant individuals may consume up to five cups worth of milk per day.  In addition to its attempts to convince the public that lactose intolerance is no reason to stop consuming milk, the milk industry falsely maintains that people who are lactose intolerant need to consume milk in order to maintain good health.  It even suggests that consuming dairy products can help control several calcium deficiency-related diseases, such as overweight and obesity.  (Complaint ¶¶ 49–50).

Bombarded by the milk-promoting messages of the federal government and by the dairy industry advertising campaigns designed to fool them into purchasing milk for its purported health benefits, consumers undoubtedly have little understanding of lactose intolerance. Thus, the need for warning labels is clear.  (Complaint ¶ 51).

Accordingly, Plaintiffs request damages for the named plaintiffs only, and, on behalf of the class, a permanent injunction requiring defendants to place warning labels on all packaging of milk sold in the District of Columbia, notifying consumers that the contents may sicken them.  (Complaint ¶ 8).  Defendants Giant of Maryland, LLC, Safeway, Inc., Horizon Organic Holding

Corporation, Dean Foods Company, Nestle Holdings, Inc., Farmland Dairies, LLC,

Shenandoah's Pride, LLC, and Stonyfield Farm, Inc., together have filed with the Court a motion

to dismiss ("Giant Brief").  Defendant Cloverland Farms Dairy, Inc. has separately filed with the

Court a motion to dismiss ("Cloverland Brief").

## ARGUMENT

**II.    PLAINTIFFS' CLAIMS ARE NOT PREEMPTED BY THE FEDERAL FOOD, DRUG & COSMETICS ACT**

        **A.    In *Bates v. Dow Agrosciences LLC*, The Supreme Court Established That Common Law Claims, Such As Those Asserted By Plaintiffs, Are Not Preempted By Federal Preemption Provision In FIFRA, Which Is Virtually Identical To The Preemption Provision In The FD & C Act**

While Defendants have set forth in great detail the statutory regime establishing the

standard of identity for milk (*see* 21 U.S.C. § 341 and 21 C.F.R. Part 131) and the federal

prohibition on state requirements that are not identical to those federal standards, including

labeling requirements (*see* FD & C Act § 403A), Defendants have failed to bring to this Court's

attention a most recent and salient decision by the U.S. Supreme Court that is directly contrary to

their preemption argument.  A simple reading of this decision, *Bates v. Dow Agrosciences LLC,*

125 S. Ct. 1788 (2005), reveals that Plaintiffs' claims in the instant case are not preempted.

Plaintiffs are attempting to enforce requirements by means of District of Columbia tort claims

that are already required by the FD & C Act misbranding provisions.  *See* 21 U.S.C. § 343(a)("A

food shall be deemed to be misbranded . . .[i]f its labeling is false or misleading in any

particular); 21 U.S.C. § 321(n) (providing that in determining whether an article has been

misbranded, one must consider "the extent to which the labeling or advertising fails to reveal

facts material . . . with respect to consequences which may result from the use of the article . .

.").

Therefore, Plaintiffs' claims are not additional, new or different requirements that should be preempted.  Moreover, the Supreme Court has held that an event, such as a jury verdict, that might induce a milk manufacturer to change its label should not be viewed as a "requirement" that would be preempted.  *Id.* at 1798.  Thus, only a plaintiff's claims, and not the nature of the remedy sought, must be identical to the federal provisions in the standard of identity in order for a state cause of action to survive a challenge on preemption grounds.  These holdings open the way for Plaintiffs' present challenge of Defendants' misleading and negligent failure to warn consumers regarding the health hazards of lactose intolerance.

In *Bates*, Dow, an herbicide manufacturer, sought a declaratory judgment against certain Texas peanut farmers who were threatening to sue Dow for crop damage allegedly caused by its herbicide.  The farmers counterclaimed for breach of express warranty, fraud, violation of the Texas Deceptive Trade Practices Act, strict liability, negligent testing and negligent failure to warn.  While the District Court granted summary judgment to Dow on preemption grounds, and the Fifth Circuit affirmed, the Supreme Court reversed the lower courts' finding of preemption and clarified the law on preemption issues exactly like the one presently before this Court.

While the *Bates* case looked at the preemptive effect of the Federal Insecticide, Fungicide, and Rodenticide Act ("FIFRA") and the present case involves the preemption provision of the FD & C Act, the similarity between these two statutes makes the *Bates* holding equally applicable to preemption in the context of the FD & C Act.  FIFRA provides that a "State shall not impose or continue in effect any **requirements** for **labeling** or packaging **in addition to or different from** those required under [FIFRA]."  7 U.S.C. § 136v(b) (emphasis added).  Similarly, the FD & C Act provides that "no State or political subdivision of a State may directly or indirectly establish . . . (1) any **requirement** for a food which is the subject of a standard of

7

identity . . . that is not **identical to** such standard of identity." 21 U.S.C. § 343-1 (emphasis

added). The FDA's implementing regulations clarify that the FD & C Act preempts a State

requirement that "directly or indirectly imposes obligations or contains provisions concerning the

composition or **labeling** of food . . . ." 21 C.F.R. § 100.1(c)(4) (2005).

As admitted by Defendants in their brief, the slightly different wording used in the

FIFRA preemption of State requirements "in addition to, or different than," certain federal

requirements (the preemption language also used by Congress in the Federal Meat Inspection

Act, 21 U.S.C. § 601 *et seq.,* as interpreted by the Court in *Jones v. Rath Packing,* 430 U.S. 519

(1977)) is "legally indistinguishable" from the wording used in the FD & C Act which prohibits

State requirements that are "not identical" to certain federal requirements. (Giant Br. at 8-9)

(quoting *Nat'l Broiler Council v. Voss,* 44 F.3d 740, 744–45 (9th Cir. 1994) (comparing nearly

ten federal preemption statutory provisions and concluding that "there is no indication . . . that

Congress intends substantive differences to flow from minor wording changes [e.g., use of 'in

addition to, or different than' rather than 'not identical to'] in [the] various [operative] clauses").

Thus, as the provisions at issue are legally indistinguishable, the analysis applied by the Supreme

Court to the FIFRA preemption issues in *Bates,* applies equally to the FD & C Act in this case.

The preemption issue before the Court in *Bates,* was remarkably similar to the present

dispute. As in *Bates*, this Court must first determine whether the challenged prohibition is a

"requirement." "An occurrence that merely motivates an optional decision does not qualify as a

requirement. The Court of Appeals was therefore wrong when it assumed that any event, such as

a jury verdict, that might 'induce' a pesticide manufacturer to change its label should be viewed

as a requirement." *Id.* at 1798. Simply because a finding of liability on a claim would induce a

manufacturer to alter its label, applying what the Court calls a faulty "effects-based" or

"inducement" test of defining requirements, does not mean that the cause of action creating this

claim is a "requirement" regarding the label. *Id.* at 1798–99. The following words of the *Bates*

decision are most instructive:

> A requirement is a rule of law that must be obeyed; an event, such as a
> jury verdict, that merely motivates an optional decision is not a
> requirement. The proper inquiry calls for an examination of the elements
> of the common-law duty at issue, *see Cipollone,* 505 U.S. at 524, 112 S.
> Ct. 2608; it does not call for speculation as to whether a jury verdict will
> prompt the manufacturer to take any particular action (a question, in any
> event, that will depend on a variety of cost/benefit calculations best left to
> the manufacturer's accountants).

*Bates,* 125 S. Ct. at 1799.

With respect to Plaintiffs' claims for negligent failure to warn and products liability,

while these state causes of action impose "requirements" with respect to milk, they happen to be

state requirements that are **identical** to the misbranding requirement regarding a "misleading

label." *See* 21 U.S.C. § 343(a) ("A food shall be deemed to be misbranded . . .[i]f its labeling is

false or misleading in any particular). This conclusion is bolstered by the fact that the federal

statutes and regulations define a label as misleading, not only for the affirmative representations

it makes, but also for the omission of information regarding the effects from the use or

consumption of the product. *See* 21 U.S.C. § 321(n)(providing that in determining whether an

article has been misbranded, one must consider "the extent to which the labeling or advertising

fails to reveal facts material . . .  with respect to consequences which may result from the use of

the article . . . "); *see also* 21 CFR § 1.21(a).

The fact that the jury might require one or more of the defendants to place a lactose

intolerance warning on future milk cartons they intend to sell in the District of Columbia, and

that this warning would not be identical to the milk standard of identity, is irrelevant to the

Court's preemption inquiry. *See Bates,* 125 S. Ct. at 1799. There are two key points of law in

the preemption analysis at hand: (1) Plaintiffs' causes of action for negligent failure to warn and products liability for failure to warn are the only state requirements here at issue, and (2) these "state requirements" are identical to the milk standard of identity misbranding provisions. Therefore, under the direct language of the statute, Plaintiffs' claims are not preempted.

Much like Defendants in this case, the herbicide manufacturer in *Bates* pointed to the case of *Cipollone v. Liggett Group, Inc.,* 505 U.S. 504, 521 (1992), in an effort to have its adversaries' common law claims held preempted. (*see also* Giant Br. at 7). However, unlike the preemption clause in *Cipollone*, which stated—without qualification--that **no** requirement based on smoking or health should be imposed under State law, the preemption provisions at issue here and in *Bates* are qualified to allow State requirements that are "identical to" or not "in addition to or different from" the labeling requirements under the FD & C Act and FIFRA, respectively. The Supreme Court rejected submissions by Dow and the United States that argued for an interpretation of the FIFRA provision that no state requirements whatsoever would be permitted. The Court stated that this construction of the FIFRA preemption provision provided no alternative interpretation of the phrase "in addition to or different from" that would give that phrase meaning. *Id.* at 1801. As a matter of basic statutory construction the use of the phrase "identical to" in the FD & C Act is evidence of Congressional "intent to draw a distinction between state labeling requirements that are pre-empted and those that are not." *Id.*

While, in order to survive preemption, the requirements imposed by Congress and the state must be identical, the state-law requirement does not need to be phrased in the **identical language** as its federal counterpart. "[I]ndeed, it would be surprising if a common-law requirement used the same phraseology" as a federal statute specific to a given subject area or group of products. *See Bates* at 1804. And, "if a case proceeds to trial, the court's jury

10

instructions must ensure that nominally equivalent labeling requirements are genuinely equivalent." *Id.*

Thus, the Supreme Court in *Bates* adopted a "parallel requirements" reading of FIFRA's preemption provision and held that the petitioners' claims based on fraud and failure to warn would not be preempted, as long as the Court of Appeals determines that the requirements imposed by these State obligations were equivalent to, and fully consistent with, FIFRA's misbranding provisions. Moreover, in making this evaluation, the Court concluded that even if there were two equally plausible outcomes, the Court "nevertheless had a duty to accept the reading that disfavors pre-emption" because "[i]n areas of traditional state regulation, we assume that a federal statute has not supplanted state law unless Congress has made such an intention 'clear and manifest.'" *Id.* at 1801 (citations omitted); *see also Air Conditioning and Refrigeration Institute v. Energy Resources Conservation and Development Commission*, 410 F.3d 492, 496 (9th Cir. 2005) ("Express preemption statutory provisions should be given a narrow interpretation."). Furthermore, as stated in *Bates*: "[S]tate law need not explicitly incorporate [the federal requirement's] standards as an element of a cause of action in order to survive pre-emption." *Bates*, 125 S. Ct. at 1800. Therefore, if this Court determines that Plaintiffs' failure to warn and products liability causes of action run parallel to the FD & C Act misbranding provision for false and misleading labels, then Plaintiffs' claim is not preempted. As the requirements imposed by the two are "identical," there is no federal preemption.

The cases cited by Defendants in support of their argument that Plaintiffs' claims are preempted by section 403A, all pre-date the Supreme Court's decision in *Bates* and must, therefore, be considered in that context. Moreover, the numerous decisions cited in Defendants' brief in which the courts find preemption of state labeling requirements can be distinguished

from the instant case on a number of grounds.  Most importantly, none of these cases involve a common law claim that is imposing a requirement, or more precisely, a prohibition (here, regarding misleading labels) that is essentially identical to the federal prohibition in the misbranding provisions.  (*See* Giant Br. at 10).

For example, in *Jones v. Rath Packing*, 430 U.S. 519 (1977), the Court considered a California statute and regulation that very clearly differed from the federal requirements.  While the federal regulations allowed for variations in package weight caused by manufacturing deviations and moisture loss, the California regulations permitted only variations from manufacturing deviations.  It was very easy for the Court to find preemption by the Federal Meat Inspection Act:  First, the California statute and regulations were clearly labeling or packaging requirements and second, the state requirements were clearly "different than" the federal requirements.   *Id.* at 530-31 (citing 21 USC § 601 et seq.).  Another meat case cited by Defendants, *National Broiler Council v. Voss*, 22 F.3d 740, 744-45 (9th Cir. 1994), involved a California regulation that directly contradicted the provisions of the poultry Products Inspection Act regarding the conditions under which a poultry product could be labeled fresh.  These cases do not shed any light on the proper resolution of the debate in the instant case.

In considering the significance of these cases with respect to the present litigation, it is important to note that federal statutes and regulations regarding the packaging and labeling of meat and poultry are very broad and detailed compared to those governing milk.  There is a clear intention by the federal government to cast a very broad net and to regulate every possible aspect of the packaging and labeling of meat.  *See* 9 C.F.R. § 381.115.  In fact, no final label shall be used for poultry unless a sketch thereof has been approved by the Department of Agriculture.  *See* 9 CFR § 381.132.  However, with respect to milk, only a very small portion of the

information presented on many milk containers is actually required by the federal milk standards

of identity.  By simply looking at milk cartons in the grocery store, it is apparent that milk

producers make many claims on their packaging regarding the wholesomeness of the product,

the "farm" where it originates, and its various healthy properties.[2]  These differences are of great

significance to a preemption analysis, as the "structure and purpose of the statute as a whole, as

revealed not only by the text, but through [our] reasoned understanding of the way in which

Congress intended the statute and its surrounding regulatory scheme to affect business,

consumers, and the law."  *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 486 (1996) (internal citation

and quotation marks omitted).  It seems that none of the information, text and graphics on a milk

package above and beyond the information regulated by the standard of identity is considered

part of the "principle display panel" of the label.  The "label" as defined by the standard of

identity addresses only these terms to be included on the principle display panel: information

describing the product as milk, skim milk, reduced-fat milk, etc., whether it is pasteurized or

ultrapasteurized and which (at the option of the producer) may include information regarding

added vitamins and whether or not the product is homogenized.  21 C.F.R. § 131.110.  There are

many legal claims that could arise regarding milk products that would address issues outside

these few specific matters addressed in milk's standard of identity.  Much like the claims brought

by Plaintiffs, these issues are not preempted, but are allowed by means of the broad language

included in other portions of the statures, here, the milk misbranding provisions.  *See e.g.*

*Consumers Union of U.S., Inc v. Alta-Dena Certified Dairy,* 6 Cal. Rptr. 2d 193 (1992)

(upholding trial court's order that defendant place warnings on its raw, certified milk for 10 years

to counter defendant's previous, misleading claims on its packaging and in advertisements);

---

[2] In fact, many milk producers, including some of the defendants in this case, are making claims regarding the
ability of dairy and/or milk consumption to help one lose weight.  They go on to prescribe a particular milk diet by
which a person can lose weight.

*Witczak v. Pfizer, Inc.,* 377 F.Supp.2d 726 (D. Minn. 2005) (finding no preemption of plaintiff's

Minnesota failure to warn claim by (1) FDA's prohibition on false and misleading labels because

FDA reapproval of label merely confirmed minimum labeling requirements or (2) by FD & C

Act, as its purpose and objectives were to protect the public).

### B.    Plaintiffs' Requested Warnings Are About Safety And Are Covered By The FD & C Act's Exception To Preemption

Even assuming that the Court finds that Plaintiffs' claims in the instant case are state

requirements and that they are not identical to the federal regulatory regime for milk, Plaintiffs'

claims would still not be preempted.  The FD & C Act provides an exception to its preemption

provision for a state requirement regarding "a warning concerning the safety of the food or

component of the food."  NLEA S. 6(c), Pub. L. No. 101-535, 104 Stat. 2353, 2364 (1990).

Defendants assert that this exception does not apply as a matter of law because "statements about

gastrointestinal discomfort caused by lactose intolerance do not under the FD & C Act constitute

'warning' statements about food 'safety.'"  (Motion to Dismiss ("Giant Br.") at 11).  However,

Defendants provide no authoritative support for this bizarre assertion, which is simply based on

defense counsel's incorrect assumptions and misrepresentations.  Firstly, the allegations of harm

caused by Defendants' product as set forth in Plaintiffs' complaint are much graver than

indicated by Defendants.  Plaintiffs have alleged suffering beyond mere gastrointestinal

discomfort; they have alleged serious bouts of diarrhea.  (Complaint ¶¶ 2, 11–19 and 66).

Diarrhea, as set forth in the Olestra decision upon which Defendants so heavily relies, is a health

condition beyond the less serious symptom of loose bowels and involves such adverse health

consequences as the loss of electrolytes and dehydration.  *See* 61 Fed. Reg. 3118-01, 3160-61

(Jan. 30, 1996) ("[T]he 'diarrhea' experienced by the study subjects was not diarrhea in the usual

medical sense because it was not associated with loss of water or electrolytes.").  In fact, diarrhea

can be, and especially in developing countries, often is, fatal.  Certainly, a warning as to such a serious and hazardous side effect of a food would necessarily relate to its "safety."[3]

Secondly, Defendants have misrepresented the FDA's findings in its review and approval of Olestra.  The FDA's decision is an evaluation regarding the potential misbranding of Olestra, the possible need for a warning, and the conclusion that a warning regarding the product's gastrointestinal effects was needed.  The FDA concludes that the consumption of Olestra, while causing "GI symptoms such as abdominal cramping and loose stools," did not cause "adverse health consequences."  *Id.* at 3160.  The decision goes on to explain why the effects were not considered "adverse health consequences, as well as why the effects of lactose intolerance as experienced by Plaintiffs and set forth in the complaint are "adverse health consequences."

> As noted, the effect of Olestra on stool consistency is similar to that produced by mineral oil, which softens fecal contents and interferes with the development of firm, well-formed stools.  Further, the "diarrhea" experienced by the study subjects was not diarrhea in the usual medical sense because it was not associated with loss of water or electrolytes.  Nonetheless, while the agency has concluded that based upon the evaluation of the available evidence there are no safety concerns with respect to the effect of Olestra on the GI tract, the agency believes that consumers should be provided with information to enable them to associate Olestra with the GI symptoms that it may cause.  The agency believes that providing this information to consumers would preclude unnecessary concerns about the origin of GI effects, were they to be observed, and may also prevent unnecessary or inappropriate medical treatment of those symptoms.

61 C.F.R. at 3160–61.  The long and varied list of substances that Defendants cite as having been found harmful and rising to the level of a safety issue seems to indicate that the nature of what fits under the safety warning exception to the FD & C Act preemption provision is an individual determination to be made on the specific facts alleged in a specific case.  Here,

---

[3] The dictionary definition of "safety' is "the state of being safe; freedom from the occurrence of risk of injury, danger or loss." Webster's Unabridged Dictionary 1690 (2[d] ed. 2001).  In turn, "injury" is defined as "harm or damage that is done or sustained." *Id.* at 983.  None of these terms in the statute indicates a requirement with respect to "safety" that is greater than the harm and damage alleged in the complaint.

Plaintiffs have alleged serious health consequences as a result of drinking milk in the District of Columbia, and this Court cannot make a determination to the contrary based on the current record on a motion to dismiss. Once the parties have had discovery and presented their evidence and expert witness testimony, then the Court can properly determine whether or not the symptoms alleged are sufficiently adverse or harmful so as to require a safety warning and avoid any preemption problems.

## III.    PLAINTIFFS' REQUESTED RELIEF IS NOT BARRED BY CONFLICTS PREEMPTION

As set forth above, Plaintiffs' claims are not barred by express preemption; nor are they barred by the more amorphous principle of "conflicts preemption." While conflicts preemption occurs when a state requirement would "stand[] as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress," *United Distribution Cos. v. F.E.R.C.,* 88 F.3d 1105, 1155 (D.C. Cir. 1995) (internal quotation marks and brackets omitted), these circumstances are clearly not present in the instant case. Plaintiffs are simply asserting a products liability and a negligent failure to warn claim based on the absence of any warning on Defendants' milk products about lactose intolerance and the symptoms thereof. This failure to provide important information on milk labels regarding the possible consequences of consuming milk is misleading. These misleading labels have injured Plaintiffs and continue to injure the residents of the District of Columbia, a large majority of whom are lactose intolerant.

Assuming the facts in Plaintiffs' complaint are true (as one must on a 12(b)(6) motion to dismiss), this suit's ability to correct misleading or misbranded labels for a failure to warn of the serious health consequences potentially resulting from consumption of a product would, in and of itself, make a small step forward in **promoting** important federal objectives regarding health and safety. The very language of the FDA in its Olestra decision, as set forth above, reveals that

the federal government's objectives are very much in line with those of the plaintiffs in the case.

Both Plaintiffs' and the federal government want consumers to "be provided with information to

enable them to associate [a product] with the GI symptoms that it may cause. [They] believe[]

that providing this information to consumers would preclude unnecessary concerns about the

origin of GI effects, were they to be observed, and may also prevent unnecessary or

inappropriate medical treatment of those symptoms."  61 C.F.R. at 3160-61.   Moreover, it seems

an exaggeration to suggest that this lawsuit could constitute any serious obstacle to Congress

with respect to such a broad objective as the promotion of milk.

    A.    **Plaintiffs' Claims Are Not Preempted by Congressional Objectives To Promote Milk Consumption**

Plaintiffs do not dispute that there is a general, federal policy of promoting United States

farmers and agriculture, including dairy producers and their products.  However, this is a far cry

from Defendants' apparent claim that the federal government wants to promote the consumption

of milk by those very individuals who are made sick by it.  One cannot seriously argue (1) that

the federal government seeks to promote milk if the results are unhealthful for the consumers at

issue or (2) that that the milk objective would be promoted to the exclusion of other--more

important--conflicting government interests, such as health and safety.  Furthermore, it is not a

warning against the drinking of milk that Plaintiffs seek.  Instead, Plaintiffs seek a warning to

inform lactose intolerant individuals regarding the likely cause of their lactose intolerance

symptoms.  While the federal government may have an interest in promoting milk, it has an

equal or, hopefully greater, interest in protecting the health of all its citizens.  Thus, the

17

objectives of this lawsuit and the causes of action contained therein are not inconsistent with the objectives of the federal government.[4]

**B.     Plaintiffs' Claims Are Not Preempted By FDA's Decision Regarding Ingredient Labeling**

The mere fact that the Food and Drug Administration has determined in its review of food labeling regulations that "lactose must be listed on a food label whenever it is used as an ingredient of food, however it need not be listed 'when present as a component of an ingredient (e.g., whey, nonfat dry milk),'" (Giant Br. at 21) (quoting 58 Fed. Reg. 2850, 2859 (Jan. 6, 1993)), cannot possibly serve to preempt Plaintiffs' claims. Defendants' attempt to conclude from this FDA rule that the federal government has "expressly decided that food labeling need not . . . warn the lactose intolerant against milk consumption" is quite a stretch, to say the least. (Giant Br. at 22). The FDA rule says no such thing. Moreover, the fact that the FDA has decided not to require manufacturers of food products to include in their ingredient listing the fact that whey or nonfat dry milk contains lactose, says nothing about the federal government's position or policy, much less its determination to preempt the field, with respect to warnings about lactose intolerance symptoms on milk containers. Ingredient lists are an entirely separate domain. Furthermore, the amount of lactose in the nonfat dry milk or whey in, for example, a serving of cookies is insignificant to a lactose intolerant consumer compared to the lactose

---

[4] Defendants cite *Bonito Boats, Inc. v. Thunder Craft Boats, Inc.,* 489 U.S. 141 (1989) as support for their proposition that Plaintiffs' lawsuit should be preempted because it is "aimed directly at reducing milk consumption, and thus likewise poses a substantial threat to the accomplishment of the federal government's mission . . . of promoting milk consumption." (Giant Br. at 21) (quotation marks omitted). First, as stated above, Defendants have mischaracterized Plaintiffs' aim, and, secondly, *Bonito Boats* has virtually nothing to do with the issues in the case at hand. *Bonito Boats* involved a Florida law that granted something like patent protection to the creator of an unpatented and un-patentable manufacturing process. Patents are clearly within the realm of the federal government per the U.S. Constitution. U.S. Const. amend. X (vesting in Congress the exclusive power to grant patents). A state law that attempts to protect a process that cannot be patented would clearly be preempted. Perhaps if the current case involved a state statute that outlawed the sale of milk it would be comparable to the degree of federal state conflict present in *Bonita Boats.*

contained in a glass of milk.   This argument by Defendants is too weak to merit further discussion.

### C.    Plaintiffs' Claims Are Not Preempted By The Federal Government's General Policy Against An Overuse Of Warning Labels

Although the position that consumers would stop reading and paying attention to warnings if they were placed on every food for every little allergy or discomfort they might cause certainly makes sense,  that is not the situation presented in this case.  The FDA has clarified this point:  "If the agency were to require warnings for ingredients that only cause mild idiosyncratic responses, it is concerned that it would overexpose consumers to warnings."  (Giant Br. at 22) (quoting 56 Fed. Reg. 28592, 28615 (June 21, 1991)).  As previously mentioned, the adverse health consequences experienced by Plaintiffs as a result of lactose intolerance and asserted in their complaint, are anything but mild, idiosyncratic or simply uncomfortable.  In fact, Plaintiffs have asserted severe pain and symptoms, including diarrhea.  The medical condition of diarrhea includes the dangerous symptoms of dehydration and the loss of electrolytes.  *See* 61 Fed. Reg. 3118-01, 3160-61 (Jan. 30, 1996).

Again, Defendants point to the FDA's Olestra decision in an attempt to persuade the Court that the GI symptoms asserted by Plaintiffs have been determined as simply "unpleasant," but not "health hazards."  (Giant Br. at 23).  However, the lactose intolerance symptoms, as experienced by Plaintiffs and as alleged in their complaint, are more serious than the GI symptoms found by the FDA to result from the consumption of Olestra.  Olestra was found not to cause the medical condition of diarrhea.  Plaintiffs have asserted serious and harmful effects of milk consumption in their complaint, including painful and serious diarrhea, and, on a motion to dismiss, the Court cannot conclude otherwise.  Thus, the federal governments' position on milk

consumption and warning labels and ingredient lists do not support a finding that Plaintiffs'

claims have been preempted through the principles of conflicts preemption.

**IV.    THE PRIMARY JURISDICTION DOCTRINE DOES NOT APPLY TO
        LAWSUITS SUCH AS THIS ONE ALLEGING CLAIMS FOR PRODUCTS
        LIABILITY**

Defendants' claims as to the scope of the primary jurisdiction issue are breathtakingly

overstated.  Defendants note, correctly, that this suit requires "consideration of data

substantiating or refuting the claim that lactose intolerant consumers need a warning on milk

labeling."  (Giant Br. at 30).  Of course, every claim brought in every state and federal court

alleging a warning defect in food involves "consideration of data substantiating or refuting the

claim."  *Id.*  Thus, Defendants' argument appears to demonstrate that each and every suit

alleging a warning defect for food products now pending in any court in the United States,

whether federal or state, should be put on hold until the Food and Drug Administration acts on

each and every one of those claims.  Clearly, this cannot be the case.

Defendants are also correct that "FDA has scientific expertise and enforcement

resources" in food and drug labeling.  Thus, for example, under Defendants' reading of the

primary jurisdiction doctrine, each and every one of the pending VIOXX cases, numbering more

than 6,000, should be stayed while FDA considers whether that medication was adequately

labeled while on the market.  This rationale leads to an illogical conclusion that every pending

challenge to the label on any drug or food should be referred by the courts to the FDA for

determination.

Once the implications of Defendants' arguments are considered, their theory becomes

laughable.  Defendants have made no showing that FDA has the resources to handle this dispute

along with every other matter FDA is currently handling, not to mention handling every other

pending warning defect claim relating to food in the United States.  Nor have Defendants

explained whether FDA has the time or interest to involve itself in this dispute, much less every

other challenge to the accuracy or fairness of every label on every food and drug sold in the

United States.

Furthermore, invoking the doctrine of primary jurisdiction would do nothing more than

needlessly delay resolution of this case.  The doctrine "requires the court to enable a 'referral' to

the agency, staying further proceedings so as to give the parties reasonable opportunity to seek

an administrative ruling."  *Reiter v. Cooper*, 507 U.S. 258, 268 (1993).  Courts perform this

referral "by holding the lawsuit in abeyance so that the parties may turn to the relevant agency . .

. ."  *Allnet Communication Serv., Inc. v. Nat'l Exchange Carrier Ass'n*, 965 F.2d 1118 (D.D.C.

1992).  Staying this case in hope of an FDA ruling would be an exercise in futility and cause

unnecessary delay and costs for the legal system, because, as set forth in IV(D), *infra*, FDA does

not provide a meaningful adjudicatory mechanism for concerned citizens.  Plaintiffs and

Defendants would simply find themselves, years down the road, in the very same place that they

are now: in front of this Court.  In the meantime, Defendants' products would continue to injure

countless consumers.

A.    **Products Liability Determinations Under District of Columbia Law Do Not Require FDA's Expertise**

Obviously, the primary jurisdiction doctrine is far more limited than Defendants' brief

suggests.  As set forth in *United States v. McDonnell Douglas Corporation*, 751 F.2d 220 (8th

Cir. 1984),

> The doctrine of primary jurisdiction is a flexible tool used to allocate "business between court and agency, and should seldom be invoked unless a factual question requires both expert consideration and uniformity of resolution."  A court "should be reluctant to invoke the doctrine of

> primary jurisdiction, which often, but not always, results in added expense
> and delay to the litigants . . . ."

*Id.* at 224 (citations omitted, emphasis added).  *See also Mississippi Power & Light Co. v.*

*Transamerica Freight Lines, Inc.*, 532 F.2d 412, 419 (5th Cir. 1978), *cert. denied* 429 U.S. 1094

(1977).

This case falls directly into the category in which invocation of the primary jurisdiction

doctrine is inappropriate.  FDA regulates the labeling of food packaging under the FD & C Act.

As set forth above, federal preemption of state labeling requirements is not absolute.  Thus,

courts may order warning labels to be placed on milk in certain circumstances.  *See, e.g.*,

*Consumers Union of U.S., Inc. v. Alta-Dena Certified Dairy*, 6 Cal. Rptr. 2d 193, 197, 201 (Cal.

Ct. App. 1992) (affirming an order requiring dairy producer to place the following warning on its

raw certified milk for ten years: "WARNING: THIS MILK MAY CONTAIN DANGEROUS

BACTERIA . . .").

Defendants argue that FDA already "addresses the specific issue of food sensitivities"

(Giant Br. at 29) through legislation such as the Food Allergen Labeling and Consumer

Protection Act of 2004, Pub. L. No. 108-282, 118 Stat. 891.  Although that statute requires

producers of packaged food to disclose the presence of certain allergens, it does not require them

to disclose the potential harmful side effects of consuming those allergens.  *Id.* §§ 202–203 (to be

codified at 21 U.S.C. § 343(w)).  Thus, the Act protects only those consumers who are aware of

their food allergies.  It does nothing to protect consumers, such as members of the class, who are

unaware that they are biologically unable to consume lactose.  Such a shortcoming is especially

pertinent here because Plaintiffs have alleged that the public's general awareness of lactose

intolerance is low.

**B.    No Agency Assistance Is Necessary Because Products Liability Claims Are Within The Conventional Expertise Of Judges**

Contrary to Defendants' assertions, the complaint does not raise issues outside the conventional expertise of judges.  This case is nothing more than a products liability claim, a subject matter that is well within the conventional expertise of judges.  Plaintiffs have not invoked federal law, and resolution of Plaintiffs' claims does not require analysis or interpretation of any federal regulations.  Thus, this case is not at all similar to cases in which courts have invoked the doctrine of primary jurisdiction to defer to agency expertise for reasons of technical complexity.  *See, e.g.*, *United States v. Western Pac. R.R.,* 352 U.S. 59, 66 (1956) ("But where words in a tariff are used in a peculiar or technical sense, and where extrinsic evidence is necessary to determine their meaning or proper application, so that 'the inquiry is essentially one of fact and of discretion in technical matters,' then the issue of tariff application must first go to the Commission."); *Williams Pipe Line Co. v. Empire Gas Corp.,* 76 F.3d 1491, 1498 (10th Cir. 1996) ("We cannot determine whether FERC would consider Williams' tariff indemnity provision unreasonable or discriminatory or otherwise invalid in whole or part.  Likewise, we cannot determine what practice FERC would prescribe if it declared Williams' provision invalid in whole or part."); *Sandoz Pharmaceuticals Corp. v. Richardson-Vicks, Inc.,* 902 F.2d 222, 230 (3d Cir. 1990) ("Such an interpretation of FDA regulations, absent direct guidance from the promulgating agency, is not as simple as Sandoz proposes."); *Bradley v. Weinberger*, 483 F.2d 410, 417 (1st Cir. 1973) ("Moreover, we have here not only novel issues concerning the interpretation of the statute, which the specialized enforcement agency should first undertake, but also unprecedented inquiries as to the meaning of the agency's own regulations.").  Because products liability is an issue within the conventional expertise of judges, invocation of the doctrine is inappropriate here.  *See Continental Airlines, Inc. v. United Air*

23

*Lines, Inc.*, 120 F. Supp. 2d 556, 574 (E.D. Va. 2000) (rejecting defendants' primary jurisdiction

argument after noting that disposition of antitrust claim did not require interpretation of FAA

regulations and that antitrust "is a field in which the FAA has no special expertise").

> C.    **There Is No Risk Of Inconsistent Rulings Because Plaintiffs' Claims Do Not Require Resolution Of Regulatory Issues And The Factual Issue Is Narrow**

In *Allnet Communication Serv., Inc. v. National Exchange Carrier Ass'n*, 965 F.2d 1118

(D.D.C. 1992), this Court noted that the primary jurisdiction doctrine's concern for uniform

outcomes "may be defeated if disparate courts resolve regulatory issues inconsistently." *Id.* at

1121. No regulatory issues are involved here, however. As set forth above, Plaintiffs' claims are

based entirely on District of Columbia products liability law and do not invoke federal law.

Similarly, "there is little danger of inconsistent rulings where the issue presented is a narrow

factual dispute." *Taylor v. Gabelli*, 345 F. Supp. 2d 340, 356 (S.D.N.Y. 2004) (denying

defendants' motion for stay pending referral to FCC in "factually intensive" inquiry into whether

conduct violated FCC bidding rules on de facto control). Here the Court is faced only with a

factual dispute in a traditional products liability context.

> D.    **Plaintiffs Have Made No Prior Application To FDA, And FDA's Adjudicatory Mechanisms Are Insufficient To Provide The Relief That Plaintiffs Seek**

It would be inappropriate for the Court to invoke the primary jurisdiction doctrine where,

as here, Plaintiffs have not made prior application to FDA and there is no assurance that FDA

would ever take action were Plaintiffs to do so. As Defendants note, FDA employs a citizen

petition process through which concerned parties may petition the Commissioner to issue,

amend, or revoke a regulation or order or to take or refrain from taking administrative action. 21

C.F.R. § 10.25(a) (2005). However, FDA's only obligation after the filing of a petition is to

respond within 180 days, and its choice of response is discretionary: it may approve the petition

and take "appropriate action," it may deny the petition, or it may provide a tentative response indicating why it has been unable to reach a decision. *Id.* § 10.30(e)(2).[5]  FDA's other grievance procedure, the consumer complaint, is even more discretionary.  Although there is no statutory or regulatory basis for it, the complaint process is an informal method through which consumers report violations of statutes and regulations to FDA, and it is the only way that FDA responds to requests to take enforcement action.  Any FDA response to consumer complaints is entirely discretionary and "based on the seriousness of the problem."  FDA, Office of Regulatory Affairs, ORA Field Management Directive No. 119 (1994), http://www.fda.gov/ora/inspect_ref/fmd/fmd119.htm (last updated May 21, 1999).  Additionally, FDA is not required to comment publicly or respond to the person who filed the complaint.

The cases cited by Defendants demonstrate that courts should invoke the doctrine of primary jurisdiction only when the parties have a mechanism to seek an administrative ruling. *See, e.g.*, *Reiter*, 507 U.S. at 268 ("It requires the court to enable a 'referral' to the agency, staying further proceedings so as to give the parties reasonable opportunity to seek an administrative ruling."); *United States. v. Western Pac. R.R.,*  352 U.S. 59, 63–64 (1956) ("'Primary jurisdiction,' on the other hand, . . . comes into play whenever enforcement of the claim requires the resolution of issues which, under a regulatory scheme, have been placed within the special competence of an administrative body; in such a case the judicial process is suspended pending referral of such issues to the administrative body for its views.").  Thus, in *Syntek Semiconductor Co. v. Microchip Technology Inc.*, 307 F.3d 775 (9th Cir. 2002), in which the plaintiff sought a declaratory judgment that a copyright registration was invalid, the court invoked primary jurisdiction because "there is an administrative process for cancellation, albeit

---

[5] FDA's response to a petition constitutes final agency action, reviewable in the courts under the Administrative Procedure Act. 21 C.F.R. § 10.45(d) (2005).  The plaintiffs have not, however, made any prior application to any federal agency.

ill-defined, in the Copyright Office." *Id.* at 782.  Similarly, in *Williams Pipe Line Co. v. Empire Gas Corp.*, 76 F.3d 1491 (10th Cir. 1996), the court noted the availability of citizen complaint provisions and ordered a dispute over a tariff provision's validity to be referred to the Federal Energy Regulatory Commission.  *Id.* at 1494, 1498 n.5.  Likewise, in *United States v. An Article of Device Diapulse*, 650 F.2d 908 (7th Cir. 1981), the court invoked the doctrine of primary jurisdiction because the district court had failed to "direct[] the claimant to submit his proposal to the FDA as required by [statute]."  *Id.* at 911.  *See also Thompson v. Texas Mexican Ry. Co.,* 328 U.S. 134, 145 (1946) ("Tex-Mex might invoke the Commission's jurisdiction under s 1(18) and make application for abandonment of operations by Brownsville or its trustee."); *Texas & Pac. Ry. Co. v. Abilene Cotton Oil Co.*, 204 U.S. 426, 442 (1907) ("[I]t may not be doubted that the power of the Commission would nevertheless extend to hearing legal complaints of, and awarding reparation to, individuals for wrongs unlawfully suffered . . . .").  When, as here, the administrative avenue available to citizens amounts to nothing more than a letter-writing campaign, invocation of the doctrine is inappropriate.

Finally, "[t]he parties' interest in a swift resolution of their dispute must be balanced against those factors that might favor deferral."  *APCC Serv., Inc. v. WorldCom, Inc*., 305 F. Supp. 2d 1, 13 (D.D.C. 2001) (denying defendants' request to invoke primary jurisdiction doctrine because interpretation of agency orders did not require special expertise).  *See also Nat'l Communications Ass'n v. AT&T Co*., 46 F.3d 220, 223 (2d Cir. 1995) (reversing district court's dismissal of tariff dispute because invocation of primary jurisdiction doctrine was inappropriate). This is because "[a]gency decisionmaking often takes a long time" and the delay "imposes enormous costs on individuals, society, and the legal system."  *Id.* at 225 (citations omitted).  As this Court can conclude this matter far more quickly and efficiently than an agency can, a

potential delay of several years far outweighs any benefit that might be achieved by deferring the matter to FDA.

Accordingly, the Defendants' primary jurisdiction argument should be rejected, and Plaintiffs' complaint should stand.

## V.   PLAINTIFFS HAVE PROPERLY STATED CLAIMS UNDER PRODUCTS LIABILITY LAW

The standard on a motion to dismiss is set forth in *Atchinson v. District of Columbia*, 73 F.3d 418 (D.C. Cir. 1996) as follows:

> The complaint "should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." We accept as true all of the complaint's factual allegations, giving [the plaintiff] "the benefit of all inferences that can be derived from the facts alleged."

*Id.* at 422 (citations omitted). Additionally, "the issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *Cooper v. First Gov't Mortgage & Investors Corp.,* 206 F. Supp. 2d 33, 36 (D.D.C. 2002).

A manufacturer or seller of a product has a legal duty to warn the user if that product can cause foreseeable harm to the user of the product. *E. Penn Mfg. Co. v. Pineda*, 578 A.2d 1113, 1118 (D.C. 1990). This duty to warn exists when the defendant "knew or should have known of a danger" that is serious enough to require a warning. *Id.* at 1119 (quoting *Russell v. G. A. F. Corp.,* 422 A.2d 989, 992 (D.C. 1980)). Defendants point to the Restatement (Second) of Torts, § 402A cmt. i (1965), which states that an "article must be dangerous to an extent beyond which would be contemplated by the ordinary consumer who purchases it, with the ordinary knowledge common to the community as to its characteristics." *Id.* In the context of allergens, which, like lactose, may injure unwitting consumers, comment j adds the following:

> Where, however, the product contains an ingredient to which a substantial number of the population are allergic, and the ingredient is one whose danger is not generally known, or if known is one which the consumer would reasonably not expect to find in the product, **the seller is required to give warning against it**, if he has knowledge, or by the application of reasonable, developed human skill and foresight should have knowledge, of the presence of the ingredient and the danger.

*Id.* § 402A cmt. j (emphasis added).  Indeed, Plaintiffs have alleged that Defendants' milk contains the ingredient lactose to which a substantial portion of the population of the District of Columbia is intolerant, that the public is generally unaware of lactose intolerance, and that Defendants knew or should have known of the presence of the ingredient and its danger.

The Third Restatement of Torts agrees:

> Cases of adverse allergic or idiosyncratic reactions involve a special subset of products that may be defective because of inadequate warnings. . . .  The general rule in cases involving allergic reactions is that **a warning is required when the harm-causing ingredient is one to which a substantial number of persons are allergic.** . . .  When the presence of the allergenic ingredient would not be anticipated by a reasonable user or consumer, warnings concerning its presence are required.  Similarly, when the presence of the ingredient is generally known to consumers, but its dangers are not, a warning of the dangers must be given.

Restatement (Third) of Torts: Products Liability § 2 cmt. k (1997) (emphasis added).  Thus, courts have increasingly recognized that a duty to warn may exist when food contains harmful ingredients.  *See, e.g.*, *Edwards v. Hop Sin, Inc.,* 140 S.W.3d 13, 16–17 (Ky. App. 2003) (reversing summary judgment in favor of defendants because genuine issue of material fact existed as to whether restaurant had duty to warn customers of risk posed by presence of bacterium in raw oysters); *Livingston v. Marie Callender's, Inc.,* 85 Cal. Rptr. 2d 528, 533–34 (Cal. Ct. App. 1999) (reversing order striking plaintiff's strict liability cause of action because restaurant could be found liable for failure to warn of presence of monosodium glutamate, an ingredient to which a substantial number of the population were allegedly allergic); *Brown v.*

*McDonald's Corp,* 655 N.E.2d 440 (Ohio Ct. App. 1995) (reversing summary judgment in favor of defendants because jury could find a failure to warn consumers of risk of consuming seaweed-derived ingredient in hamburger).

Plaintiffs have alleged that Defendants' products are harmful and dangerous. Under the procedural posture of this case, these allegations must be accepted as true. Defendants have not proven that no set of facts exists to support the claim that milk is a dangerous product for a substantial portion of District of Columbia residents. Nor can this Court rule, as a matter of law, that a product capable of sickening and injuring 75% of the world's population is not dangerous. Accordingly, Defendants' argument that there is no duty to warn should be rejected, and Plaintiffs' complaint should stand.

## VI.    PLAINTIFFS HAVE STATED A VALID CLAIM FOR INJUNCTIVE RELIEF

Defendants have failed to meet their burden of proving that no set of facts would entitle Plaintiffs to relief. This Court considers four factors in evaluating claims for permanent injunctions: "(1) success on the merits, (2) whether the plaintiffs will suffer irreparable injury absent an injunction, (3) whether, balancing the hardships, there is harm to defendants or other interested parties, and (4) whether the public interest favors granting the injunction." *Am. Civil Liberties Union v. Mineta,* 319 F. Supp. 2d 69, 87 (D.D.C. 2004). As this case has not yet been decided on the merits and no preliminary injunction is sought, the Court need not perform this analysis at this time, nor are Plaintiffs required to plead the elements of injunctive relief in their Complaint.

Defendants point to the entirely irrelevant fact that the named plaintiffs, viewed in isolation, could not satisfy the irreparable harm standard for injunctive relief because they are already aware of their lactose intolerance and need no warning with respect to consumption of

29

milk.  That may be the case, but it is irrelevant.  The elephant in the room here is that this case

has been filed as a class action lawsuit, and the named plaintiffs also are serving as

representatives of that class.

       With respect to the class action, there can be no dispute that the class members will suffer

irreparable injury in the absence of injunctive relief.  The dairy industry has spent hundreds of

million of dollars on advertising campaigns to increase consumption of dairy products.  The

dairy industry continues to spend vast sums on consumer misinformation downplaying the

dangers and incidence of lactose intolerance.  Obviously, the mere filing of this lawsuit cannot

adequately educate thousands of District consumers about lactose intolerance or protect

unwitting consumers from experiencing avoidable pain.  The consumption of milk can cause

severe pain, sickness, diarrhea, stomach cramps, flatulence, and bloating for lactose intolerance

individuals, depending on a number of independent factors, such as age, race, amount of milk

consumed, type of milk products consumed, and whether the milk is consumed alone or with

other foods.  Such injury is certain and great, actual and not theoretical.  In fact, diarrhea can

even be fatal.  Further, a finding of irreparable harm is appropriate when it is not possible to

adequately or accurately calculate damages.  *See, e.g.*, *Ross-Simons of Warwick, Inc. v. Baccarat,*

*Inc.*, 217 F.3d 8, 13 (1st Cir. 2000) ("It is settled beyond peradventure that irreparable harm can

consist of 'a substantial injury that is not accurately measurable or adequately compensable by

money damages.'"); *Tom Doherty Assocs., Inc. v. Saban Entm't, Inc.*, 60 F.3d 27, 38 (2d Cir.

1995) ("These cases stand for the general proposition that irreparable harm exists only where

there is a threatened imminent loss that will be very difficult to quantify at trial."); *see also*

*Lakedreams v. Taylor*, 932 F.2d 1103, 1109 (5th Cir. 1991).  The aggregate harm of all Plaintiffs

cannot be quantified monetarily with any certainty because each Plaintiff's harm differs and the

resources required to interview each Plaintiff to assess harm would be prohibitive.  Thus, class members will suffer irreparable harm in the absence of the relief requested.

Defendant Cloverland Farms argues that Defendants would be harmed by the issuance of an injunction due to the "costs of producing specially labeled milk for sale in the District of Columbia."  (Cloverland Br. at 9).  This hardship can easily be eliminated, as nothing prevents Defendants from placing labels on all of their products, whether sold in the District or not.  If this Court finds that Defendants have breached their duty of care toward District of Columbia consumers, it hardly seems appropriate to allow them to escape that duty on the ground that an injunction might hinder their abilities to mislead and injure consumers elsewhere.

Public interest also favors granting the injunction.  Defendants are part of a powerful and influential industry that misleadingly promotes its products as essential to a healthy diet.  The widespread lack of awareness about lactose intolerance ensures that a substantial portion of the District's population will continue to be injured by consuming Defendants' products.  The only way for this lawsuit to result in protection for the class and the public, if Plaintiffs prevail, is for the Court to order Defendants to place warning labels on their milk products.

**VII.    THE DISTRICT OF COLUMBIA SELF-GOVERNMENT AND GOVERNMENTAL REORGANIZATION ACT DOES NOT BAR THE RELIEF SOUGHT BY PLAINTIFFS**

**A.    The Home Rule Act Limits Legislative Authority And Does Not Apply To The Judicial Branch**

In passing the District of Columbia Self-Government and Governmental Reorganization Act, Pub. L. No. 93-198, 87 Stat. 774 (1973) ("Home Rule Act"), Congress delegated to the District of Columbia Council the power to "legislate[] upon essentially local District matters," subject to "retention by Congress of the ultimate legislative authority" over the District.  Home Rule Act § 102.  Congress explicitly limited the Council's legislative authority by stating, in a

provision entitled "Limitations on the Council," "The Council shall have no authority to . . .

[e]nact any act, or enact any act to amend or repeal any Act of Congress, . . . which is not

restricted in its application exclusively in or to the District."  D.C. Code Ann. § 1-206.02(a)(3)

(2005).

Contrary to Defendants' assertions, this limitation on the Council's legislative power

does not apply to the judiciary branch.  It goes without saying that judges are not members of the

Council.  As the Home Rule Act sets forth in "Part A. The Council,"

> (a) There is established a Council of the District of Columbia; and the members of the Council shall be elected by the registered qualified electors of the District.
>
> (b)(1) The Council established under subsection (a) of this section shall consist of 13 members elected on a partisan basis. The Chairman and 4 members shall be elected at large in the District, and 8 members shall be elected 1 each from the 8 election wards established, from time to time, under Chapter 10 of this title. The term of office of the members of the Council shall be 4 years, except as provided in paragraph (3) of this subsection, and shall begin at noon on January 2nd of the year following their election.

*Id.* § 1-204.01.  The appointment of judges is provided for in "Part C. The Judiciary."

> [T]he President shall nominate, from the list of persons recommended by the District of Columbia Judicial Nomination Commission established under § 1-204.34, and, by and with the advice and consent of the Senate, appoint all judges of the District of Columbia courts.

*Id.* § 1-204.33(a).  Further, the Home Rule Act contains no restriction on judicial activity.

Instead, it allows judges to impose necessary injunctive relief by providing that "[t]he Superior

Court has jurisdiction of any civil action or other matter (at law or in equity) brought in the

District and of any criminal case under any law applicable exclusively to the District."  *Id.* § 1-

204.31(a).

Therefore, Defendants' citation of *McConnell v. United States*, 537 A.2d 211 (D.C. 1988), for the proposition that the Council may not pass an act that works an effective repeal of legislation national in scope (Giant Br. at 40) is irrelevant. A judgment of the court is not an act of the Council, and the imposition of injunctive relief limited in scope to the District of Columbia does not act a repeal of legislation that is national in scope. Defendants mistakenly rely on *Cipollone v. Liggett Group, Inc.*, 505 U.S. 504 (1992), claiming that the limitation on the Council's legislative authority extends to "legal duties sought to be imposed through common law actions." (Giant Br. at 40). This is not so. In *Cipollone*, the Supreme Court held only that specific preemption language of the Federal Cigarette Labeling and Advertising Act, as amended, preempted both positive statutory enactments and common law actions arising under state law. *Id.* at 521–24. *Cipollone* does not apply to all common law duties when, as here, claims based on the breach of those duties are not barred by the relevant preemption provision. *See Bates,* 125 S. Ct. at 1800.

**B.    Even if the Home Rule Act Limited Judicial Authority, The Relief Sought By Plaintiffs Is Restricted In Its Application Exclusively In Or To The District**

Furthermore, an order requiring Defendants to place warning labels on their products is, in fact, "restricted in its application exclusively in or to the District," D.C. Code Ann. § 1-206.02 (2005), as illustrated by *American Council of Life Ins. v. District of Columbia,* 645 F. Supp. 84 (D.D.C. 1986). In that case, the Council passed legislation prohibiting insurers from discriminating on the basis of the results of AIDS tests and from denying benefits to an individual who develops AIDS. *Id.* at 85. The insurance company moved for summary judgment and a preliminary injunction, claiming that the law violated the Home Rule Act because it regulated activities beyond the District of Columbia, namely "discriminat[ion] against individuals exposed to AIDS." *Id.* at 85, 88. Finding that the "statute would only apply when

the company was doing business in the District of Columbia," this Court upheld the law and

granted summary judgment for the District.  *Id.* at 89.  *See also Dimond v. District of Columbia,*

618 F. Supp. 519, 527 (D.D.C. 1984) (upholding District statute requiring auto-insurance

companies doing business in the District to provide out-of-state liability coverage against a

challenge that the law violated the Home Rule Act's prohibition on District legislation that

would apply beyond the District), *rev'd on other grounds,* 792 F.2d 179 (D.C. Cir. 1986).

As this Court has stated, "[t]hese cases demonstrate that there is a distinction, for Home

Rule Act purposes, between the incidental effects of local regulation and direct regulation of

external conduct."  *CSX Transp., Inc. v. Williams*, No. Civ. A. 05-338EGS, 2005 WL 902130, at

*23 (D.D.C. Apr. 18, 2005).  The position urged by Defendants would eviscerate the power of

the judiciary to hear cases brought under District law against out-of-state defendants, and clearly

has not been adopted by District of Columbia courts.  *See, e.g.*, *Boyle v. Giral*, 820 A.2d 561

(D.C. 2003) (affirming approval of settlement agreement in class action brought under District of

Columbia Antitrust Act and District of Columbia Consumer Protection Procedures Act against

out-of-state vitamin product distributor); *Rastall v. CSX Transp., Inc.,* 697 A.2d 46 (D.C. 1997)

(affirming judgment for union of Canadian railroad employees, working in Canada, in class

action alleging violation of collective bargaining agreements and decided under District of

Columbia contract law); *Wells v. Allstate Ins. Co.*, 210 F.R.D. 1 (D.D.C. 2002) (granting class

certification in suit alleging that national automobile insurer violated District of Columbia

Consumer Protection Procedures Act).  Given that the injunctive relief sought by Plaintiffs

applies only within the boundaries of the District of Columbia, it "does not run afoul of the

Home Rule Act's requirement that the application of D.C. laws be restricted to the District

simply because it may have financial implications for plaintiff beyond the District." *Williams*,

2005 WL 902130, at *23.  Thus, Defendants' argument should be rejected.

## VIII.  THE IDENTIFICATION OF THE SPECIFIC DEFENDANTS WHO ARE LIABLE FOR MONETARY DAMAGES IS A DISCOVERY ISSUE, NOT A PLEADING REQUIREMENT

Defendant Cloverland Farms Dairy, Inc., correctly states that "plaintiffs have not alleged

that they purchased milk sold by Cloverland."  (Cloverland Br. at 6).  Plaintiffs acknowledge that

they will ultimately need to prove that at least one of the plaintiffs was injured by consuming

each defendant's milk.  The process of identifying which of the defendants harmed each plaintiff

is a discovery issue, not a pleading issue.  At present, two of the named plaintiffs believe that

they were injured by consuming defendant Cloverland's milk.  If, however, the discovery

process reveals that no named plaintiff suffered injury from Cloverland's milk, Plaintiffs will

voluntarily dismiss their damage claims with respect to defendant Cloverland.

CONCLUSION

For all the foregoing reasons, Plaintiffs' Complaint should not be dismissed.


DATED:  December 19, 2005

Respectfully submitted,



_____/s/_____
Daniel Kinburn, Esq.
PHYSICIANS COMMITTEE FOR
RESPONSIBLE MEDICINE
5100 Wisconsin Avenue, N.W.
Washington, D.C. 20016
(202) 686-2210 ext. 308
(202) 686-2155 (fax)

*Counsel for Plaintiffs*